FILED
APR 03 2008 NR
Apr 3, 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| POLARIS SALES INC., ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | 08CV1924 |
| ) | JUDGE ZAGEL |
| HSBC BANK NEVADA, N.A., ) | MAGISTRATE JUDGE MASON |
| Defendant. ) | |
| ) | |

## COMPLAINT

Plaintiff Polaris Sales Inc. ("Polaris") for its Complaint against Defendant HSBC Bank Nevada, N.A. ("HSBC" or "Bank") alleges as follows:

### NATURE OF THE ACTION

1. Polaris, a leading manufacturer and distributor of specialty and recreational vehicles, brings this action for defendant's breach of the parties' Revolving Program Agreement, dated August 10, 2005 ("Agreement"). The Agreement governs, for an initial term of five years, the revolving credit program ("Revolving Program") that enables Polaris customers to finance the retail purchases of products and services from authorized Polaris dealers. The Agreement is a volume-based agreement that is intended to maintain or increase retail sales volume of Polaris products. It is an exclusive Agreement, so Polaris must use HSBC for all of its revolving retail financing programs.

2. This action arises from HSBC's sudden announcement in January 2008, that upon approximately thirty (30) days notice, HSBC would artificially tighten the credit scores it requires to approve loans – thereby slashing the loan approval rates for Polaris's customers by nearly fifty percent – unless Polaris would forgo substantial contractual rights and benefits.

Polaris made multiple requests to HSBC for meaningful information that would explain the purported need for these changes and even proposed alternatives. HSBC, however, ignored Polaris's efforts and failed to meaningfully reconsider its demand. HSBC's actions threatened, and continue to threaten, to cause the sudden and drastic collapse of Polaris retail sales volume and to substantially damage Polaris's dealer relationships, its reputation, and its goodwill. Moreover, HSBC's actions frustrated and defeated the purpose of the Agreement and the Revolving Program.

3. HSBC's actions are commercially unreasonable, and they violate both the terms of the Agreement and HSBC's duty of good faith and fair dealing inherent in the Agreement. Polaris brings this action to obtain a judicial finding and declaration that the wrongful conduct of HSBC constitutes a continuing breach of the Agreement, and to recover damages for the injuries Polaris has and will continue to sustain as a result of HSBC's wrongful conduct.

## THE PARTIES

4. Plaintiff Polaris Sales Inc. is a Minnesota corporation with its principal place of business in Medina, Minnesota. Polaris is a globally recognized manufacturer and distributor of snowmobiles, utility vehicles, all-terrain vehicles, motorcycles, and other related products and services. Polaris sells these products and services through a long-established network of qualified dealers.

5. Defendant HSBC Bank Nevada N.A. is a nationally chartered bank association with its principal place of business in Las Vegas, Nevada. Representatives and agents of Defendant have maintained their principal offices or have participated in material acts alleged herein within this judicial District.

2

## JURISDICTION AND VENUE

6. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 based on the diversity of citizenship among the parties. The amount in controversy exceeds $75,000.00, exclusive of interest and costs. Furthermore, under Section 24 of the Agreement, the parties irrevocably consented and submitted to the exclusive jurisdiction of this Court and the courts of the State of Illinois for the purpose of any suit, action, proceeding, or judgment arising from the Agreement.

7. Venue in this District is proper under 28 U.S.C. §1391(a). Furthermore, in Section 24 of the Agreement, the parties agreed that any suit, action, or proceeding arising out of or relating to the Agreement must be brought solely in the United States District Court for the Northern District of Illinois or the courts of the State of Illinois.

## FACTUAL ALLEGATIONS

8. This action arises from HSBC's continuing and material breach of its long-term, exclusive Agreement, under the terms of which the Bank committed to provide a revolving credit program to enable retail customers to finance the purchase of goods and services from authorized Polaris dealers. The Agreement replaced the parties' 2001 Revolving Program Agreement, as amended ( "2001 Agreement"), under which HSBC and its predecessor financed retail customer purchases and Polaris and HSBC shared the risk of loss on the portfolio. In 2005, at the urging of HSBC, the 2001 Agreement was restructured to increase retail sales volume. Under HSBC's 2005 proposal, Polaris would receive income based upon sales volume, and HSBC assured Polaris that it would manage the Revolving Program to increase sales volume.

9. Based upon HSBC's assurances and representations, Polaris agreed to move to the volume-based structure and entered into the Agreement in August 2005. A true and complete

3

copy of the Agreement, incorporated herein as Complaint Exhibit A, has been filed under seal with the Clerk of the Court pursuant to N.D. Ill. L.R. 5.7(a).

10. Under Section 2 of the Agreement, HSBC provides a revolving credit program through which customers can buy products and services from authorized Polaris dealers using a private label credit card issued by HSBC and bearing the "StarCard" label.

