IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| POLARIS SALES INC., | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 08 CV 1924 ) ) |
| HSBC BANK NEVADA, N.A., | ) Judge Zagel ) Magistrate Judge Mason |
| Defendant. | ) |

### PLAINTIFF'S ANSWER TO COUNTERLCAIM

Plaintiff Polaris Sales Inc. ("Polaris") answers Defendant HSBC Bank Nevada, N.A.'s ("HSBC") Counterclaim as follows:

### COUNTERCLAIM

1.   Polaris and HSBC clearly and unambiguously stated in their Revolving Program Agreement, dated August 10, 2005 (the "Agreement," a copy of which is attached hereto as Exhibit A) that HSBC would bear the credit risk for the revolving program. Specifically, the Agreement states, "HSBC or its Affiliates shall own all Accounts and shall bear the credit risk for such Accounts." (Agreement, attached hereto as Exhibit A, §2)

**ANSWER:**   Admitted that Polaris and HSBC entered into an a Revolving Program Agreement dated August 10, 2005 (the "Agreement"), that a copy of the Agreement is attached to the Counterclaim as Exhibit A, and that Section 2 of the Agreement includes the quotation alleged, but Polaris denies that paragraph 1 sets out a complete and accurate description of the Program. Polaris denies the remaining allegations contained in paragraph 1.

2.   Not surprisingly, because the parties agreed that HSBC would bear all of the risk associated with the revolving credit program, HSBC has the right to set the credit approval criteria. The provisions of the Agreement are clear and unambiguous as to the nature and extent of the very limited restrictions on HSBC's right to alter those criteria. Specifically, the parties agreed that:

**ANSWER:**   Denied.

  a. HSBC would use particular credit score cut-offs through the end of 2005, as explicitly stated in the Agreement, which provides, "During the period of time beginning ten (10) business days following the Effective Date through December 31, 2005, HSBC agrees to utilize credit score cutoffs used just prior to the January, 2005 score cutoff adjustments. (Agreement, attached hereto as Exhibit A, §4f.)

**ANSWER:** Admitted.

  b. If volume fell below a certain point, the parties would meet to discuss how to increase sales volume, e.g., by modifying credit criteria: "The parties agree that if the dollar volume of Card Sales generated by the Revolving Program during any twelve (12) month period is less than $350,000,000.00, then the parties will meet to discuss proposed changes to the Revolving Program such as, for example, credit underwriting, credit promotion mix, marketing strategies and support, and other proposed changes in an effort to increase Card Sales." (Agreement, attached hereto as Exhibit A, §4g.)

**ANSWER:** Admitted.

  3. If the parties had intended to include in their Agreement other, additional restrictions on HSBC's right to alter credit score cut-offs and other underwriting criteria from and after the end of 2005, they could have. Their inclusion of the few limitations described above indicates that they would have explicitly spelled out any additional imitations, had they intended that there should be any. They chose not to, and HSBC's right to set those criteria from and after the end of 2005 is unrestricted, except for the obligation to meet and discuss if volume should fall below $350 million.

**ANSWER:** Paragraph 3 consists of Defendant's argument and speculation for which no response is required. To the extent a further response is necessary, paragraph 3 is denied.

  4. Volume has not fallen below $350 million.

**ANSWER:** Admitted that the last Program information provided by HSBC reports that twelve month card sales dollar volumes generated by the Revolving Credit Program have not as of yet fallen below $350 million dollars. Polaris states further that HSBC, contrary to the terms of the Agreement, has not provided the last quarterly report to Polaris and has refused repeated

requests by Polaris to supply it with specific information regarding the Program and related activity.

