## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| POLARIS SALES INC., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 08 CV 1924 |
| | ) | |
| v. | ) | Judge Zagel |
| | ) | |
| HSBC BANK NEVADA, N.A., | ) | Magistrate Judge Mason |
| | ) | |
| Defendant. | ) | |

## HSBC'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

The circumstances surrounding this case can be summarized quite simply. Polaris Sales, Inc. ("Plaintiff" or "Polaris") and HSBC Bank Nevada, N.A. ("Defendant" or "HSBC") signed the Revolving Program Agreement ("Program Agreement" or "Agreement") setting forth the terms by which HSBC would provide revolving credit financing to eligible consumers making purchases from participating Polaris dealers. Polaris is displeased by the consequences of the clear and bargained-for terms set forth in the Program Agreement, and, in an effort to avoid those consequences, has filed a meritless lawsuit against HSBC.

The nature of this dispute can be summarized just as simply: the parties dispute the meaning of the Program Agreement's terms. Polaris has filed a complaint alleging that HSBC breached the Program Agreement by altering, and does not have the right to alter, the credit terms that HSBC uses to determine which consumers may receive credit under the parties' revolving credit program. HSBC has filed an Answer, Affirmative Defenses and Counterclaim asserting that the Program Agreement does give it that right.[1] The question for the Court,

---

[1] Polaris has not asserted a separate and distinct claim for breach of the covenant of good faith and fair dealing, but allegations of the Complaint do refer to such a covenant and its breach. HSBC's counterclaim, and its current Motion for Summary Judgment, are dispositive as to Polaris' claims, even if

therefore, is whether HSBC has the right to alter its revolving credit approval criteria. As established herein, HSBC does have that right under the clear and unambiguous terms of the Program Agreement.

## PROCEDURAL POSTURE

On April 3, 2008, Polaris filed its Complaint alleging that HSBC violated the terms of the Program Agreement by announcing its intention to tighten the criteria it uses to approve credit to consumers under the Agreement and by making changes to those criteria. Specifically, Count I asserts causes of action for Breach of Contract, and Count II requests a Declaratory Judgment that HSBC's conduct violated the contract and that HSBC is contractually obligated to utilize the previous set of criteria in approving credit to be extended under the Agreement.

On May 1, 2008, HSBC filed its Answer, Additional Defenses, and Counterclaim ("Answer"). HSBC's counterclaim seeks a declaratory judgment that (1) HSBC has the right under the Agreement to alter the criteria it uses to approve credit to consumers under the Agreement; (2) HSBC had the right under the Agreement to make the changes it announced in January 2008, and the changes it made in March 2008, to the criteria it uses to approve credit to consumers under the Agreement; (3) HSBC did not breach the Agreement by announcing its intention to tighten the criteria it uses to approve credit to consumers under the Agreement or by making changes to those criteria; and (4) HSBC is not obligated under the Agreement to

---

they are read to include a claim for breach of the covenant of good faith and fair dealing, because, as established herein, the "spirit and purpose" of the Agreement can be gleaned from within its four corners, and HSBC's conduct is consistent therewith. *See e.g., LaForge v. State Univ. and Cmty. College Sys. of Nev.*, 116 Nev. 415, 422, 997 P.2d 130, 135 (Nev. 2000) (determining that there was no breach of contract or breach of the covenant of good faith and fair dealing based on reading of plain language of the contract); *Cordry v. Vanderbilt Mort. & Fin., Inc.*, 445 F.3d 1106, 1111 (8th Cir. 2006) (looking to contractual language to ascertain parties' intentions for purposes of analyzing claim for breach of the covenant of good faith and fair dealing filed against lender).

continue to provide retail financing based on the applicant approval rates and credit criteria used prior to March 1, 2008.

HSBC is entitled to judgment as a matter of law because the parties' Agreement is clear and unambiguous regarding HSBC's right to set the criteria under which it will extend credit, and HSBC's conduct is consistent with the express and unambiguous terms of the Agreement, as well as the spirit and intent of the Agreement, as established by the express terms of that Agreement. Accordingly, Defendant respectfully requests that the Court grant its Motion for Summary Judgment.

