IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| POLARIS SALES INC., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 08 CV 1924 |
| | ) | |
| v. | ) | Judge Zagel |
| | ) | |
| HSBC BANK NEVADA, N.A., | ) | Magistrate Judge Mason |
| | ) | |
| Defendant. | ) | |

**DEFENDANT HSBC BANK NEVADA, N.A.'S STATEMENT OF UNCONTESTED
FACTS PURSUANT TO LOCAL RULE 56.1(a)(3)**

In support of its Motion for Summary Judgment pursuant to Federal Rule of Civil
Procedure 56(c), and in accordance with Local Rule 56.1(a)(3) of this Court, Defendant HSBC
Bank Nevada, N.A. ("HSBC") hereby submits the following statement of material facts as to
which there is no genuine issue:

### Parties, Jurisdiction And Venue

1.      Polaris Sales, Inc. ("Polaris" or "Plaintiff") is a Minnesota corporation with its
principal place of business in Medina, Minnesota.  (Complaint, which is attached hereto as
Ex. A, §4; Defendant's Answer, Additional Defenses, and Counterclaim ("Answ."), which is
attached hereto as Ex. B, §4)

2.      Polaris is engaged in the sale of snowmobiles, utility vehicles, all terrain vehicles,
motorcycles, and other related products and services ("Goods") through a distribution network of
Dealers.  (The Revolving Program Agreement ("Program Agreement" or "Agreement"), which is
attached hereto as Ex. C, §2.; Ex. A, §4)

3.      HSBC is a nationally chartered bank association located in Las Vegas, Nevada.
(Ex. A, §5; Ex. B, §5; Ex. C, Introduction ("Intro."))

1

4.      Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 based on the diversity of citizenship among the parties. (Ex. A, §6; Ex. B, §6)  The amount in controversy exceeds $75,000.00, exclusive of interest and costs. (Ex. A, §6; Ex. B, §6)  Furthermore, in Section 24 of the Program Agreement, the parties consented and submitted to the exclusive jurisdiction of this Court and the courts of the State of Illinois for the purpose of any suit, action, proceeding, or judgment arising from the Program Agreement. (Ex. A, §6; Ex. B, §6; Ex. C, §24)

5.      Venue in this District is proper under 28 U.S.C. § 1391(a). (Ex. A, §7; Ex. B, §7)  Furthermore, in Section 24 of the Program Agreement, the parties irrevocably agreed that any suit, action, or proceeding arising out of or relating to the Program Agreement must be brought solely in the United States District Court for the Northern District of Illinois or the courts of the State of Illinois. (Ex. A, §7; Ex. B, §7; Ex. C, §24)

6.      In Section 15 of the Program Agreement, the parties agreed that the Program Agreement shall be governed by and construed in accordance with the laws of the State of Nevada. (Ex. C, § 15)

7.      There is an actual controversy under 28 U.S.C. § 2201 between HSBC and Polaris, which controversy is within the proper jurisdiction of this Court. (Ex. A, §43; Ex. B, §43, Counterclaim, §12)

### The "Scope" of the Program Agreement

8.      On August 10, 2005, the parties entered into a Revolving Program Agreement to provide revolving credit to customers of independent dealers selling Polaris products which runs until October 31, 2010. (Ex. A, §1; Ex. B, §1; Ex. C, §8)  The parties' dispute relates to this Program Agreement. (Ex. A, §8, Ex. B, §8)

9.    The Program Agreement constitutes a valid contract between HSBC and Polaris. (Ex. A, §32, Ex. B, §32)

10.    The parties included in their Program Agreement a provision entitled, "Scope." (Ex. C, §2)

11.    In the provision of the Program Agreement entitled "Scope," the parties agree that "Polaris is engaged in the sale of snowmobiles, utility vehicles, all terrain vehicles, motorcycles, and other related products and services ("Goods") through a distribution network of Dealers. Polaris requested and HSBC agreed to provide a Private Label Credit Card program and Debt Cancellation program for consumers purchasing Goods from Dealers (the 'Revolving Program') *under the terms and conditions of agreements with Dealers ('Dealer Revolving Agreements') entered into heretofore and hereafter between HSBC and Dealers.* HSBC shall own all Accounts and shall bear the credit risk for such Accounts." (Ex. B, Counterclaim, §5; Ex. C, §2) (emphasis added)

12.    The form Dealer Revolving Agreement, to which the parties' Program Agreement explicitly refers, is attached hereto as Exhibit D and states that "[a]ll completed applications for Accounts submitted by Dealer to HSBC whether mailed, telephoned or otherwise electronically transmitted will be processed and approved or declined *in accordance with such credit criteria and procedures established from time to time by HSBC with HSBC having and retaining all rights to reject or accept such applications.*" (Ex. B, Counterclaim, §5(a); Ex. D, §2b(a)) (emphasis added)

13.    The parties' Program Agreement makes other express references to the Dealer Agreements. (Ex. B, Counterclaim, §5; Ex. C, §1k, §2, §4a, §4b, §8c, §8d, §11, §14, §19, §21A2)

3

**The Program Agreement Contains Only One Limitation
With Respect to HSBC's Ability to Alter Credit Criteria**

14.    The parties' Program Agreement explicitly references the credit criteria that HSBC would use to approve the consumers to which it would extend financing under the revolving credit program. Specifically, Section 4f of the Program Agreement provides, "[d]uring the period of time beginning ten (10) business days following the Effective Date through December 31, 2005, HSBC agrees to utilize credit score cutoffs used just prior to the January, 2005 score cutoff adjustments." (Ex. B, Counterclaim, §2(a); Ex. C, §4f)

**The Program Agreement Contains Only One Requirement
Relating to HSBC's Ability to Alter Credit Criteria**

15.    Section 4g of the Program Agreement provides, "[t]he parties agree that if the dollar volume of Card Sales generated by the Revolving Program during any twelve (12) month period is less than $350,000,000.00, then the parties will meet to discuss proposed changes to the Revolving Program such as, for example, credit underwriting, credit promotion mix, marketing strategies and support, and other proposed changes in an effort to increase Card Sales." (Ex. B, Counterclaim, §2(b); Ex. C, §4g)

16.    There are no other express provisions placing any limitation or procedural requirement on HSBC's right to alter credit criteria. (Ex. B, Counterclaim, §2, §3; Ex. C)

17.    The dollar volume of card sales generated by the Revolving Program has not fallen below $350,000,000.00. (Ex. A, §17; Ex. B, §17)

**Numerous Provisions of the Program Agreement
Require Polaris' Agreement or Approval for HSBC Action**

18.    Several provisions of the Program Agreement require Polaris' agreement or approval for HSBC Action. Specifically:

A.    Section 1t of the Program Agreement provides, "'Marketing Expenses' means and includes, but is not limited to, expenses for point of sale materials, direct mail materials, general media advertising and any other marketing materials related to promoting and marketing the Revolving Program *mutually agreed upon by HSBC and Polaris*.  Marketing Expenses shall not include discounts associated with Credit Promotions or Participation Fees. (Ex. C, §1t) (emphasis added)

B.    Section 5e of the Program Agreement provides, "[o]n or before the 10th Business Day of each Month, HSBC shall provide to Polaris *agreed-upon sales and marketing reports.*" (Ex. C, §5e) (emphasis added)

C.    Section 4h of the Program Agreement provides, "HSBC agrees that all Dealer-facing service representatives will be based on locations within the United States *unless otherwise agreed upon by the parties*." (Ex. C, §4h) (emphasis added)

D.    Section 4c of the Program Agreement provides, "Polaris agrees to actively promote the Revolving Program with both Dealers and consumers including, but not limited to, providing such Dealer training and consumer marketing regarding the Revolving Program *mutually agreed to by Polaris and HSBC*." (Ex. C, §4c) (emphasis added)

E.    Section 12 of the Program Agreement provides, "[d]uring and after the term of this Agreement, HSBC and or/its Affiliates shall have the non-exclusive right to solicit Cardholders for the products set forth in Schedule 12, attached hereto.  HSBC may add additional products to Schedule 12 after the Commencement Date of the Agreement, but any additions to the products set forth in Schedule 12 *shall receive Polaris' prior review*.  Such solicitations shall comply with Applicable Law, including privacy laws." (Ex. C, §12) (emphasis added)

5

F.      Section 21 of the Program Agreement provides, "HSBC shall offer a debt cancellation product ('Debt Cancellation') to Cardholders, which may be made available through the *following mutually agreed upon channels*: (1) Card applications available at point of sale, and (2) other business channels including direct mail, inbound telemarketing, outbound telemarketing and card carriers in the states agreed upon by the parties in accordance with [certain terms]." (Ex. C, §21) (emphasis added)

G.      Section 21.B.1 of the Program Agreement provides, "HSBC shall develop and print the contractual terms and conditions ("Terms and Conditions") for Debt Cancellation and shall also supply Debt Cancellation disclosures to Polaris Dealers to be inserted in the Card Application.  HSBC may from time to time, at its discretion, revise the Terms and Conditions and the Debt Cancellation disclosures provided to Polaris.  HSBC will notify Polaris of any changes.  *If such changes, in Polaris' reasonable judgment, materially change the Debt Cancellation program, Polaris may require HSBC to cease offering Debt Cancellation on new customers.*" (Ex. C, §21.B.1) (emphasis added)

H.