11. Pursuant to the Agreement, Polaris must exclusively use HSBC for all private label credit cards with revolving financing and for other revolving promotional financing.

12. Consumers interested in purchasing products using financing under the Revolving Program submit applications to HSBC through authorized Polaris dealers. HSBC then underwrites and issues credit and a "StarCard" credit card to qualified applicants.

13. The Agreement provides that HSBC shall pay Polaris a "Volume Incentive" that is based on total sales financed through the Revolving Program. Agreement at §3.a and Schedule 3a. Polaris, in turn, pays "Promotional Payments" to HSBC for discounted promotional interest rates offered by the Bank. The Promotional Payments are fixed by the Agreement. *Id.* at §3.b and Schedule 3b. In 2007, Polaris earned approximately $27.4 million in Volume Incentives and paid approximately $13.6 million in Promotional Payments.

14. The Agreement provides that HSBC's criteria for the acceptance of credit customers and other features of the Revolving Program may be changed by mutual agreement of the parties if the dollar volume of "Card Sales" generated by the Revolving Program falls below $350 million during any twelve-month period. In that case, Section 4.g expressly provides that the parties will meet to discuss changes to the Revolving Program, including changes to credit underwriting, the credit promotion mix, or marketing strategies "in an effort to increase Card Sales."

15. HSBC negotiates separate agreements with authorized Polaris dealers that govern their participation in the Revolving Program ("Dealer Revolving Agreements"). The Agreement prohibits HSBC from using the Dealer Revolving Agreement to alter HSBC's and Polaris's rights and obligations under the Agreement. The Agreement affirms that Polaris and HSBC are independent contractors with respect to each other and the Agreement, and that neither Polaris nor HSBC has the power or authority to incur any obligation binding on the other. Agreement at § 2. Section 20 provides, among other things, that Polaris is not a party to and shall not be bound by any agreement between HSBC and authorized Polaris dealers. Furthermore, Polaris is not responsible for "acts between HSBC and dealers," or "for any other obligations of HSBC or any Dealer." *Id.* at § 20.

16. The Agreement binds Polaris exclusively to HSBC's revolving retail financing services for the initial five-year term, followed by automatic successive one year renewals. *Id.* at § 8.a. HSBC may terminate the Agreement upon sixty days notice if the dollar volume of Card Sales generated by the Revolving Program over one year falls below $100 million. The Agreement further provides that "no obligation of either party can be released or waived by either party, except by a writing signed by a duly authorized officer or representative of each party." *Id.* at § 8.b.

17. In 2007, retail sales volume financed under the Agreement was approximately $699 million in Card Sales.

18. In order to enhance the sales volume and related incentives under the Agreement, the parties amended the Agreement, effective October 31, 2007, to grant Polaris a modified Sales Volume Compensation Fee to reflect annual sales volume exceeding $550 million. A true copy

5

of the 2007 Amendment, incorporated herein as Complaint Exhibit B, has been filed under seal with the Clerk of the Court pursuant to N.D. Ill. L.R. 5.7(a).

19. At and around the time of the 2007 Amendment, and at other times pertinent herein, HSBC assured Polaris that its loan losses related to the core Polaris portfolio, and excluding a discontinued program that offered financing for non-Polaris products ("Dealer Choice"), had remained at a relatively consistent and acceptable rate of approximately 5% of total receivables. HSBC did not express any concerns regarding the profitability of the Revolving Program or the ongoing viability of the Agreement or the Revolving Program's structure.

20. In its December 2007 business review with Polaris, HSBC re-affirmed that loan losses in the core Polaris portfolio (excluding Dealer Choice) continued to remain relatively unchanged and at acceptable levels. HSBC did not express any concerns regarding the profitability of the Revolving Program or the Agreement.

## DEFENDANT'S WRONGFUL CONDUCT

21. During a presentation by HSBC to Polaris held on or about January 25, 2008, the Bank suddenly reversed its December 2007 position and assurances by claiming that its average losses on loans were, in fact, expected to be significantly greater than past levels on the core Polaris portfolio (excluding the discontinued Dealer Choice program). In making this claim, HSBC allegedly relied on a new, forward-looking "model" to predict losses to the overall portfolio. HSBC's new model was, for the first time, detached from and ignored the actual historical performance of the Polaris program's loan portfolio. Based upon this new model, HSBC announced that, within approximately thirty (30) days, it would unilaterally tighten the credit scores required to obtain financing under the Revolving Program and thereby drastically

slash loan approval rates for Polaris customers to an unprecedented level. HSBC told Polaris that these changes would be made unless Polaris would forgo its rights under the Agreement by ending the Volume Incentive or increasing Promotional Payments.