    5.    The parties also made clear HSBC's ability to alter credit criteria in Section 2 of their Agreement, which defines the Agreement's "Scope." Specifically:

    **ANSWER:**    Denied.

    a.    HSBC entered into a separate agreement with the Polaris Dealers who were accepted for participation in the program (the "Dealer Revolving Agreement," a copy of which is attached hereto as Exhibit B). That Dealer Revolving Agreement explicitly states that "All completed applications for Accounts submitted by Dealer to HSBC whether mailed, telephone or otherwise electronically transmitted *will be processed and approved or declined in accordance with such credit criteria and procedures established from time to time by HSBC with HSBC having and retaining all rights to reject or accept such applications.*" (Dealer Revolving Agreement, attached hereto as Exhibit B, §2b)

**ANSWER:**    Admitted that HSBC has entered into separate agreements with Polaris dealers called the Dealer Revolving Agreement, that Exhibit B to the Counterclaim appears to be a form of the Dealer Revolving Agreement that HSBC claims to use, and that Section 2.b. of the form Dealer Revolving Agreement includes the quoted sentence alleged except for the comma omitted in paragraph 5.a. Polaris denies that paragraph 5.a. sets forth a complete and accurate description of the Program. Polaris denies the remaining allegations contained in paragraph 5.a., stating further that HSBC expressly agrees and acknowledges in its Agreement with Polaris, among other things, that Polaris is not a party to any agreement between HSBC and the individual dealers and that Polaris shall not be responsible for the obligations of HSBC and the dealers to one another.

    b.    The Dealer Revolving Agreement – which includes the provision quoted above specifically stating that HSBC alone shall establish the program's credit criteria -- was explicitly referenced by Polaris and HSBC in their Agreement. Specifically, in defining the "Scope" of the Agreement

between them, HSBC and Polaris agreed and acknowledged that, "...Polaris requested and HSBC agreed to provide a Private label Credit Card program and Debt Cancellation program for consumers purchasing Goods from Dealers (the "Revolving Credit Program") *under the terms and conditions of agreements with Dealers ("Dealer Revolving Agreements") entered into heretofore and hereafter between HSBC and Dealers.*" (Exhibit A, Section 2.)

**ANSWER:** Admitted that Section 2.b. of the form Dealer Revolving Agreement includes the quoted sentence alleged in paragraph 5.b. of the Counterclaim except for the comma omitted in paragraph 5.b., and that Section 2 of the Agreement includes the quoted sentence that is alleged in paragraph 5.b. except for the highlighting added to the quotation, but Polaris denies that paragraph 5.b. sets forth a complete and accurate description of the Program. Polaris also denies that the terms of any Dealer Revolving Agreement were incorporated into the Agreement between Polaris and HSBC, stating further that HSBC expressly agrees and acknowledges in its Agreement with Polaris, among other things, that Polaris is not a party to any agreement between HSBC and the individual dealers and that Polaris shall not be responsible for the obligations of HSBC and the dealers to one another. The remaining allegations are denied.

6.   The parties' intent must be gleaned, where possible, from the four corners of the Agreement.

**ANSWER:** Paragraph 6 consists of a legal conclusion for which no response is necessary.

7.   The Agreement is clear and unambiguous on its face: HSBC was to use certain credit score cut-off criteria until the end of 2005, and HSBC will meet with Polaris to discuss modifying such criteria to increase sales volume, should sales volume fall below $350 million. Otherwise, there is no restriction on HSBC's ability to alter credit approval criteria. Indeed, the Agreement is premised upon and makes explicit and specific reference to the Dealer Revolving Agreement, which explicitly states and confirms that the underwriting criteria are to be determined by HSBC.

**ANSWER:** Admitted that the Agreement provides that HSBC must use certain credit score cut-off criteria to the end of 2005 and that HSBC and Polaris would need to discuss action to increase sales volume should the sales volume for the preceding twelve months fall below $350 million. The remaining allegations contained in paragraph 7 are denied.

8. In light of changes in the credit and financing markets, and faced with deteriorating performance of the various promotions offered under the revolving credit program, HSBC notified Polaris in January 2008, that it would be altering the credit criteria for that program. In an effort to mitigate the impact on Polaris, HSBC offered, in addition to and as alternatives to the tightening of the credit criteria, several other options, including altering the participation payments.

**ANSWER:** Denied.

9. Polaris accepted one of the proffered options which provided that changes (including altered approval criteria) would be made to the program in March of 2008.