## FACTS[2]

### A.    The Revolving Credit Program

HSBC is a nationally chartered bank association located in Las Vegas, Nevada. (Facts at ¶ 3) Through its revolving credit programs, HSBC issues credit cards to eligible consumers of retail store products and the products of companies such as Polaris. Polaris is a company engaged in the sale of snowmobiles, utility vehicles, all terrain vehicles, motorcycles, and other related products and services through a distribution network of Dealers. (Facts at ¶ 2)

On August 10, 2005, the parties entered into a Revolving Program Agreement (the "Agreement" or the "Program Agreement"), in which HSBC agreed to provide a Private Label Credit Card Program and Debt Cancellation Program ("the Program") for eligible consumers making purchases from authorized Polaris dealers. (Facts at ¶¶ 8, 11)

### B.    The Program Agreement Expressly Sets Forth All Restrictions Upon HSBC's Right to Establish Credit Criteria

Polaris and HSBC clearly and unambiguously stated in their Program Agreement that HSBC would bear the credit risk for the revolving program. The Agreement expressly states,

---

[2] The facts set forth in Defendant's Rule 56.1 Statement of Uncontested Facts are expressly incorporated herein by reference, and shall be referred to as "Facts at ¶ __."

"HSBC or its Affiliates shall own all Accounts and shall bear the credit risk for such Accounts." (Facts at ¶ 11)

Not surprisingly, because the parties agreed that HSBC would bear all of the risks associated with the revolving credit program, the parties put only one limited restriction upon HSBC's right to set the approval criteria by which it would extend credit under the program and specified one action that could be required of HSBC in conjunction with its choice of credit criteria. (Facts at ¶¶ 14, 15) The provisions of the Agreement are plain and unambiguous as to the nature and extent of that limited restriction and requirement. Specifically, the parties agreed that:

- HSBC would use particular credit score cut-offs through the end of 2005, as explicitly stated in the Agreement, which provides, "During the period of time beginning ten (10) business days following the Effective Date through December 31, 2005, HSBC agrees to utilize credit score cutoffs used just prior to the January, 2005 score cutoff adjustments. (Facts at ¶ 14)

- If volume fell below a certain point, the parties would meet to discuss how to increase sales volume, e.g., by modifying credit criteria: "The parties agree that if the dollar volume of Card Sales generated by the Revolving Program during any twelve (12) month period is less than $350,000,000.00, then the parties will meet to discuss proposed changes to the Revolving Program such as, for example, credit underwriting, credit promotion mix, marketing strategies and support, and other proposed changes in an effort to increase Card Sales." (Facts at ¶ 15)

If the parties had intended to include in their Agreement other additional restrictions on HSBC's right to alter credit score cut-offs and other underwriting criteria from and after the end of 2005, they could have. For example, the parties certainly knew how to draft a provision requiring Polaris' prior approval for actions to be taken by HSBC -- they included in the Agreement many such provisions. (Facts at ¶ 18) None of those provisions relate to the criteria or terms for providing revolving credit, however. On those issues, HSBC is given control and discretion. (Facts at ¶¶ 11, 12, 16, 19, 20, 21) The parties' inclusion of the few explicit and limited restrictions described above, therefore, indicates that HSBC's right to set its credit

criteria from and after the end of 2005 is unrestricted, except for the obligation to meet and discuss if volume should fall below $350 million. Volume has not fallen below $350 million. (Facts at ¶ 17)

**C.   The "Scope" of the Agreement Explicitly Allows HSBC to Change Credit Criteria**

The parties also made clear HSBC's ability to alter credit criteria in Section 2 of their Agreement. Specifically, in defining the "Scope" of the Agreement between the parties, HSBC and Polaris explicitly agreed and acknowledged that, " . . . Polaris requested and HSBC agreed to provide a Private Label Credit Card program and Debt Cancellation program for consumers purchasing Goods from Dealers (the "Revolving Credit Program") *under the terms and conditions of agreements with Dealers ("Dealer Revolving Agreements") entered into heretofore and hereafter between HSBC and Dealers*." (Facts at ¶ 11) (emphasis added)

The form "Dealer Revolving Agreement," which governs the relationship between HSBC and Polaris Dealers who are accepted for participation in the program, explicitly states that "[a]ll completed applications for Accounts submitted by Dealer to HSBC whether mailed, telephoned or otherwise electronically transmitted *will be processed and approved or declined in accordance with such credit criteria and procedures established from time to time by HSBC with HSBC having and retaining all rights to reject or accept such applications*." (Facts at ¶ 12) (emphasis added)  The parties' reference to these Dealer Revolving Agreements – and this clear and unambiguous language -- in defining the "Scope" of their own Agreement confirms and establishes that HSBC is entitled to "establish from time to time" the credit criteria it uses to approve the consumers to whom it would extend revolving credit.