**REDACTED**

I.      Section 18 of the Program Agreement provides in pertinent part, "Polaris hereby authorizes HSBC, solely for the purposes and obligations described in the Agreement, to

use Polaris' name, logo, registered trademarks and service marks (if any) and any other propriety designations ("Proprietary Materials") on the credit cards, applications, periodic statements, billing statements, collection letters, documents, promotional or advertising materials and otherwise in connection with the Revolving Program, *subject to Polaris' periodic reasonable review of such use and to such reasonable specifications of Polaris.*" (Ex. C, §18) (emphasis added)

J.

## REDACTED

19.    The parties did not include in the Program Agreement a requirement that HSBC obtain Polaris' agreement or approval before making changes to the credit criteria.  (Ex. B, Counterclaim, §2, §7; Ex. C)

### The Program Agreement Gives HSBC The Right To Determine The Terms By Which It Deals With Consumers

20.    Under the 2005 Program Agreement, HSBC alone took on all of the credit risks associated with the revolving credit program.  Specifically, Section 2 of the Agreement states, in pertinent part, "HSBC or its Affiliates shall own all Accounts and shall bear the credit risk for such Accounts." (Ex. B, Counterclaim, §1; Ex. C, §2)

21.    The Program Agreement gives HSBC the right to determine the terms by which it deals with consumers.  Specifically:

A.      Section 1i of the Program Agreement, which sets forth definitions for purposes of construing the Agreement, provides, "'Cardholder Agreement' means as to any Account, the related application and agreement between the Cardholder and HSBC, governing the terms and conditions of such Account, as such agreement may be amended from time to time by HSBC." (Ex. C, §1i)

B.      Section 1n of the Program Agreement provides, "'Credit Promotion' means the promotional plans set forth in the Cardholder Agreements." (Ex. C, §1n)

C.      Section 1o of the Program Agreement provides, "'Credit Promotion Period' means the promotional period for the promotional plans set forth in the Cardholder Agreements.'" (Ex. C, §1o)

D.      Section 6 of the Program Agreement provides, "[c]ardholder Terms between HSBC and the consumer(s) who purchase Goods from the Dealers are set forth on Schedule 6. HSBC reserves the right to amend the terms of the Cardholder Agreement (other than the terms and conditions of the Credit Promotions previously agreed to in writing by the parties) in its sole discretion and with reasonable advance notice to Polaris. Notwithstanding the foregoing, HSBC may amend the terms and conditions of Credit Promotions, if required by Applicable law." (Ex. C, §6)

### The Dispute Between The Parties

22.      HSBC and Polaris had a telephone conference on January 25, 2008, during which HSBC informed Polaris that it would be altering the credit criteria for the program. (Ex. A, §21; Ex. B, §21)

23.      HSBC offered, in addition to and as an alternative to the tightening of the credit criteria, several other options, including altering the payments to be made under the Program Agreement. (Ex. B, §28, Counterclaim, §8)

24.    HSBC also gave Polaris the option of terminating the Program Agreement before the termination date so that Polaris could replace HSBC with another financial institution and a revolving credit program more to Polaris' liking.  (Ex. B, Counterclaim, § 2; The February 29, 2008 Execution Letter from Brian D. Hughes to Scott Swenson, which is attached hereto as Ex. E)

25.    Polaris objected to the changes in credit criteria that HSBC announced on January 25, 2008, and it challenged HSBC's right to make such alterations.  (Ex. A, §28; Ex. B, §28; The February 18, 2008 Letter from Thomas M. Lynch to HSBC is attached hereto as Ex. F)

26.    On February 22, 2008, Polaris chose one of the proffered options which provided that changes (including altered approval criteria) would be made to the program in March 2008, but did so claiming that it was acting "under duress." (Ex. B, Counterclaim, §9; The February 22, 2008 Acceptance Letter, which is attached hereto as Ex. G)  The option chosen by Polaris set forth the following terms:

- The Revolving Program Compensation Fee will end effective March 1, 2008. The compensation fee will be paid for the February 2008 period.

- **REDACTED**

- **REDACTED**

- All non-contractual promotions end effective February 29, 2008.  Extension of non-contractual promotions will be reviewed on a case-by-case basis.

- **REDACTED**

(Ex. G; Ex. E)

27.    Polaris continues to allege that HSBC does not have the right to alter the criteria that it uses to approve credit to consumers under the Program Agreement. (Ex. A, §§25-27, §34; Ex. B, Counterclaim, §10)

28.    Polaris alleges that HSBC did not have the right to make the program changes it announced in January 2008, and made in March 2008, including changes to the criteria it uses to approve credit to consumers under the Agreement. (Ex. A, §§25-27, 34; Ex. B, Counterclaims, §§10-11)

29.    On April 3, 2008, Polaris filed the instant action against HSBC, alleging breach of contract, breach of the covenant of good faith and fair dealing, and declaratory judgment. (Ex. A; Ex. B, §3)

30.    On May 1, 2008, HSBC filed its Answer to Complaint, Additional Defenses, and Counterclaim setting forth the parties' dispute and requesting a declaratory judgment resolving that dispute based upon the language of their Agreement. (Ex. B)

31.    HSBC's counterclaim seeks declaratory relief and requests that the Court declare:

A.    HSBC has the right to alter the criteria it uses to approve credit to consumers under the Program Agreement.

B.    HSBC had the right under the Agreement to make the changes it announced in January 2008, and the changes it made in March 2008, to the criteria it uses to approve credit to consumers under the Agreement.

C.    HSBC did not breach the Agreement by announcing its intention to tighten the criteria it uses to approve credit to consumers under the Agreement or by making changes to those criteria.

10

D.    HSBC is not obligated under the Agreement to continue to provide retail financing based on the applicant approval rates and credit criteria used prior to March 1, 2008. (Ex. A, Counterclaim, Prayer for Relief)

32.    A ripe and justiciable controversy exists between the parties that can and should be settled by declaratory judgment issued by this Court.  (Ex. A, §43, Ex. B, §43, Counterclaim, §12)

Dated:  May 27, 2008

Ronald S. Safer
Linda K. Stevens
SCHIFF HARDIN LLP
6600 Sears Tower
Chicago, Illinois  60606
312-258-5500

Drahcir M. Smith
SCHIFF HARDIN LLP
1201 West Peachtree Street
Atlanta, Georgia  30309
404-437-7000

Attorneys for Defendant
HSBC BANK NEVADA, N.A.

**EXHIBITS TO DEFENDANT HSBC BANK NEVADA, N.A.'S
STATEMENT OF UNCONTESTED FACTS
PURSUANT TO LOCAL RULE 56.1(a)(3)**

Ex. A        Complaint

Ex. B        Defendant's Answer, Additional Defenses, and Counterclaim

Ex. C        The Revolving Program Agreement

Ex. D        Dealer Revolving Agreement

Ex. E        February 29, 2008 Execution Letter from Brian D. Hughes to Scott Swenson

Ex. F        February 18, 2008 Letter from Thomas M. Lynch to HSBC

Ex. G        February 22, 2008 Acceptance Letter

CH2\2514474.1



**RECEIVED**

IN THE UNITED STATES DISTRICT COURT        APR 0 3 2008
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION                  MICHAEL W. DOBBINS
                                CLERK, U.S. DISTRICT COURT

POLARIS SALES INC.,            )
                Plaintiff,      )
                                )
        v.                      )
                                )   Case No.   **08CV1924**
HSBC BANK NEVADA, N.A.,         )
                                )
                Defendant.      )              JUDGE ZAGEL
                                )
                                )          MAGISTRATE JUDGE MASON

## COMPLAINT

Plaintiff Polaris Sales Inc. ("Polaris") for its Complaint against Defendant HSBC Bank

Nevada, N.A. ("HSBC" or "Bank") alleges as follows:

### NATURE OF THE ACTION

1.      Polaris, a leading manufacturer and distributor of specialty and recreational

vehicles, brings this action for defendant's breach of the parties' Revolving Program Agreement,

dated August 10, 2005 ("Agreement"). The Agreement governs, for an initial term of five years,

the revolving credit program ("Revolving Program") that enables Polaris customers to finance

the retail purchases of products and services from authorized Polaris dealers. The Agreement is

a volume-based agreement that is intended to maintain or increase retail sales volume of Polaris

products. It is an exclusive Agreement, so Polaris must use HSBC for all of its revolving retail

financing programs.

2.      This action arises from HSBC's sudden announcement in January 2008, that upon

approximately thirty (30) days notice, HSBC would artificially tighten the credit scores it

requires to approve loans – thereby slashing the loan approval rates for Polaris's customers by

nearly fifty percent – unless Polaris would forgo substantial contractual rights and benefits.

**EXHIBIT A**

Polaris made multiple requests to HSBC for meaningful information that would explain the purported need for these changes and even proposed alternatives. HSBC, however, ignored Polaris's efforts and failed to meaningfully reconsider its demand. HSBC's actions threatened, and continue to threaten, to cause the sudden and drastic collapse of Polaris retail sales volume and to substantially damage Polaris's dealer relationships, its reputation, and its goodwill. Moreover, HSBC's actions frustrated and defeated the purpose of the Agreement and the Revolving Program.

3.    HSBC's actions are commercially unreasonable, and they violate both the terms of the Agreement and HSBC's duty of good faith and fair dealing inherent in the Agreement. Polaris brings this action to obtain a judicial finding and declaration that the wrongful conduct of HSBC constitutes a continuing breach of the Agreement, and to recover damages for the injuries Polaris has and will continue to sustain as a result of HSBC's wrongful conduct.