22. The result of HSBC's artificial tightening of credit scores would have been a drastic reduction of approved loans and devastation of retail sales. From July to December 2007, HSBC approved approximately 52 percent of applicants under the Revolving Program. Had HSBC implemented its threat to tighten credit scores, HSBC estimated the loan approval rate for Polaris retail customers would have plummeted by more than 47 percent down to approximately 28 percent.

23. The totally unprecedented and unwarranted loan approval rates threatened by HSBC immediately jeopardized hundreds of millions of dollars of sales to otherwise qualified and good Polaris customers. The net result of HSBC's reduction of the loan approval rates for retail customers would have been a severe decrease of annual retail sales volume to below $350 million in Card Sales.

24. Upon receiving HSBC's threat, Polaris made numerous requests to HSBC for factual information to substantiate the claimed need for these changes. To date, HSBC has not provided this information. Even without receiving this information, Polaris offered a solution that reasonably attempted to address HSBC's purported concerns. HSBC rejected Polaris's proposal.

25. HSBC's improper and arbitrary manipulation of its credit criteria is not commercially reasonable and was intended to frustrate and impair the Agreement for several reasons, including without limitation:

7

    a. HSBC has not provided any substantive support to Polaris for the need for its proposed change;

    b. the proposed tightened credit scores would be unprecedented in this type of retail financing;

    c. the proposed credit scores would slash loan approvals and thus, the sales volume under the Agreement by more than 50 percent;

    d. HSBC sought to impose these drastic changes on approximately thirty (30) days notice; and

    e. Polaris has no alternative financing source due to the exclusivity of the Agreement.

26.     HSBC's plan to unilaterally impose changes to the Agreement violates its express requirement that any amendment must be agreed to in writing by both parties.

27.     HSBC knew that its proposed changes would immediately and dramatically impact Polaris, its dealers, and its customers. The changes would reduce retail sales of Polaris products, as potential customers with good credit would be rejected by HSBC. Based upon the parties' past dealings and the nature of the relationships, HSBC knew well and understood that the disruption caused by its arbitrary denial of credit would significantly damage Polaris's goodwill among its dealers and customers.

28.     On February 22, 2008, under severe commercial duress, having no feasible alternative, and due to HSBC's demands, Polaris informed HSBC that it would forgo its Volume Incentive and proceed with modest revisions to underwriting applications to the Revolving Program. Polaris made it clear that its action was only offered under severe duress, without waiver of its rights and remedies under the Agreement, and that it was doing so only to mitigate

its damages from HSBC's breach. Polaris had no other practical alternatives to avoid the severe and drastic interruption of customer's retail credit purchases available at that time.

29. When implementing the changes in March 2008, HSBC went even further than the terms it threatened in January 2008 and unilaterally imposed additional terms and modifications to the Revolving Program, changes that were even more harmful to Polaris's contractual rights.

30. As a result of HSBC's wrongful conduct, Polaris has suffered and will continue to suffer substantial damages through the remaining term of the Agreement in an amount to be proved at trial, but in excess $50 million.

## COUNT I – BREACH OF CONTRACT

31. Polaris repeats and re-alleges each and every allegation contained in paragraphs 1 through 30 above.

32. The Agreement constitutes a valid contract between Polaris and HSBC.

33. Polaris has performed and continues to perform any and all necessary conditions on its part under the Agreement.

34. HSBC has breached and continues to breach the Agreement by imposing changes to its operation of the Revolving Program in violation of the express terms of the Agreement. Among other things, the Bank breached the Agreement by:

    a. Wrongfully ending the Volume Incentive Payments due Polaris in violation of Sections 3.a and 14 of the Agreement, Schedule 3a, and the First Amendment to the Revolving Program Agreement;

    b. Wrongfully raising its Promotion Payments charged by imposing a new formula for the calculation and adjustment of the charge, and by

9

increasing its promotional Annual Percentage Rate adjustment by 9 basis points, all in violation of the Agreement, including Sections 3.b and 14 and Schedule 3b; and

    c. Taking steps to implement unprecedented, unjustified and arbitrary underwriting changes and related procedures to immediately reduce credit approval rates and related sales volumes, and deny financing for Polaris customers who otherwise would have qualified for the Revolving Program in violation of the Agreement, including Sections 4.g and 14.