**ANSWER:** Admitted that HSBC demanded that Polaris accept one of the options that it had proffered to Polaris on or about January 25, 2008, and that under severe commercial duress and protest without waiver of its rights, claims and objections, and in mitigation of its damages, all being expressly raised in its response, Polaris was forced to forgo its Volume Incentive and proceed with proposed modest revisions to underwriting applications to the Revolving Program in order to avoid severe and drastic interruption of customer retail credit purchases. Polaris states further that HSBC further unilaterally revised some of the terms of its "proffered option." The remaining allegations contained in paragraph 9 are denied.

10. The clear and unambiguous language of the agreement establishes both the spirit and intent of the agreement as well as HSBC's compliance with that spirit and intent.

**ANSWER:** Denied.

10. [sic] Polaris alleges that HSBC does not have the right to alter the criteria that it uses to approve credit to consumers under the Agreement.

**ANSWER:** The second paragraph 10 mischaracterizes the allegations set forth in the Polaris Complaint and, therefore, is denied.

11. Polaris alleges that HSBC did not have the right to make the program changes it announced in January 2008, and made in March of 2008, including changes to the criteria it uses to approve credit to consumers under the Agreement.

**ANSWER:** Paragraph 11 mischaracterizes the allegations set forth in the Polaris Complaint and, therefore, is denied.

12. There is an actual controversy under 28 U.S.C., § 2201 between the Bank and Polaris as set forth herein, which controversy is within the proper jurisdiction of this Court.

**ANSWER:** Admitted.

### HSBC'S PRAYER FOR RELIEF

WHEREFORE, HSBC respectfully prays that this Court enter judgment in its favor and grant it the following relief:

A. HSBC asks the Court to declare the rights and obligations of the parties relative to this controversy and declare that:

   a. HSBC has the right under the Agreement to alter the criteria it uses to approve credit to consumers under the Agreement.

   b. HSBC had the right under the Agreement to make the changes it announced in January 2008, and the changes it made in March 2008, to the criteria it uses to approve credit to consumers under the Agreement.

   c. HSBC did not breach the Agreement by announcing its intention to tighten the criteria it uses to approve credit to consumers under the Agreement or by making changes to those criteria.

   d. HSBC is not obligated under the Agreement to continue to provide retail financing based on the applicant approval rates and credit criteria used prior to March 1, 2008.

   e. The clear and unambiguous language of the agreement establishes both the spirit and intent of the agreement as well as HSBC's compliance with that spirit and intent.

B. HSBC also seeks its costs and fees incurred herein, and such other relief as the Court deems just and proper.

**ANSWER:**   Polaris denies that HSBC is entitled to and that Polaris is liable for any of the relief HSBC seeks.

### POLARIS'S AFFIRMATIVE DEFENSE

HSBC's claims are precluded by the defense of duress, based on facts described above and in Polaris's Complaint.

WHEREFORE, Plaintiff Polaris Sales Inc. respectfully asks this Court to enter judgment in its favor and to award it its costs and fees and to grant it such other relief as the Court determines to be just and necessary.

May 21, 2008

        POLARIS SALES INC.,
        Plaintiff


By: __/s/ Thomas M. Lynch_____
      One of its Attorneys

Thomas M. Lynch (Atty. no. 6197698)
James J. Hegarty (Atty. no. 6280186)
Wildman, Harrold, Allen & Dixon LLP
225 West Wacker Drive, Suite 3000
Chicago, IL 60606
(312) 201-2000 / Fax: (312) 201-2555

*Of Counsel:*
Mary P. McConnell
Michael Mitchell
Polaris Industries Inc.
2100 Highway 55
Medina, MN  55340

1879023-1

(763) 542-0500 / Facsimile: (763) 542-0595

Attorneys for Plaintiff Polaris Sales Inc.

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 21, 2008, a copy of the foregoing **Plaintiff's Answer to Counterclaim** was filed with the Clerk of U.S. District. Notice of this filing will be sent to the following parties by operation of the court's electronic filing system. Parties may access this filing through the Court's system.

Ronald S. Safer
Linda K. Stevens
Schiff Hardin LLP
6600 Sears Tower
Chicago, IL  60606

    /s/ Thomas M. Lynch