**D.    The Spirit and Intent of the Agreement Gives HSBC The Right To Determine The Terms By Which It Deals With Consumers**

Additional provisions of the Program Agreement, while not dealing expressly with credit criteria, also confirm the parties' spirit and intent that HSBC would have control over the terms by which it deals with consumers.  For example:

- Section 1i of the Program Agreement, which sets forth definitions for purposes of construing the Agreement, provides, "'Cardholder Agreement' means as to any Account, the related application and agreement between the Cardholder and HSBC, governing the terms and conditions of such Account, *as such agreement may be amended from time to time by HSBC*."  (Facts at ¶ 21(A)) (emphasis added)

- Section 1n of the Program Agreement provides, "'Credit Promotion' means the promotional plans set forth in the Cardholder Agreements."  (Facts at ¶ 21(B))

- Section 1o of the Program Agreement provides, "'Credit Promotion Period' means the promotional period for the promotional plans set forth in the Cardholder Agreements.'"  (Facts at ¶ 21(C))

- Section 6 of the Agreement provides, "The Cardholder Terms between HSBC and the consumer(s) who purchase Goods from the Dealers are set forth on Schedule 6.  HSBC reserves the right to amend the terms of the Cardholder Agreement (other than the terms and conditions of the Credit Promotions previously agreed to in writing by the parties) *in its sole discretion* and with reasonable advance notice to Polaris.  (Facts at ¶ 21(D)) (emphasis added)

**E.    HSBC Announced Changes To, And Changed, The Credit Criteria.**

In light of changes in the credit and financing markets, and faced with deteriorating performance of the various promotions offered under the revolving credit program, on January 25, 2008, HSBC notified Polaris that it was implementing changes to the credit criteria for the Program.  (Facts at ¶ 22)  In an effort to ease the potential impact of these changes on Polaris, HSBC offered, in addition to, and as an alternative to the tightening of the credit criteria, several other options that Polaris could choose that would require less tightening of the credit criteria, including altering the participation payments under the Agreement.  (Facts at ¶ 23)  HSBC also

expressed that it was willing to agree to an early termination of the Agreement in order to allow Polaris to obtain a substitute revolving credit provider. (Facts at ¶ 24)

On February 22, 2008, Polaris selected one of the alternative options presented by HSBC, although it claimed to do so "under duress." (Facts at ¶ 26) Pursuant to the option chosen by Polaris, the following terms became effective March 1, 2008:

- The Revolving Program Compensation Fee will end effective March 1, 2008. The compensation fee will be paid for the February 2008 period.

- The Credit Promotion Discount Fees will be recalculated on March 1, 2008 using the method provided in the Agreement and using the business daily average LIBOR for February 2008. Further, the LIBOR Adjustment shall be multiplied by 80%. The discounts calculated on March 1 shall be applicable for the period of March 1, 2008 through May 31, 2008. This methodology will continue in subsequent three-month periods using LIBOR for the last month in the preceding period so long as LIBOR remains in the range of 2.2% to 4.2%. If LIBOR exceeds 4.2% or drops below 2.2% the calculation will have to be revisited.

- As of March 1, 2008, all promotional APRs will be increased 9 bps (e.g., 9.90% increased to 9.99%).

- All non-contractual promotions end effective February 29, 2008. Extension of non-contractual promotions will be reviewed on a case-by-case basis.

- Underwriting changes will be implemented effective March 19, 2008. As indicated in the e-mail dated February 21, 2008, the revised cut-off scores will be a NextGen of 600, CAP of 230 and a BPS of 899. The NextGen and CAP will be implemented using a matrix with a "stair step."