## THE PARTIES

4.    Plaintiff Polaris Sales Inc. is a Minnesota corporation with its principal place of business in Medina, Minnesota. Polaris is a globally recognized manufacturer and distributor of snowmobiles, utility vehicles, all-terrain vehicles, motorcycles, and other related products and services. Polaris sells these products and services through a long-established network of qualified dealers.

5.    Defendant HSBC Bank Nevada N.A. is a nationally chartered bank association with its principal place of business in Las Vegas, Nevada. Representatives and agents of Defendant have maintained their principal offices or have participated in material acts alleged herein within this judicial District.

2

## JURISDICTION AND VENUE

6.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 based on the diversity of citizenship among the parties. The amount in controversy exceeds $75,000.00, exclusive of interest and costs. Furthermore, under Section 24 of the Agreement, the parties irrevocably consented and submitted to the exclusive jurisdiction of this Court and the courts of the State of Illinois for the purpose of any suit, action, proceeding, or judgment arising from the Agreement.

7.    Venue in this District is proper under 28 U.S.C. §1391(a). Furthermore, in Section 24 of the Agreement, the parties agreed that any suit, action, or proceeding arising out of or relating to the Agreement must be brought solely in the United States District Court for the Northern District of Illinois or the courts of the State of Illinois.

## FACTUAL ALLEGATIONS

8.    This action arises from HSBC's continuing and material breach of its long-term, exclusive Agreement, under the terms of which the Bank committed to provide a revolving credit program to enable retail customers to finance the purchase of goods and services from authorized Polaris dealers. The Agreement replaced the parties' 2001 Revolving Program Agreement, as amended ( "2001 Agreement"), under which HSBC and its predecessor financed retail customer purchases and Polaris and HSBC shared the risk of loss on the portfolio. In 2005, at the urging of HSBC, the 2001 Agreement was restructured to increase retail sales volume. Under HSBC's 2005 proposal, Polaris would receive income based upon sales volume, and HSBC assured Polaris that it would manage the Revolving Program to increase sales volume.

9.    Based upon HSBC's assurances and representations, Polaris agreed to move to the volume-based structure and entered into the Agreement in August 2005. A true and complete

3

copy of the Agreement, incorporated herein as Complaint Exhibit A, has been filed under seal

with the Clerk of the Court pursuant to N.D. Ill. L.R. 5.7(a).

10.     Under Section 2 of the Agreement, HSBC provides a revolving credit program

through which customers can buy products and services from authorized Polaris dealers using a

private label credit card issued by HSBC and bearing the "StarCard" label.

11.     Pursuant to the Agreement, Polaris must exclusively use HSBC for all private

label credit cards with revolving financing and for other revolving promotional financing.

12.     Consumers interested in purchasing products using financing under the Revolving

Program submit applications to HSBC through authorized Polaris dealers.  HSBC then

underwrites and issues credit and a "StarCard" credit card to qualified applicants.

13.     The Agreement provides that HSBC shall pay Polaris a "Volume Incentive" that

is based on total sales financed through the Revolving Program.  Agreement at §3.a and

Schedule 3a.  Polaris, in turn, pays "Promotional Payments" to HSBC for discounted

promotional interest rates offered by the Bank.   The Promotional Payments are fixed by the

Agreement.  *Id.* at §3.b and Schedule 3b.   In 2007, Polaris earned approximately $27.4 million

in Volume Incentives and paid approximately $13.6 million in Promotional Payments.

14.     The Agreement provides that HSBC's criteria for the acceptance of credit

customers and other features of the Revolving Program may be changed by mutual agreement of

the parties if the dollar volume of "Card Sales" generated by the Revolving Program falls below

$350 million during any twelve-month period.  In that case, Section 4.g expressly provides that

the parties will meet to discuss changes to the Revolving Program, including changes to credit

underwriting, the credit promotion mix, or marketing strategies "in an effort to increase Card

Sales."

4

15.    HSBC negotiates separate agreements with authorized Polaris dealers that govern their participation in the Revolving Program ("Dealer Revolving Agreements").  The Agreement prohibits HSBC from using the Dealer Revolving Agreement to alter HSBC's and Polaris's rights and obligations under the Agreement.  The Agreement affirms that Polaris and HSBC are independent contractors with respect to each other and the Agreement, and that neither Polaris nor HSBC has the power or authority to incur any obligation binding on the other.  Agreement at § 2.  Section 20 provides, among other things, that Polaris is not a party to and shall not be bound by any agreement between HSBC and authorized Polaris dealers.  Furthermore, Polaris is not responsible for "acts between HSBC and dealers," or "for any other obligations of HSBC or any Dealer." *Id.* at § 20.

16.    The Agreement binds Polaris exclusively to HSBC's revolving retail financing services for the initial five-year term, followed by automatic successive one year renewals. *Id.* at § 8.a.  HSBC may terminate the Agreement upon sixty days notice if the dollar volume of Card Sales generated by the Revolving Program over one year falls below $100 million.  The Agreement further provides that "no obligation of either party can be released or waived by either party, except by a writing signed by a duly authorized officer or representative of each party." *Id.* at § 8.b.

17.    In 2007, retail sales volume financed under the Agreement was approximately $699 million in Card Sales.

18.    In order to enhance the sales volume and related incentives under the Agreement, the parties amended the Agreement, effective October 31, 2007, to grant Polaris a modified Sales Volume Compensation Fee to reflect annual sales volume exceeding $550 million.  A true copy

5

of the 2007 Amendment, incorporated herein as Complaint Exhibit B, has been filed under seal

with the Clerk of the Court pursuant to N.D. Ill. L.R. 5.7(a).

19.    At and around the time of the 2007 Amendment, and at other times pertinent

herein, HSBC assured Polaris that its loan losses related to the core Polaris portfolio, and

excluding a discontinued program that offered financing for non-Polaris products ("Dealer

Choice"), had remained at a relatively consistent and acceptable rate of approximately 5% of

total receivables. HSBC did not express any concerns regarding the profitability of the

Revolving Program or the ongoing viability of the Agreement or the Revolving Program's

structure.

20.    In its December 2007 business review with Polaris, HSBC re-affirmed that loan

losses in the core Polaris portfolio (excluding Dealer Choice) continued to remain relatively

unchanged and at acceptable levels. HSBC did not express any concerns regarding the

profitability of the Revolving Program or the Agreement.

### DEFENDANT'S WRONGFUL CONDUCT

21.    During a presentation by HSBC to Polaris held on or about January 25, 2008, the

Bank suddenly reversed its December 2007 position and assurances by claiming that its average

losses on loans were, in fact, expected to be significantly greater than past levels on the core

Polaris portfolio (excluding the discontinued Dealer Choice program). In making this claim,

HSBC allegedly relied on a new, forward-looking "model" to predict losses to the overall

portfolio. HSBC's new model was, for the first time, detached from and ignored the actual

historical performance of the Polaris program's loan portfolio. Based upon this new model,

HSBC announced that, within approximately thirty (30) days, it would unilaterally tighten the

credit scores required to obtain financing under the Revolving Program and thereby drastically

slash loan approval rates for Polaris customers to an unprecedented level. HSBC told Polaris that these changes would be made unless Polaris would forgo its rights under the Agreement by ending the Volume Incentive or increasing Promotional Payments.

22.    The result of HSBC's artificial tightening of credit scores would have been a drastic reduction of approved loans and devastation of retail sales. From July to December 2007, HSBC approved approximately 52 percent of applicants under the Revolving Program. Had HSBC implemented its threat to tighten credit scores, HSBC estimated the loan approval rate for Polaris retail customers would have plummeted by more than 47 percent down to approximately 28 percent.

23.    The totally unprecedented and unwarranted loan approval rates threatened by HSBC immediately jeopardized hundreds of millions of dollars of sales to otherwise qualified and good Polaris customers. The net result of HSBC's reduction of the loan approval rates for retail customers would have been a severe decrease of annual retail sales volume to below $350 million in Card Sales.

24.    Upon receiving HSBC's threat, Polaris made numerous requests to HSBC for factual information to substantiate the claimed need for these changes. To date, HSBC has not provided this information. Even without receiving this information, Polaris offered a solution that reasonably attempted to address HSBC's purported concerns. HSBC rejected Polaris's proposal.

25.    HSBC's improper and arbitrary manipulation of its credit criteria is not commercially reasonable and was intended to frustrate and impair the Agreement for several reasons, including without limitation:

7



a. HSBC has not provided any substantive support to Polaris for the need for its proposed change;

b. the proposed tightened credit scores would be unprecedented in this type of retail financing;

c. the proposed credit scores would slash loan approvals and thus, the sales volume under the Agreement by more than 50 percent;

d. HSBC sought to impose these drastic changes on approximately thirty (30) days notice; and

e. Polaris has no alternative financing source due to the exclusivity of the Agreement.

26.    HSBC's plan to unilaterally impose changes to the Agreement violates its express requirement that any amendment must be agreed to in writing by both parties.

27.    HSBC knew that its proposed changes would immediately and dramatically impact Polaris, its dealers, and its customers. The changes would reduce retail sales of Polaris products, as potential customers with good credit would be rejected by HSBC. Based upon the parties' past dealings and the nature of the relationships, HSBC knew well and understood that the disruption caused by its arbitrary denial of credit would significantly damage Polaris's goodwill among its dealers and customers.