35. HSBC owes Polaris a duty of good faith and fair dealing that is implied into the Agreement by law, and HSBC has acted in bad faith and breached, and continues to breach, this implied covenant by, among other things, its threats and actions in the middle of long-term, exclusive agreement, to:

    a. unreasonably reduce the availability of credit to Polaris customers;

    b. wrongfully frustrate and impair the contractual purpose of maintaining and increasing Polaris retail sales volume;

    c. force Polaris to forgo its contractual rights and benefits;

    d. demand these changes to the Agreement while at the same time demanding strict compliance by Polaris with the provisions of the Agreement whereby the Bank holds exclusive rights to any Polaris private label credit card or other revolving promotional financing programs;

    e. reduce the approval of consumer applicants to the Revolving Program as a means to drive down sales volume and to force a renegotiation of the

10

    Revolving Program to wrongfully obtain additional material gain for the Bank; and

  f. carry out the Revolving Program to undermine the Agreement and its purposes, being fully aware that, due to the exclusive nature of the Agreement, Polaris had no alternative but to continue to participate in the HSBC program as demanded by HSBC.

36. These actions are in violation of the terms of the parties' Agreement and wrongfully deny Polaris the contractual benefits to which it is entitled.

37. Polaris has been and continues to be harmed by HSBC's breach of the Agreement and its implied duty of good faith and fair dealing, as Polaris has suffered significant and ongoing damages, and impairment to the value of the Agreement.

## COUNT II – DECLARATORY RELIEF

38. Polaris repeats and re-alleges each and every allegation contained in paragraphs 1 through 37 above.

39. The Bank now asserts, in the middle of a long-term, exclusive agreement that:

  a. it may unilaterally, arbitrarily, and significantly reduce approval rates for customer credit applications and thereby reduce retail sales volumes for financed sales by its reduction; and

  b. it may cause Polaris to forgo its contractual rights and benefits by threatening to impose sudden, unreasonable, and drastic reductions of approval rates along with the concomitant loss of retail sales and customers.

40. Polaris believes these assertions and related actions are contrary to and materially frustrate the terms and purposes of the Agreement, and that HSBC's actions to impose same constitute a failure to comply with the Agreement under the indemnity given by HSBC in section 7(b) of the Agreement.

41. Polaris supplied HSBC with due and proper notice of Polaris's claim for indemnity.

42. The Declaratory Judgment Act, 28 U.S.C. sec. 2201, 2201, provides, in pertinent part, that

> [i]n a case of actual controversy within its jurisdiction…any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. s. 2201

43. There is an actual controversy between the Bank and Polaris as set forth above.

44. This actual controversy is within the jurisdiction of this Court.

45. This Court can and should declare the rights and obligations of the parties relative to this controversy.

46. Polaris is entitled to and requests declaratory judgment, whereby this Court resolve this actual controversy between the parties and declare that:

   a. HSBC breached the Agreement by threatening to drastically reduce the approval rate for consumer applicants to the Revolving Program and thereby radically drive down the volume of retail sales of Polaris products and services;

b. HSBC is obligated under the Agreement to continue to provide retail financing based on the applicant approval rates and credit criteria used prior to March 1, 2008, absent evidence that the use of such rates and criteria would directly result in commercially unreasonable losses.

c. HSBC's threats and related actions violate and materially frustrate the terms and purposes of the Agreement all of which has and will continue to harm Polaris in its business, and which constitute a failure to comply with the Agreement as provided under section 7.b therein.

## PRAYER FOR RELIEF

WHEREFORE, Polaris requests that judgment be entered that:

A.  Polaris has been injured by HSBC's wrongful conduct in breach of the express provisions and the implied covenant of good faith in the Agreement between HSBC and Polaris, and as a result, Polaris has been and will continue to be harmed in its business. Polaris is entitled to actual and expectancy damages in an amount to be determined at trial. Polaris also is entitled to such declaratory and equitable relief as is proper to restore the status quo among the parties.

B.  Polaris is entitled to specific performance of the Agreement.

C.  Polaris is entitled to and requests a declaratory judgment declaring that

1. HSBC breached the Agreement by threatening to reduce the approval rate for consumer applicants to the Revolving Program and thereby radically drive down the volume of retail sales of Polaris products and services;

2. HSBC is obligated under the Agreement to continue to provide retail financing based on the applicant approval rates and credit criteria used prior to March 1, 2008, absent evidence that the use of such rates and criteria would directly result in commercially unreasonable losses; and

3. HSBC's threats and related actions violate and materially frustrate the terms and purposes of the Agreement, all of which has and will continue to harm

13

    Polaris in its business, and which constitute a failure to comply with the Agreement as provided under section 7.b therein.

D.   Polaris requests an award for costs incurred herein.

E.   Polaris requests such additional relief that the Court deems just and proper.

Dated: April 3, 2008

            POLARIS SALES INC.

            By: _____
              One of its attorneys

Thomas M. Lynch (6197698)
James J. Hegarty (6280186)
WILDMAN, HARROLD, ALLEN & DIXON LLP
225 West Wacker Drive, Suite 3000
Chicago, IL 60606
(312) 201-2000

*Attorneys for Plaintiff*