(Facts at ¶ 26)

**F.    Polaris Asserts A Breach Of The Agreement.**

On April 3, 2008, Polaris filed its Complaint alleging breach of contract and seeking a declaratory judgment. (Facts at ¶ 29) On May 2, 2008, HSBC filed an Answer, Additional Defenses, and Counterclaim seeking declaratory judgment. (Facts at ¶ 30) The dispute therefore is ripe for adjudication.

## LEGAL ARGUMENT

### I.    Nevada Law Should Be Applied

The Revolving Program Agreement provides, in pertinent part, that the agreement "shall be governed by and construed in accordance with the laws of the state of Nevada." (Facts at ¶ 6) Accordingly, the Court should apply Nevada law in this case.[3]

### II.    Summary Judgment Standard

Summary judgment should be granted when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "Rule 56(c) mandates the entry of summary judgment" if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986). The non-moving party cannot defeat summary judgment "simply [by] show[ing] that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, "the nonmoving party must come forward with specific facts showing that there is a *genuine issue* for trial," and must offer "significant probative evidence tending to support the complaint." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986).

The Seventh Circuit "favors summary judgment as a means to resolve disputes over the interpretation of a contract." *Tingstol Co. v. Rainbow Sales, Inc.*, 218 F.3d 770, 771 (7th Cir. 2000) (affirming entry of summary judgment); *Global Computing, Inc. v. Hartford Cas. Ins. Co.*,

---

[3] Illinois courts respect contractual choice-of-law provisions as long as the contract at issue is valid. *Kohler v. Leslie Hindman, Inc.*, 80 F.3d 1181, 1185 (7th Cir. 1996).

No. 05 C 6753, 2007 WL 844618, *2 (N.D. Ill. March 14, 2007).   While ordinarily "the question of contract interpretation, being a question of the parties' intent, is a question of fact . . . [w]here there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law . . . ."  *Capitol Indem. Corp. v. Blazer*, 51 F. Supp. 2d 1080, 1083-84 (D.Nev. 1999); *McDonald's Corp. v. C.B. Mgmt. Co., Inc.* 13 F. Supp. 2d 705 (N.D. Ill. 1998); *Tallmadge Bros., Inc. v. Iroquois Gas Transmission Sys., L.P.*, 252 Conn. 479, 495, 746 A.2d 1277, 1287 (Conn. 2000).

## III.    The Revolving Program Agreement Is Clear And Unambiguous

Where the language of a contract is not ambiguous, a court must enforce it in accordance with its provisions. *Lindley & Co v. Piggly Wiggly Nev. Co.*, 55 Nev. 458, 39 P.2d 903 (Nev. 1935).  Where, as here, there is no ambiguity, parole evidence is not necessary and may not be introduced to explain its meaning.  *Geo. B. Smith Chem. Works, Inc. v. Simon, II*, 92 Nev. 580, 582, 555 P.2d 216 (Nev. 1976); *Kaldi v. Farmers Ins. Exch.*, 117 Nev. 273, 281, 21 P.3d 16, 21 (Nev. 2001).  Rather, the Court should ascertain the intent of the parties from the language of their contract. *LaForge v. State University and Community College System of Nevada*, 116 Nev. 415, 422, 997 P.2d 130, 135 (Nev. 2000); *Cincinnati Microwave, Inc. v. Wilson*, 705 F. Supp. 1453, 1456 (D.Nev. 1989); *Larson v. B.R. Enter., Inc.*, 104 Nev. 252, 256, 757 P.2d 354, 357 (Nev. 1988); *University of Nevada, Reno v. Stacey*, 116 Nev. 428, 432, 997 P.2d 812, 814 (Nev. 2000); *see also Cordry v. Vanderbilt Mort. & Fin., Inc.*, 445 F.3d 1106, 1111 (8th Cir. 2006).