28.    On February 22, 2008, under severe commercial duress, having no feasible alternative, and due to HSBC's demands, Polaris informed HSBC that it would forgo its Volume Incentive and proceed with modest revisions to underwriting applications to the Revolving Program. Polaris made it clear that its action was only offered under severe duress, without waiver of its rights and remedies under the Agreement, and that it was doing so only to mitigate

8

its damages from HSBC's breach. Polaris had no other practical alternatives to avoid the severe and drastic interruption of customer's retail credit purchases available at that time.

29.     When implementing the changes in March 2008, HSBC went even further than the terms it threatened in January 2008 and unilaterally imposed additional terms and modifications to the Revolving Program, changes that were even more harmful to Polaris's contractual rights.

30.     As a result of HSBC's wrongful conduct, Polaris has suffered and will continue to suffer substantial damages through the remaining term of the Agreement in an amount to be proved at trial, but in excess $50 million.

<u>COUNT I – BREACH OF CONTRACT</u>

31.     Polaris repeats and re-alleges each and every allegation contained in paragraphs 1 through 30 above.

32.     The Agreement constitutes a valid contract between Polaris and HSBC.

33.     Polaris has performed and continues to perform any and all necessary conditions on its part under the Agreement.

34.     HSBC has breached and continues to breach the Agreement by imposing changes to its operation of the Revolving Program in violation of the express terms of the Agreement. Among other things, the Bank breached the Agreement by:

a.    Wrongfully ending the Volume Incentive Payments due Polaris in violation of Sections 3.a and 14 of the Agreement, Schedule 3a, and the First Amendment to the Revolving Program Agreement;

b.    Wrongfully raising its Promotion Payments charged by imposing a new formula for the calculation and adjustment of the charge, and by

9

increasing its promotional Annual Percentage Rate adjustment by 9 basis

points, all in violation of the Agreement, including Sections 3.b and 14

and Schedule 3b; and

c.    Taking steps to implement unprecedented, unjustified and arbitrary

underwriting changes and related procedures to immediately reduce credit

approval rates and related sales volumes, and deny financing for Polaris

customers who otherwise would have qualified for the Revolving Program

in violation of the Agreement, including Sections 4.g and 14.

35.    HSBC owes Polaris a duty of good faith and fair dealing that is implied into the

Agreement by law, and HSBC has acted in bad faith and breached, and continues to breach, this

implied covenant by, among other things, its threats and actions in the middle of long-term,

exclusive agreement, to:

a.    unreasonably reduce the availability of credit to Polaris customers;

b.    wrongfully frustrate and impair the contractual purpose of maintaining and

increasing Polaris retail sales volume;

c.    force Polaris to forgo its contractual rights and benefits;

d.    demand these changes to the Agreement while at the same time

demanding strict compliance by Polaris with the provisions of the

Agreement whereby the Bank holds exclusive rights to any Polaris private

label credit card or other revolving promotional financing programs;

e.    reduce the approval of consumer applicants to the Revolving Program as a

means to drive down sales volume and to force a renegotiation of the

10

Revolving Program to wrongfully obtain additional material gain for the Bank; and

f.  carry out the Revolving Program to undermine the Agreement and its purposes, being fully aware that, due to the exclusive nature of the Agreement, Polaris had no alternative but to continue to participate in the HSBC program as demanded by HSBC.

36.  These actions are in violation of the terms of the parties' Agreement and wrongfully deny Polaris the contractual benefits to which it is entitled.

37.  Polaris has been and continues to be harmed by HSBC's breach of the Agreement and its implied duty of good faith and fair dealing, as Polaris has suffered significant and ongoing damages, and impairment to the value of the Agreement.

## COUNT II – DECLARATORY RELIEF

38.  Polaris repeats and re-alleges each and every allegation contained in paragraphs 1 through 37 above.

39.  The Bank now asserts, in the middle of a long-term, exclusive agreement that:

a.  it may unilaterally, arbitrarily, and significantly reduce approval rates for customer credit applications and thereby reduce retail sales volumes for financed sales by its reduction; and

b.  it may cause Polaris to forgo its contractual rights and benefits by threatening to impose sudden, unreasonable, and drastic reductions of approval rates along with the concomitant loss of retail sales and customers.

11

40.     Polaris believes these assertions and related actions are contrary to and materially frustrate the terms and purposes of the Agreement, and that HSBC's actions to impose same constitute a failure to comply with the Agreement under the indemnity given by HSBC in section 7(b) of the Agreement.

41.     Polaris supplied HSBC with due and proper notice of Polaris's claim for indemnity.

42.     The Declaratory Judgment Act, 28 U.S.C. sec. 2201, 2201, provides, in pertinent part, that

> [i]n a case of actual controversy within its jurisdiction…any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.  Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. s. 2201

43.     There is an actual controversy between the Bank and Polaris as set forth above.

44.     This actual controversy is within the jurisdiction of this Court.

45.     This Court can and should declare the rights and obligations of the parties relative to this controversy.

46.     Polaris is entitled to and requests declaratory judgment, whereby this Court resolve this actual controversy between the parties and declare that:

    a.     HSBC breached the Agreement by threatening to drastically reduce the approval rate for consumer applicants to the Revolving Program and thereby radically drive down the volume of retail sales of Polaris products and services;

12

b.  HSBC is obligated under the Agreement to continue to provide retail

financing based on the applicant approval rates and credit criteria used

prior to March 1, 2008, absent evidence that the use of such rates and

criteria would directly result in commercially unreasonable losses.

c.  HSBC's threats and related actions violate and materially frustrate the

terms and purposes of the Agreement all of which has and will continue to

harm Polaris in its business, and which constitute a failure to comply with

the Agreement as provided under section 7.b therein.

## PRAYER FOR RELIEF

WHEREFORE, Polaris requests that judgment be entered that:

A.    Polaris has been injured by HSBC's wrongful conduct in breach of the express

provisions and the implied covenant of good faith in the Agreement between HSBC and Polaris,

and as a result, Polaris has been and will continue to be harmed in its business.  Polaris is entitled

to actual and expectancy damages in an amount to be determined at trial.  Polaris also is entitled

to such declaratory and equitable relief as is proper to restore the status quo among the parties.

B.    Polaris is entitled to specific performance of the Agreement.

C.    Polaris is entitled to and requests a declaratory judgment declaring that

1.  HSBC breached the Agreement by threatening to reduce the approval rate for
consumer applicants to the Revolving Program and thereby radically drive
down the volume of retail sales of Polaris products and services;

2.  HSBC is obligated under the Agreement to continue to provide retail
financing based on the applicant approval rates and credit criteria used prior to
March 1, 2008, absent evidence that the use of such rates and criteria would
directly result in commercially unreasonable losses; and

3.  HSBC's threats and related actions violate and materially frustrate the terms
and purposes of the Agreement, all of which has and will continue to harm

13

Polaris in its business, and which constitute a failure to comply with the Agreement as provided under section 7.b therein.

D.    Polaris requests an award for costs incurred herein.

E.    Polaris requests such additional relief that the Court deems just and proper.

Dated: April 3, 2008

POLARIS SALES INC.

By:

One of its attorneys

Thomas M. Lynch  (6197698)
James J. Hegarty  (6280186)
WILDMAN, HARROLD, ALLEN & DIXON LLP
225 West Wacker Drive, Suite 3000
Chicago, IL 60606
(312) 201-2000

*Attorneys for Plaintiff*

14

APR 03 2008

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

POLARIS SALES INC.,                     )
                         Plaintiff,     )
                                        )
              v.                        )
                                        )
HSBC BANK NEVADA, N.A.,                 )    Case No. _____
                                        )
                         Defendant.     )
                                        )

# 08CV1924

JUDGE ZAGEL

MAGISTRATE JUDGE MASON

### RESTRICTED DOCUMENT PURSUANT TO LR26.2

Exhibit A and Exhibit B to the Complaint in the above-captioned matter are filed as

restricted in accordance with an order of this Court dated April _____, 2008.

POLARIS SALES INC.

By: _____
        One of its attorneys

Thomas M. Lynch  (6197698)
lynch@wildman.com
James J. Hegarty  (6280186)
hegarty@wildman.com
WILDMAN, HARROLD, ALLEN & DIXON LLP
225 West Wacker Drive, Suite 3000
Chicago, IL 60606
(312) 201-2000

*Attorneys for Plaintiff*

RECEIVED

APR 03 2008

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

# EXHIBIT A

**REDACTED -- copy of Revolving Program Agreement and First Amendment thereto removed in accordance with the Court's April 8, 2008 Order**

# EXHIBIT B

**REDACTED -- copy of Revolving Program Agreement and First Amendment thereto removed in accordance with the Court's April 8, 2008 Order**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| POLARIS SALES INC., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 08 CV 1924 |
| | ) | |
| v. | ) | Judge Zagel |
| | ) | |
| HSBC BANK NEVADA, N.A., | ) | Magistrate Judge Mason |
| | ) | |
| Defendant. | ) | |

## HSBC'S ANSWER TO COMPLAINT,
## ADDITIONAL DEFENSES AND COUNTERCLAIM

Defendant HSBC Bank Nevada, N.A. ("HSBC"), in answer to the complaint filed by

plaintiff Polaris Sales, Inc., ("Polaris"), states as follows:

FIRST DEFENSE

1.    Polaris, a leading manufacturer and distributor of specialty and recreational

vehicles, brings this action for defendant's breach of the parties' Revolving Program Agreement,

dated August 10, 2005 ("Agreement"). The Agreement governs, for an initial term of five years,

the revolving credit program ("Revolving Program") that enables Polaris customers to finance

the retail purchases of products and services from authorized Polaris dealers. The Agreement is

a volume-based agreement that is intended to maintain or increase retail sales volume of Polaris

products. It is an exclusive Agreement, so Polaris must use HSBC for all of its revolving retail

financing programs.