A review of the Program Agreement, and the Dealer Revolving Agreement to which the Agreement explicitly refers, comprise a clear and unequivocal agreement.  As such, the parties' intent is a question of law, not fact, and summary judgment can be properly entered without the parties engaging in any discovery practice. *Chwialkowski v. Sachs*, 108 Nev. 404, 406, 834 P.2d 405 (Nev. 1992) (summary judgment was appropriate based on plain reading of unambiguous

contract); *Capitol Indem. Corp.*, 51 F. Supp. 2d at 1084, fn1 (rejecting assertion that motion for summary adjudication was premature where the parties had not completed discovery on grounds that discovery would not aid the Court's interpretation of an unambiguous contract); *LaForge*, 997 P.2d at 135 (Nev. 2000) (determining that there was no breach of contract based on reading of plain language of the contract); *Echo, Inc. v. Whitson Co., Inc.*, 52 F.3d 702, 705 (7th Cir. 1995) (affirming order granting summary judgment based on construction of unambiguous contract).

### IV.  HSBC Has The Right To Unilaterally Change Consumer Credit Criteria

The language of the Program Agreement conclusively demonstrates that the parties intended that HSBC have the right to change credit criteria in its sole discretion. (Facts at ¶¶ 11, 11, 15, 18, 19, 20)  This intent is evidenced throughout the Agreement—both expressly and implicitly.

One of the primary indicators that the parties intended for HSBC to have sole discretion in establishing consumer credit criteria is that the parties agreed that HSBC would bear all credit risks for consumer accounts. (Facts at ¶¶ 11, 19)  This agreement, which is conspicuously set forth in the provision establishing the "Scope" of the Agreement, subjects HSBC to the unique risks associated with extending revolving, or "credit card" financing to consumers.  This risk is dramatically increased in the context of a capricious or lagging economy.  Accordingly, it would be contrary to the parties' explicitly expressed intentions – and common sense – for HSBC to give Polaris a veto authority over HSBC's credit criteria decisions, which could ultimately subject HSBC, alone, to greater risk and economic losses.  *See Geo. B. Smith Chem. Works, Inc.*, 92 Nev. At 582 (it was error for the court to disregard the plain language of the agreement and revise it); *Cincinnati Microwave, Inc.*, 705 F. Supp. at 1455 (absent explicit contractual provisions to the contrary, the Court could not expect that the [party to the contract] would

contractually preclude itself from the opportunity to conduct business in accordance with its own business judgment).

The parties' intent is further demonstrated by the express provisions of the Agreement. This is not a case where the pertinent agreement is silent as to a topic or a party's rights with regard to a topic. Here, the parties explicitly addressed and memorialized the limitations and restrictions on HSBC's right to set credit criteria. As set forth in the Facts section, *supra*, Section 4f of the Agreement reflects HSBC's agreement to utilize credit score cutoffs used just prior to the January 2005 cutoff from August 24, 2005 through December 31 2005. (Facts at ¶ 14) This provision demonstrates that (1) the parties intended that with the exception of this limitation, the establishment of credit score cutoffs be in the sole discretion of HSBC; otherwise the Agreement would state "*the parties* agree to utilize credit score cutoffs..."; and (2) HSBC was limited in its choice of credit criteria only through the end of 2005. *Traffic Control Services, Inc. v. United Rentals Northwest, Inc.*, 120 Nev. 168, 176, 87 P.3d 1054, 1059 (Nev. 2004) (where asset sale agreement listed three non-competition covenants as "assumed contracts" and was silent as to a fourth non-competition covenant, the court could not interpolate the fourth non-competition covenant into the contract).

The only other provision giving Polaris any right pertaining to HSBC's credit criteria is Section 4(g), which requires that HSBC meet with Polaris to discuss changes in the program if sales volume falls below $350 million. (Facts at ¶ 15) As a primary matter, volume has not fallen below $350 million. (Facts at ¶ 17) Consequently, Section 4(g) has no application in this case – other than as a further illustration that the parties fully addressed and stated in the Program Agreement their intentions and agreement regarding HSBC's ability to alter the criteria

under which it would provide credit for the program.[4]  However, even if this provision were applicable (and it is not), a plain reading of the provision demonstrates that there is no requirement that such meeting could require or prohibit a change in credit criteria or even that such a meeting must result in consensus before HSBC can change the criteria.  Thus, to construe the contract as requiring Polaris' "agreement" would require the insertion of a term not agreed to by the parties.  *Id.*; *Kaldi*, 117 Nev. at 281.