**ANSWER:**  HSBC admits that Polaris has attempted to state a cause of action for breach of

contract, that the agreement relates to a revolving retail credit program for the purchase of

EXHIBIT B

products from certain Polaris dealers, and that the agreement contains volume incentives and an exclusivity clause. HSBC denies the remaining allegations of paragraph 1.

2.     This action arises from HSBC's sudden announcement in January 2008, that upon approximately thirty (30) days notice, HSBC would artificially tighten the credit scores it requires to approve loans – thereby slashing the loan approval rates for Polaris's customers by nearly fifty percent – unless Polaris would forgo substantial contractual rights and benefits. Polaris made multiple requests to HSBC for meaningful information that would explain the purported need for these changes and even proposed alternatives. HSBC, however, ignored Polaris's efforts and failed to meaningfully reconsider its demand. HSBC's actions threatened, and continue to threaten, to cause the sudden and drastic collapse of Polaris retail sales volume and to substantially damage Polaris's dealer relationships, its reputation, and its goodwill. Moreover, HSBC's actions frustrated and defeated the purpose of the Agreement and the Revolving Program.

**ANSWER:**  HSBC admits that the parties engaged in discussions regarding HSBC's need to improve the profitability of the lending portfolio at issue and that they discussed several options for achieving that goal, including tightening credit score criteria and changes to the provisions regarding payments to Polaris, and that Polaris requested information regarding those options. HSBC denies the remaining allegations of paragraph 2.

3.     HSBC's actions are commercially unreasonable, and they violate both the terms of the Agreement and HSBC's duty of good faith and fair dealing inherent in the Agreement. Polaris brings this action to obtain a judicial finding and declaration that the wrongful conduct of

2

HSBC constitutes a continuing breach of the Agreement, and to recover damages for the injuries Polaris has and will continue to sustain as a result of HSBC's wrongful conduct.

**ANSWER:** HSBC admits that Polaris has filed the complaint in this action seeking the relief requested therein and denies the remaining allegations of paragraph 3.

4.      Plaintiff Polaris Sales Inc. is a Minnesota corporation with its principal place of business in Medina, Minnesota. Polaris is a globally recognized manufacturer and distributor of snowmobiles, utility vehicles, all-terrain vehicles, motorcycles, and other related products and services. Polaris sells these products and services through a long-established network of qualified dealers.

**ANSWER:** HSBC admits that Polaris Sales Inc. is listed in Dunn & Bradstreet as a Minnesota corporation with its address in Medina, Minnesota, and states that it lacks knowledge and information sufficient to form a belief as to the truth of the remaining allegations of paragraph 4.

5.      Defendant HSBC Bank Nevada N.A. is a nationally chartered bank association with its principal place of business in Las Vegas, Nevada. Representatives and agents of Defendant have maintained their principal offices or have participated in material acts alleged herein within this judicial District.

**ANSWER:** HSBC denies that its principal office is maintained within this district, states that it lacks knowledge and information sufficient to form a belief as to which of its "representatives and agents" have maintained their own principal offices in this district, and admits the remaining allegations of paragraph 5.

3

6.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 based on the diversity of citizenship among the parties.  The amount in controversy exceeds $75,000.00, exclusive of interest and costs.  Furthermore, under Section 24 of the Agreement, the parties irrevocably consented and submitted to the exclusive jurisdiction of this Court and the courts of the State of Illinois for the purpose of any suit, action, proceeding, or judgment arising from the Agreement.

**ANSWER:**  HSBC admits the allegations of paragraph 6.

7.     Venue in this District is proper under 28 U.S.C. § 1391(a).  Furthermore, in Section 24 of the Agreement, the parties agreed that any suit, action, or proceeding arising out of or relating to the Agreement must be brought solely in the United States District Court for the Northern District of Illinois or the courts of the State of Illinois.

**ANSWER:**  HSBC admits the allegations of paragraph 7.

8.     This action arises from HSBC's continuing and material breach of its long-term, exclusive Agreement, under the terms of which the Bank committed to provide a revolving credit program to enable retail customers to finance the purchase of goods and services from authorized Polaris dealers.  The Agreement replaced the parties' 2001 Revolving Program Agreement, as amended ("2001 Agreement"), under which HSBC and its predecessor financed retail customer purchases and Polaris and HSBC shared the risk of loss on the portfolio.  In 2005, at the urging of HSBC, the 2001 Agreement was restructured to increase retail sales volume.  Under HSBC's 2005 proposal, Polaris would receive income based upon sales volume, and HSBC assured Polaris that it would manage the Revolving Program to increase sales volume.

**ANSWER:** HSBC admits the second sentence of paragraph 8, except that it denies that it has a "predecessor." HSBC also admits that Polaris seeks relief in this suit for an alleged breach of the referenced contract, but denies such breach and denies the remaining allegations of paragraph 8.

9.      Based upon HSBC's assurances and representations, Polaris agreed to move to the volume-based structure and entered into the Agreement in August 2005.  A true and complete copy of the Agreement, incorporated herein as Complaint Exhibit A, ahs [sic] been filed under seal with the Clerk of the Court pursuant to N.D. Ill. L.R. 5.7(a).

**ANSWER:** HSBC admits that the parties entered into a new agreement in August of 2005, that a copy of that agreement is attached to the complaint as Exhibit A, and that the court has granted Polaris' motion to place that exhibit under seal.  HSBC denies the remaining allegations of paragraph 9.

10.     Under Section 2 of the Agreement, HSBC provides a revolving credit program through which customers can buy products and services from authorized Polaris dealers using a private label credit card issued by HSBC and bearing the "StarCard" label.

**ANSWER:** HSBC admits that it issues a private label credit card bearing the "Star Card label and that Section 2 of the Agreement addresses the described "StarCard" revolving credit program, but HSBC denies that paragraph 10 contains a complete and accurate description of that program, denies Section 2 is the only provision of the Agreement governing that program, and denies the remaining allegations of paragraph 10.

11.     Pursuant to the Agreement, Polaris must exclusively use HSBC for all private label credit cards with revolving financing and for other revolving promotional financing.

**ANSWER**:  HSBC admits that the Agreement contains an exclusivity provision.  HSBC therefore denies the remaining allegations of paragraph 11.


12.     Consumers interested in purchasing products using financing under the Revolving Program submit applications to HSBC through authorized Polaris dealers.  HSBC then underwrites and issues credit and a "StarCard" credit card to qualified applicants.

**ANSWER**: HSBC admits the allegations of paragraph 12.


13.     The Agreement provides that HSBC shall pay Polaris a "Volume Incentive" that is based on total sales financed through the Revolving Program.  Agreement at §3.a and Schedule 3a.  Polaris, in turn, pays "Promotional Payments" to HSBC for discounted promotional interest rates offered by the Bank.  The Promotional Payments are fixed by the Agreement.  *Id.* at §3.b and Schedule 3b.  In 2007, Polaris earned approximately $27.4 million in Volume Incentives and paid approximately $13.6 million in Promotional Payments.

**ANSWER**: HSBC denies that Promotional Payments are "fixed" by the Agreement but admits that the rates for those payments are set forth in the Agreement, and HSBC admits the remaining allegations of paragraph 13.


14.     The Agreement provides that HSBC's criteria for the acceptance of credit customers and other features of the Revolving Program may be changed by mutual agreement of the parties if the dollar volume of "Card Sales" generated by the Revolving Program falls below

$350 million during any twelve-month period. In that case, Section 4.g expressly provides that
the parties will meet to discuss changes to the Revolving Program, including changes to credit
underwriting, the credit promotion mix, or marketing strategies "in an effort to increase Card
Sales."

**ANSWER:** HSBC admits that Section 4.g of the Agreement states that "the parties agree that if
the dollar volume of Card Sales generated by the Revolving Program during any twelve (12)
month period is less than $350,000,000.00 then the parties will meet to discuss proposed changes
to the Revolving Program such as, for example, credit underwriting, credit promotion mix,
marketing strategies an support, and other proposed changes in an effort to increase Card Sales."
HSBC denies the remaining allegations of paragraph 14.

15.     HSBC negotiates separate agreements with authorized Polaris dealers that govern
their participation in the Revolving Program ("Dealer Revolving Agreements"). The Agreement
prohibits HSBC from using the Dealer Revolving Agreement to alter HSBC's and Polaris's
rights and obligations under the Agreement. The Agreement affirms that Polaris and HSBC are
independent contractors with respect to each other and the Agreement, and that neither Polaris
nor HSBC has the power or authority to incur any obligation binding on the other. Agreement at
§ 2. Section 20 provides, among other things, that Polaris is not a party to and shall not be bound
by any agreement between HSBC and authorized Polaris dealers. Furthermore, Polaris is not
responsible for "acts between HSBC and dealers," or "for any other obligations of HSBC or any
Dealer." *Id.* at § 20.