Indeed, a plain reading of the Program Agreement demonstrates that wherever the parties intended that Polaris should have a right of approval or agreement as to <u>any</u> HSBC conduct, they set forth express terms referencing that right.  For example:

- Section 1t provides, "'Marketing Expenses' means and includes, but is not limited to, expenses for point of sale materials, direct mail materials, general media advertising and any other marketing materials related to promoting and marketing the Revolving Program *mutually agreed upon by HSBC and Polaris*.  Marketing Expenses shall not included discounts associated with Credit Promotions or Participation Fees."  (Facts at ¶ 18(A)) (emphasis added);

- Section 4h provides, "HSBC agrees that all Dealer-facing service representatives will be based on locations within the United States *unless otherwise agreed upon by the parties*."  (Facts at ¶ 18(C)) (emphasis added);

- Section 4c provides, "Polaris agrees to actively promote the Revolving Program with both Dealers and consumers including, but not limited to, providing such Dealer training and consumer marketing regarding the Revolving Program *mutually agreed to by Polaris and HSBC*."  (Facts at ¶ 18(D)) (emphasis added);

- Section 12 provides, "[d]uring and after the term of this Agreement, HSBC and or/its Affiliates shall have the non-exclusive right to solicit Cardholders for the products set forth in Schedule 12, attached hereto.  HSBC may add additional products to Schedule 12 after the Commencement Date of the Agreement, but any additions to the products set forth in Schedule 12 *shall receive Polaris' prior review*."  (Facts at ¶ 18(E)) (emphasis added);

- Section 18 provides, "Polaris hereby authorizes HSBC, solely for the purposes and obligations described in the Agreement, to use Polaris' name, logo, registered trademarks

---

[4] Interestingly, it is most likely that the underwriting changes to be discussed in a falling-volume situation would be to *relax* or loosen credit criteria, thereby stimulating more sales, but in this case, the credit criteria changes of which Polaris complains were changes to *tighten* the criteria, making it even more clear that Section 4g does not apply to the disputed changes in any event.

and service marks (if any) and any other propriety designations ("Proprietary Materials") on the credit cards, applications, periodic statements, billing statements, collection letters, documents, promotional or advertising materials and otherwise in connection with the Revolving Program, *subject to Polaris' periodic reasonable review of such use and to such reasonable specifications of Polaris.*" (Facts at ¶ 18(I)) (emphasis added);

- Schedule 3c provides, "HSBC and Polaris each agreed to equally contribute up to $250,000.00 to a marketing budget in the amount of $500,000.00 per Program year for expenses related to promoting and marketing the Revolving Program ("Marketing Expenses") *which are mutually agreed to by Polaris and HSBC*. Contributions shall be made monthly as Marketing Expenses included in an approved budget become payable." (Facts at ¶ 18(J)) (emphasis added);

- Section 21 of the Program Agreement provides, "HSBC shall offer a debt cancellation product ('Debt Cancellation') to Cardholders, which may be made available through the *following mutually agreed upon channels*: (1) Card applications available at point of sale, and (2) other business channels including direct mail, inbound telemarketing, outbound telemarketing and card carriers in the states agreed upon by the parties in accordance with [certain terms]." (Facts at ¶ 18(F)) (emphasis added);

- Section 21.B.1 provides, "HSBC may from time to time, at its discretion, revise the Terms and Conditions and the Debt Cancellation disclosures provided to Polaris. HSBC will notify Polaris of any changes. *If such changes, in Polaris reasonable judgment, materially change the Debt Cancellation program, Polaris may required HSBC to cease offering Debt Cancellation on new customers.*" (Facts at ¶ 18(G)) (emphasis added);

- Section 21.B.2 provides, "HSBC may from time to time, increase or decrease [applicable fees for Debt Cancellation] at its discretion. HSBC will notify Polaris of any changes. *If such changes, in Polaris' reasonable judgment, materially change the Debt Cancellation program, Polaris may require HSBC to cease offering Debt Cancellation on new customers.*" (Facts at ¶ 18(H)) (emphasis added).

It is thus evident that the parties knew how to require Polaris' agreement or approval. When it came to HSBC's ability to control the terms on which it would deal with revolving credit consumers – including its right to alter credit criteria – the parties chose not to require Polaris' agreement or approval.