**ANSWER:** HSBC denies that Polaris has cited to all provisions of the Agreement bearing on
the topics and issues described in paragraph 15. Moreover, to the extent that paragraph 15

7

purports to describe what the cited Agreement provisions say, HSBC denies that the paragraph contains an accurate and complete recitation of those provisions. To the extent that paragraph 15 purports to describe what the cited Agreement provisions mean, HSBC denies the allegations.

16.   The Agreement binds Polaris exclusively to HSBC's revolving retail financing services for the initial five-year term, followed by automatic successive one year renewals. *Id.* at § 8.a. HSBC may terminate the Agreement upon sixty days notice if the dollar volume of Card Sales generated by the Revolving Program over one year falls below $100 million. The Agreement further provides that "no obligation of either party can be released or waived by either party, except by a writing signed by a duly authorized officer or representative of each party." *Id.* at § 8.b.

**ANSWER:** HSBC denies that Polaris has cited to all provisions of the Agreement bearing on the topics and issues described in paragraph 16. Moreover, to the extent that paragraph 16 purports to describe what the cited Agreement provisions say, HSBC denies that the paragraph contains an accurate and complete recitation of those provisions. To the extent that paragraph 16 purports to describe what the cited Agreement provisions mean, HSBC denies the allegations.

17.   In 2007, retail sales volume financed under the Agreement was approximately $699 million in Card Sales.

**ANSWER:** HSBD admits the allegations of paragraph 17.

18.   In order to enhance the sales volume and related incentives under the Agreement, the parties amended the Agreement, effective October 31, 2007, to grant Polaris a modified Sales

8

Volume Compensation Fee to reflect annual sales volume exceeding $550 million. A true copy of the 2007 Amendment, incorporated herein as Complaint Exhibit B, has been filed under seal with the Clerk of the Court pursuant to N.D. Ill. L.R. 5.7(a).

**ANSWER:** HSBC admits that the Agreement was amended effective October 31, 2007 and that a copy of that amendment was attached as Exhibit B to the Complaint as served, and that Polaris' motion to place that exhibit under seal was granted. To the extent that paragraph 18 purports to describe the reasons for the amendment and/or purports to be a complete and accurate description of the amendment, HSBC denies those allegations.

19.    At and around the time of the 2007 Amendment, and at other times pertinent herein, HSBC assured Polaris that its loan losses related to the core Polaris portfolio, and excluding a discontinued program that offered financing for non-Polaris products ("Dealer Choice"), had remained at a relatively consistent and acceptable rate of approximately 5% of total receivables. HSBC did not express any concerns regarding the profitability of the Revolving Program or the ongoing viability of the Agreement or the Revolving Program's structure.

**ANSWER:** With respect to the first sentence of paragraph 19, HSBC admits that it provided Polaris with Quarterly Business Reviews regarding the status of the revolving credit program but denies that the allegations of paragraph 19 are a complete and accurate description HSBC's statements to Polaris. HSBC denies the remaining allegations of paragraph 19.

20.    In its December 2007 business review with Polaris, HSBC re-affirmed that loan losses in the core Polaris portfolio (excluding Dealer Choice) continued to remain relatively

unchanged and at acceptable levels. HSBC did not express any concerns regarding the profitability of the Revolving Program or the Agreement.

**ANSWER:** HSBC denies the allegations of paragraph 20.


21.    During a presentation by HSBC to Polaris held on or about January 25, 2008, the Bank suddenly reversed its December 2007 position and assurances by claiming that its average losses on loans were, in fact, expected to be significantly greater than past levels on the core Polaris portfolio (excluding the discontinued Dealer Choice program). In making this claim, HSBC allegedly relied on a new, forward-looking "model" to predict losses to the overall portfolio. HSBC's new model was, for the first time, detached from and ignored the actual historical performances of the Polaris program's loan portfolio. Based upon this new model, HSBC announced that, within approximately thirty (30) days, it would unilaterally tighten the credit scores required to obtain financing under the Revolving Program and thereby drastically slash loan approval rates for Polaris customers to an unprecedented level. HSBC told Polaris that these changes would be made unless Polaris would forgo its rights under the Agreement by ending the Volume Incentive or increasing Promotional Payments.

**ANSWER:** HSBC admits that on or about January 25, 2008, it told Polaris, *inter alia,* that its average losses on loans were expected to be greater than past levels on the current promotions, that the profitability of the loan portfolio had deteriorated, and would continue to deteriorate. HSBC admits that in these discussions, it indicated that credit criteria would have to be tightened, but alternatively proposed to Polaris several options for lessening the impact to Polaris, including lessened tightening of credit score criteria and increased Promotional Payments. HSBC denies the remaining allegations of paragraph 21.

22.    The result of HSBC's artificial tightening of credit scores would have been a drastic reduction of approved loans and devastation of retail sales. From July to December 2007, HSBC approved approximately 52 percent of applicants under the Revolving Program. Had HSBC implemented its threat to tighten credit scores, HSBC estimated the loan approval rate for Polaris retail customers would have plummeted by more than 47 percent down to approximately 28 percent.

**ANSWER:** HSBC admits that the revolving program approval rate for revolving non-internet individual applications was approximately 52% for July through December 2007. HSBC is without sufficient knowledge or information to form a believe as to the truth of the remaining allegations of paragraph 22.

23.    The totally unprecedented and unwarranted loan approval rates threatened by HSBC immediately jeopardized hundreds of millions of dollars of sales to otherwise qualified and good Polaris customers. The net result of HSBC's reduction of the loan approval rates for retail customers would have been a severe decrease of annual retail sales volume to below $350 million in Card Sales.

**ANSWER:** HSBC denies the allegations of paragraph 23.

24.    Upon receiving HSBC's threat, Polaris made numerous requests to HSBC for factual information to substantiate the claimed need for these changes. To date, HSBC has not provided this information. Even without receiving this information, Polaris offered a solution

that reasonably attempted to address HSBC's purported concerns.  HSBC rejected Polaris's proposal.

**ANSWER:** HSBC admits that Polaris made requests for information and states that information was provided, and HSBC also admits that Polaris offered a proposal that HSBC did not accept as a satisfactory solution to the situation.  HSBC rejects the remaining allegations of paragraph 24.

25.    HSBC's improper and arbitrary manipulation of its credit criteria is not commercially reasonable and was intended to frustrate and impair the Agreement for several reasons, including without limitation:

    a.    HSBC has not provided any substantive support to Polaris for the need for its proposed change;

    b.    the proposed tightened credit scores would be unprecedented in this type of retail financing;

    c.    the proposed credit scores would slash loan approvals and thus, the sales volume under the Agreement by more than 50 percent;

    d.    HSBC sought to impose these drastic changes on approximately thirty (30) days notice; and

    e.    Polaris has no alternative financing source due to the exclusivity of the Agreement.

**ANSWER:** HSBC denies the allegations of paragraph 25.

26.    HSBC's plan to unilaterally impose changes to the Agreement violates its express requirement that any amendment must be agreed to in writing by both parties.

**ANSWER:** HSBC denies the allegations of paragraph 26.

27.    HSBC knew that its proposed changes would immediately and dramatically impact Polaris, its dealers, and its customers.  The changes would reduce retail sales of Polaris

products, as potential customers with good credit would be rejected by HSBC. Based upon the parties' past dealings and the nature of the relationships, HSBC knew well and understood that the disruption caused by its arbitrary denial of credit would significantly damage Polaris's goodwill among its dealers and customers.

**ANSWER:** HSBC admits that it knew the changes to credit criteria would impact Polaris, its dealers and some of its customers. HSBC denies the remaining allegations of paragraph 27.

28.    On February 22, 2008, under severe commercial duress, having no feasible alternative, and due to HSBC's demands, Polaris informed HSBC that it would forgo its Volume Incentive and proceed with modest revisions to underwriting applications to the Revolving Program. Polaris made it clear that its action was only offered under severe duress, without waiver of its right and remedies under the Agreement, and that it was doing so only to mitigate its damages from HSBC's breach. Polaris had no other practical alternatives to avoid the severe and drastic interruption of customer's retail credit purchases available at that time.

**ANSWER:** HSBC admits that Polaris wrote to HSBC on February 22, 2008 to "propose that Polaris forgo [its] volume incentive and reduce underwriting in accordance with Option 3," one of the alternatives that had been proposed by HSBC, and that Polaris stated in this writing that it was acting under duress, without waiver of its rights and remedies, and that it was doing so to mitigate its damages. HSBC denies the remaining allegations of paragraph 28.

29.    When implementing the changes in March 2008, HSBC went even further than the terms it threatened in January 2008 and unilaterally imposed additional terms and

modifications to the Revolving Program, changes that were even more harmful to Polaris's contractual rights.

**ANSWER:** HSBC admits that it raised promotional interest rates charged to certain customers by 9bps (e.g., from 9.90% to 9.99%) in March of 2008 and denies the remaining allegations of paragraph 29.

30.    As a result of HSBC's wrongful conduct, Polaris has suffered and will continue to suffer substantial damages through the remaining term of the Agreement in an amount to be proved at trial, but in excess $50 million.