Any interpretation of the Agreement that purports to require Polaris' approval or "mutual agreement" regarding changes to credit criteria therefore would constitute a distortion of the plain meaning of the contract. *Capitol Indem. Corp.*, 51 F. Supp. 2d at 1084; *Watson v. Watson*, 95 Nev. 495, 496, 596 P.2d 507, 508 (Nev. 1979). (When contract language is clear and

unambiguous, a court cannot, under the guise of interpretation, distort the plain meaning of the contract.)  Courts are not permitted to rewrite the terms of an unambiguous contract in this manner.  *Kaldi*, 117 Nev. at 281.  ("[Courts] are not free to modify or vary the terms of an unambiguous agreement."); *Old Aztec Mine, Inc. v. Brown*, 97 Nev. 49, 52, 623 P.2d 981, 983 (Nev. 1981) (courts have no power to create a new contract for the parties which they have not created or intended themselves).

In addition to the aforementioned provisions, the express language contained in the provision defining the "Scope" of the Program Agreement also demonstrates the parties' intent and agreement.  This provision states that HSBC would provide the Program "under the terms and conditions of agreements with Dealers ('*Dealer Revolving Agreement*') entered into heretofore and hereafter between HSBC and Dealers." (Facts at ¶ 11)  The Dealer Revolving Agreement is thus incorporated into the Program Agreement by reference.[5]  *In re Resort at Summerlin Litig.*, 122 Nev. 177, 127 P.3d 1076, 1080 (Nev. 2006) (holding that deed incorporated credit agreement by reference); *In re Musicland Holding Corp.*, 374 B.R. 113, 121, 48 Bankr. Ct. Dec. (S.D.N.Y. 2007) (holding that the unambiguous provisions of the intercreditor agreement gave defendant the discretion to make amendment to revolving credit agreement).

The Dealer Revolving Agreement explicitly gives HSBC sole discretion to establish credit criteria and procedures.  (Facts at ¶ 12)  Since the Program Agreement incorporates the Dealer Revolving Agreement and the Dealer Revolving Agreement expressly gives HSBC the right to unilaterally establish credit criteria, HSBC was well within its discretion when it announced its intention to do so.  *Id.*

---

[5] There are at least nine other references to the Revolving Dealer Agreements contained within the Revolving Program Agreement.  (Facts at ¶ 13)

Finally, to the extent that it is necessary to look any further to determine the meaning or the spirit and intent of the Program Agreement, further guidance is plentiful. For example, additional provisions of the Program Agreement, while not dealing expressly with credit criteria, establish and confirm the parties' intent that HSBC would have control over the terms by which it deals with consumers. (Facts at ¶ 20) Because the establishment of credit criteria is inextricably intertwined with these additional terms, the fact that HSBC had sole control over them further confirms the intent of the contract, namely, that HSBC had the right to unilaterally tighten consumer credit criteria. *Eversole v. Sunrise Villas VIII Homeowners Ass'n*, 112 Nev. 1255, 1260, 925 P.2d 505, 509 (Nev. 1996) ("contractual provisions should be harmonized whenever possible…and construed to reach a reasonable solution") (internal citations omitted).

## CONCLUSION

The plain language of the Agreement makes it clear that the meaning, spirit, intent and purpose of the Agreement is that HSBC have the right to alter the criteria it uses to approve credit to consumers under the program. Consequently, HSBC respectfully requests that this Court enter summary judgment in its favor and declare that (1) HSBC has the right under the Agreement to alter the criteria it uses to approve credit to consumers under the Agreement; (2) HSBC had the right under the Agreement to make the changes it announced in January 2008, and the changes it made in March 2008, to the criteria it uses to approve credit to consumers under the Agreement; (3) HSBC did not breach the Agreement by announcing its intention to tighten the criteria it uses to approve credit to consumers under the Agreement or by making changes to

those criteria; and (4) HSBC is not obligated under the Agreement to continue to provide retail

financing based on the applicant approval rates and credit criteria used prior to March 1, 2008.

Dated:  May 27, 2008

Ronald S. Safer
Linda K. Stevens
SCHIFF HARDIN LLP
6600 Sears Tower
Chicago, Illinois  60606
312-258-5500

Attorneys for Defendant
HSBC BANK NEVADA, N.A.