**ANSWER:** HSBC denies the allegations of paragraph 30.

31.    Polaris repeats and re-alleges each and every allegation contained in paragraphs 1 through 30 above.

**ANSWER:** HSBC repeats and incorporates here by reference its answers to paragraphs 1 through 30 above.

32.    The Agreement constitutes a valid contract between Polaris and HSBC.

**ANSWER:** HSBC admits the allegations of paragraph 32.

33.    Polaris has performed and continues to perform any and all necessary conditions on its part under the Agreement.

**ANSWER:** HSBC denies the allegations of paragraph 33.

14

34.    HSBC has breached and continues to breach the Agreement by imposing changes to its operation of the Revolving Program in violation of the express terms of the Agreement. Among other things, the Bank breached the Agreement by:

  a.    Wrongfully ending the Volume Incentive Payments due Polaris in violation of Sections 3.a and 14 of the Agreement, Schedule 3a, and the First Amendment to the Revolving Program Agreement;

  b.    Wrongfully raising its Promotion Payments charged by imposing a new formula for the calculation and adjustment of the charge, and by increasing its promotional Annual Percentage Rate adjustment by 9 basis points, all in violation of the Agreement, including Sections 3.b and 14 and Schedule 3b; and

  c.    Taking steps to implement unprecedented, unjustified and arbitrary underwriting changes and related procedures to immediately reduce credit approval rates and related sales volumes, and deny financing for Polaris customers who otherwise would have qualified for the Revolving Program in violation of the Agreement, including Sections 4.g and 14.

**ANSWER:**  HSBC denies the allegations of paragraph 34.

35.    HSBC owes Polaris a duty of good faith and fair dealing that is implied into the Agreement by law, and HSBC has acted in bad faith and breached, and continues to breach, this implied covenant by, among other things, its threats and actions in the middle of long-term, exclusive agreement, to:

  a.    unreasonably reduce the availability of credit to Polaris customers;

  b.    wrongfully frustrate and impair the contractual purpose of maintaining and increasing Polaris retail sales volume;

  c.    force Polaris to forgo its contractual rights and benefits;

  d.    demand these changes to the Agreement while at the same time demanding strict compliance by Polaris with the provisions of the Agreement whereby the Bank holds exclusive rights to any Polaris private label credit card or other revolving promotional financing programs;

  e.    reduce the approval of consumer applicants to the Revolving Program as a means to drive down sales volume and to force a renegotiation of the Revolving Program to wrongfully obtain additional material gain for the Bank; and

15

    f.    carry out the Revolving Program to undermine the Agreement and its purposes, being fully aware that, due to the exclusive nature of the Agreement, Polaris had no alternative but to continue to participate in the HSBC program as demanded by HSBC.

**ANSWER:** HSBC denies the allegations of paragraph 35.

36.    These actions are in violation of the terms of the parties' Agreement and wrongfully deny Polaris the contractual benefits to which it is entitled.

**ANSWER:** HSBC denies the allegations of paragraph 36.

37.    Polaris has been and continues to be harmed by HSBC's breach of the Agreement and its implied duty of good faith and fair dealing, as Polaris has suffered significant and ongoing damages, and impairment to the value of the Agreement.

**ANSWER:** HSBC denies the allegations of paragraph 37.

38.    Polaris repeats and re-alleges each and every allegation contained in paragraphs 1 through 37 above.

**ANSWER:** HSBC repeats and incorporates by reference here its answers to paragraphs 1 through 37 above.

39.    The Bank now asserts, in the middle of a long-term, exclusive agreement that:

    a.    it may unilaterally, arbitrarily, and significantly reduce approval rates for customer credit applications and thereby reduce retail sales volumes for financed sales by its reduction; and

    b.    it may cause Polaris to forgo its contractual rights and benefits by threatening to impose sudden, unreasonable, and drastic reductions of approval rates along with the concomitant loss of retail sales and customers.

16

**ANSWER:** HSBC admits that it has asserted the right, and does have the right, to take the positions it has taken and to make the alterations to credit criteria that have been made. HSBC denies the remaining allegations of paragraph 39.

40.   Polaris believes these assertions and related actions are contrary to and materially frustrate the terms and purposes of the Agreement, and that HSBC's actions to impose same constitute a failure to comply with the Agreement under the indemnity given by HSBC in section 7(b) of the Agreement.

**ANSWER:** HSBC lacks knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 40 regarding what Polaris "believes."

41.   Polaris supplied HSBC with due and proper notice of Polaris's claim for indemnity.

**ANSWER:** HSBC denies that Polaris has a proper or legitimate claim for indemnity and therefore denies the allegations of paragraph 41.

42.   The Declaratory Judgment Act, 28 U.S.C. sec. 2201, 2201, provides, in pertinent part, that

> [i]n a case of actual controversy within its jurisdiction...any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. s. 2201

**ANSWER:** HSBC admits the allegations of paragraph 42.

43.    There is an actual controversy between the Bank and Polaris as set forth above.

**ANSWER:**  HSBC admits the allegations of paragraph 43.

44.    This actual controversy is within the jurisdiction of this Court.

**ANSWER:**  HSBC admits the allegations of paragraph 44.

45.    This Court can and should declare the rights and obligations of the parties relative to this controversy.

**ANSWER:**  HSBC admits the allegations of paragraph 45.

46.    Polaris is entitled to and requests declaratory judgment, whereby this Court resolve this actual controversy between the parties and declare that:

    a.    HSBC breached the Agreement by threatening to drastically reduce the approval rate for consumer applicants to the Revolving Program and thereby radically drive down the volume of retail sales of Polaris products and services;

    b.    HSBC is obligated under the Agreement to continue to provide retail financing based on the applicant approval rates and credit criteria used prior to March 1, 2008, absent evidence that the use of such rates and criteria would directly result in commercially unreasonable losses.

    c.    HSBC's threats and related actions violate and materially frustrate the terms and purposes of the Agreement all of which has and will continue to harm Polaris in its business, and which constitute a failure to comply with the Agreement as provided under section 7.b therein.

**ANSWER:**  HSBC admits that Polaris seeks the described relief but denies that Polaris is entitled to that relief and denies all other allegations of paragraph 46.

POLARIS' PRAYER FOR RELIEF

18

A.    Polaris has been injured by HSBC's wrongful conduct in breach of the express provisions and the implied covenant of good faith in the Agreement between HSBC and Polaris, and as a result, Polaris has been and will continue to be harmed in its business. Polaris is entitled to actual and expectancy damages in an amount to be determined at trial. Polaris also is entitled to such declaratory and equitable relief as is proper to restore the status quo among the parties.

B.    Polaris is entitled to specific performance of the Agreement.

C.    Polaris is entitled to and requests a declaratory judgment declaring that

1.    HSBC breached the Agreement by threatening to reduce the approval rate for consumer applicants to the Revolving Program and thereby radically drive down the volume of retail sales of Polaris products and services;

2.    HSBC is obligated under the Agreement to continue to provide retail financing based on the applicant approval rates and credit criteria used prior to March 1, 2008, absent evidence that the use of such rates and criteria would directly result in commercially unreasonable losses; and

3.    HSBC's threats and related actions violate and materially frustrate the terms and purposes of the Agreement, all of which has and will continue to harm Polaris in its business, and which constitute a failure to comply with the Agreement as provided under section 7.b therein.

D.    Polaris requests an award for costs incurred herein.

E.    Polaris requests such additional relief that the Court deems just and proper.

**ANSWER:** HSBC denies that it is liable for, and denies that Polaris is entitled to, any of the relief it seeks.

## ADDITIONAL DEFENSES

1.    To the extent that Polaris has suffered any damages as a result of conduct by HSBC (which HSBC denies), Polaris has failed to mitigate its damages, for example by failing to take reasonable measures to maintain and increase the volume of revolving credit sales.

19

2.       Although the Agreement runs until 2010, HSBC has offered Polaris the opportunity to terminate the Agreement early, if it wishes to find and is able to find someone to offer a revolving credit program on terms more satisfactory to Polaris than the terms of the Agreement. (Polaris has apparently been unable to find another lender who will offer it better terms, and more relaxed credit approval criteria, than HSBC.) To the extent that Polaris is able to prove any damages as a result of any breach of the Agreement by HSBC, Polaris has failed to mitigate those damages, for example by accepting HSBC's offer to terminate the Agreement and replace HSBC with another lender to provide revolving credit to Polaris customers on terms more to Polaris' liking.

3.       Polaris committed a prior material breach of the parties' agreement by steering and diverting credit customers away from the revolving credit program with HSBC to an installment credit program with GE Money Bank.

4.       Polaris' claims are precluded by the defense of laches. On a regular and repeated basis since the Agreement was signed in August of 2005, HSBC has dictated and has made changes to the underwriting criteria, including the criteria by which it has approved credit to consumers, under the Agreement. HSBC made Polaris fully aware of those changes, Polaris acknowledged HSBC's right to make those changes, and Polaris never objected to or otherwise took issue with HSBC's assertion of the right to make those changes. Additionally, in 2007, HSBC made Polaris aware that it might make additional changes to the underwriting criteria for 2008. Polaris acknowledged HSBC's right to make those changes, and Polaris never objected to or otherwise took issue with HSBC's assertion of the right to make those changes. Polaris never indicated prior to January of 2008 that it would take the position that HSBC lacked the right to alter the underwriting criteria for the revolving credit program, HSBC had every right and

expectation to assume that it had the ability to tighten those underwriting criteria and that its rights in that regard were not and would not be challenged, and HSBC relied to its detriment on Polaris' silence on this issue. Polaris' delay in stating its current position (that HSBC does not have the right to tighten the underwriting criteria for the revolving credit program) has prejudiced HSBC and in light of the circumstances resulting from Polaris' delay, it would be inequitable to grant Polaris the relief it seeks.

5.     Polaris' claims are precluded by the defense of estoppel, based upon the facts stated above.

6.     Polaris' claims are precluded by the defense of waiver, based upon the facts stated above.

## COUNTERCLAIM

Defendant HSBC Bank Nevada, N.A. ("HSBC"), states as its counterclaim against plaintiff Polaris Sales Inc. ("Polaris") as follows:

1.     Polaris and HSBC clearly and unambiguously stated in their Revolving Program Agreement, dated August 10, 2005 (the "Agreement," a copy of which is attached hereto as Exhibit A) that HSBC would bear the credit risk for the revolving program. Specifically, the Agreement states, "HSBC or its Affiliates shall own all Accounts and shall bear the credit risk for such Accounts." (Agreement, attached hereto as Exhibit A, §2)

2.     Not surprisingly, because the parties agreed that HSBC would bear all of the risk associated with the revolving credit program, HSBC has the right to set the credit approval criteria. The provisions of the Agreement are clear and unambiguous as to the nature and extent of the very limited restrictions on HSBC's right to alter those criteria. Specifically, the parties agreed that:

a.     HSBC would use particular credit score cut-offs through the end of 2005, as explicitly stated in the Agreement, which provides, "During the period of time beginning ten (10) business days following the Effective Date through December 31, 2005, HSBC agrees to utilize credit score cutoffs used just prior to the January, 2005 score cutoff adjustments. (Agreement, attached hereto as Exhibit A, §4f.)

b.     If volume fell below a certain point, the parties would meet to discuss how to increase sales volume, e.g., by modifying credit criteria: "The parties agree that if the dollar volume of Card Sales generated by the Revolving Program during any twelve (12) month period is less than $350,000,000.00, then the parties will meet to discuss proposed changes to the Revolving Program such as, for example, credit underwriting, credit promotion mix, marketing strategies and support, and other proposed changes in an effort to increase Card Sales." (Agreement, attached hereto as Exhibit A, §4g.)

3.     If the parties had intended to include in their Agreement other, additional restrictions on HSBC's right to alter credit score cut-offs and other underwriting criteria from and after the end of 2005, they could have. Their inclusion of the few limitations described above indicates that they would have explicitly spelled out any additional limitations, had they intended that there should be any. They chose not to, and HSBC's right to set those criteria from and after the end of 2005 is unrestricted, except for the obligation to meet and discuss if volume should fall below $350 million.

4.     Volume has not fallen below $350 million.

5.      The parties also made clear HSBC's ability to alter credit criteria in Section 2 of
their Agreement, which defines the Agreement's "Scope."  Specifically:

a.      HSBC entered into a separate agreement with the Polaris Dealers who were
accepted for participation in the program (the "Dealer Revolving Agreement," a
copy of which is attached hereto as Exhibit B).   That Dealer Revolving
Agreement explicitly states that "All completed applications for Accounts
submitted by Dealer to HSBC whether mailed, telephoned or otherwise
electronically transmitted *will be processed and approved or declined in
accordance with such credit criteria and procedures established from time to
time by HSBC with HSBC having and retaining all rights to reject or accept
such applications.*"  (Dealer Revolving Agreement, attached hereto as Exhibit B,
§2b)

b.      The Dealer Revolving Agreement – which includes the provision quoted above
specifically stating that HSBC alone shall establish the program's credit criteria --
was explicitly referenced by Polaris and HSBC in their Agreement.  Specifically,
in defining the "Scope" of the Agreement between them, HSBC and Polaris
agreed and acknowledged that, " . . . Polaris requested and HSBC agreed to
provide a Private Label Credit Card program and Debt Cancellation program for
consumers purchasing Goods from Dealers (the "Revolving Credit Program")
*under the terms and conditions of agreements with Dealers ("Dealer Revolving
Agreements") entered into heretofore and hereafter between HSBC and
Dealers.*"  (Exhibit A, Section 2.)

23

6.    The parties' intent must be gleaned, where possible, from the four corners of the Agreement.

7.    The Agreement is clear and unambiguous on its face:  HSBC was to use certain credit score cut-off criteria until the end of 2005, and HSBC will meet with Polaris to discuss modifying such criteria to increase sales volume, should sales volume fall below $350 million. Otherwise, there is no restriction on HSBC's ability to alter credit approval criteria.  Indeed, the Agreement is premised upon and makes explicit and specific reference to the Dealer Revolving Agreement, which explicitly states and confirms that the underwriting criteria are to be determined by HSBC.

8.    In light of changes in the credit and financing markets, and faced with deteriorating performance of the various promotions offered under the revolving credit program, HSBC notified Polaris in January 2008, that it would be altering the credit criteria for that program.  In an effort to mitigate the impact on Polaris, HSBC offered, in addition to and as alternatives to the tightening of the credit criteria, several other options, including altering the participation payments.

9.    Polaris accepted one of the proffered options which provided that changes (including altered approval criteria) would be made to the program in March of 2008.

10.    The clear and unambiguous language of the agreement establishes both the spirit and intent of the agreement as well as HSBC's compliance with that spirit and intent.

10.    Polaris alleges that HSBC does not have the right to alter the criteria that it uses to approve credit to consumers under the Agreement.

24

11.    Polaris alleges that HSBC did not have the right to make the program changes it announced in January 2008, and made in March of 2008, including changes to the criteria it uses to approve credit to consumers under the Agreement.

12.    There is an actual controversy under 28 U.S.C. § 2201 between the Bank and Polaris as set forth herein, which controversy is within the proper jurisdiction of this Court.

## PRAYER FOR RELIEF

WHEREFORE, HSBC respectfully prays that this Court enter judgment in its favor and grant it the following relief:

A.    HSBC asks the Court to declare the rights and obligations of the parties relative to this controversy and declare that:

a.    HSBC has the right under the Agreement to alter the criteria it uses to approve credit to consumers under the Agreement.

b.    HSBC had the right under the Agreement to make the changes it announced in January 2008, and the changes it made in March 2008, to the criteria it uses to approve credit to consumers under the Agreement.

c.    HSBC did not breach the Agreement by announcing its intention to tighten the criteria it uses to approve credit to consumers under the Agreement or by making changes to those criteria.

d.    HSBC is not obligated under the Agreement to continue to provide retail financing based on the applicant approval rates and credit criteria used prior to March 1, 2008.

e.    The clear and unambiguous language of the agreement establishes both the spirit and intent of the agreement as well as HSBC's compliance with that spirit and intent.

25

B.    HSBC also seeks its costs and fees incurred herein, and such other relief as the Court deems just and proper.


Dated:  May 1, 2008                          /s/  Linda K. Stevens
                                                      Ronald S. Safer
                                                      Linda K. Stevens
                                                      SCHIFF HARDIN LLP
                                                      6600 Sears Tower
                                                      Chicago, Illinois  60606
                                                      312-258-5500

                                                      Attorneys for Defendant
                                                      HSBC BANK NEVADA, N.A.

EXHIBIT A

**REDACTED -- copy of Revolving Program Agreement
and First Amendment thereto removed in accordance
with the Court's April 8, 2008 Order**

# EXHIBIT B

**REDACTED – copy of Revolving Credit Dealer Agreement removed pursuant to Court's July 8, 2008 Order**

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on May 1, 2008, she electronically filed the foregoing HSBC's Answer, Affirmative Defenses and Counterclaim with the Clerk of the Court by using the CM/ECF system which will send notification of such filing to the following:

> Thomas M. Lynch
> James J. Hegarty
> Wildman Harrold Allen & Dixon LLP
> 225 West Wacker Drive, Suite 3000
> Chicago, Illinois 60606

/s/ Linda K. Stevens

CH2\2466625.1

**EXHIBIT C**

**Exhibit C REDACTED -- copy of Revolving Program Agreement removed pursuant to Court's April 8, 2008 Order**

**EXHIBIT D**

**Exhibit D REDACTED – copy of Revolving Credit Dealer Agreement removed pursuant to Court's July 8, 2008 Order**

**EXHIBIT E**

**Exhibit E REDACTED – copy of 2-29-08 letter to Scott Swenson removed pursuant to Court's July 8, 2008 Order**

**EXHIBIT F**

**Exhibit F REDACTED – copy of 2-18-08 letter to HSBC removed pursuant to Court's July 8, 2008 Order**

**EXHIBIT G**

**Exhibit G REDACTED – copy of 2-22-08 letter to Pat Burke removed pursuant to Court's July 8, 2008 Order**

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on May 27, 2008 she served copies of the foregoing Defendant HSBC's Motion for Summary Judgment, Brief in Support of Motion for Summary Judgment, and Statement of Uncontested Facts Pursuant to Local Rule 56.1(a)(3), upon the following via email and U.S. mail:

Thomas M. Lynch
James J. Hegarty
Wildman Harrold Allen & Dixon LLP
225 West Wacker Drive, Suite 3000
Chicago, Illinois  60606
lynch@wildmanharrold.com

Linda K. Stevens

CH2\2515174.1