**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **POLARIS SALES INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 08 CV 1924** |
| **v.** | ) | |
| | ) | **Judge Zagel** |
| **HSBC BANK NEVADA, N.A.,** | ) | |
| | ) | **Magistrate Judge Mason** |
| **Defendant.** | ) | |
| | ) | |

## POLARIS SALES INC.'S RESPONSE TO MOTION FOR SUMMARY JUDGMENT

HSBC Bank Nevada, N.A.'s, ("HSBC") "simple" summary of this case illustrates why it cannot prevail on summary judgment.[1] It is HSBC, not Polaris Sales Inc. ("Polaris"), that was "displeased" with "the clear and bargained for terms set forth in the [Program] Agreement". (*Id.*) For that very reason, HSBC suddenly, drastically, and without justification threatened to tighten credit underwriting standards to extract substantial concessions from Polaris that frustrate the express purpose of the Agreement. Resolving HSBC's motives and the reasonableness of its actions requires an analysis of more than just the language of the Agreement – it is quintessentially an issue of fact and an inquiry that HSBC is trying to avoid by seeking summary judgment before discovery.

In seeking summary judgment, HSBC also ignores several critical facts. First, HSBC ignores that the Agreement has no express language granting HSBC sole or unfettered discretion to drastically alter underwriting standards. Indeed, the language HSBC cites as proof that the parties were clear in other areas (Brief at 3-4), merely highlights that there is no similar clear language giving HSBC unfettered discretion on credit underwriting. This ambiguity alone is sufficient to deny HSBC's motion.

---

[1] *See* HSBC's Brief in Support of Motion for Summary Judgment ("Brief") at 1.

Second, HSBC ignores that the primary language upon which it relies is not even in the Agreement. Rather, HSBC relies almost exclusively on language in the form Dealer Revolving Agreements between HSBC and Polaris dealers ("DRAs"). HSBC, however, fails to identify Section 20 of the Agreement which states that Polaris is not subject to those agreements.

Third, HSBC ignores Polaris' claim for breach of contract, including the implied covenant of good faith and fair dealing. The key question on that claim is not whether HSBC has discretion to alter underwriting, but whether it exercised its discretion appropriately. Here, HSBC seeks a declaration, without any express language in the Agreement, that the parties intended to allow HSBC to shut off credit to Polaris customers on a whim, and without any regard for Polaris' business goals and the purpose of the Agreement. Such a declaration not only defies common sense, it defies the express language in the Agreement and HSBC's implied covenant of good faith and fair dealing.

Lastly, HSBC ignores that its threat to cut credit approval rates almost in half was not only a radical departure from the parties' past dealings, but is contrary to the purpose of the Agreement and a brazen attempt to extort contractual concessions that deprived Polaris of the key intended benefit of the Agreement — its $20 million annual volume incentive income. HSBC's threats, if enacted, would have drastically reduced sales volume even though it is clear from the Agreement's language and incentive structure, and the parties' dealings under negotiation of the Agreement, that the Agreement's purpose was to increase sales volume.

In sum, HSBC has not and cannot meet its burden on summary judgment. At a minimum, the issues highlighted above raise genuine issues of material fact in this dispute. As Polaris is entitled to have all reasonable inferences resolved in its favor, it is clear that summary judgment is not appropriate.

## FACTS

I.    **Intent of the Parties and Purpose of the 2005 Agreement**

On August 10, 2005, Polaris and HSBC entered into the Revolving Program Agreement ("Agreement", Resp. ¶¶4-7[2]) to provide a Private Label Credit Card program and Debt Cancellation program for retail customers to finance purchases of Polaris vehicles and related goods and services. (Resp. ¶¶1, 2, 4-7)  The purpose of the Agreement is clearly set forth: "Polaris and HSBC have joined in this Agreement to promote their <u>respective business goals</u>." (*Id.*) (emphasis added)  While the Agreement does not define each party's "respective business goals," the negotiation and language of the Agreement makes clear that increasing retail sales volume was a mutual goal of the parties.

A.    **The Negotiation and Background of the Agreement**

Polaris and HSBC entered into the Agreement in 2005 after performing under an earlier agreement through which they shared the risk of extending credit to consumers.  (The "2001 Agreement"; Resp. ¶3)  In 2005, HSBC approached Polaris and expressed a desire to loosen the credit criteria to approve more applicants and increase sales volume.  (Resp. ¶6)  When Polaris informed HSBC that it preferred a more conservative approach, HSBC responded by proposing a volume-based structure under which Polaris received a monthly payment based upon the sales volume without being required take on the credit risk.  (Resp. ¶5)  This proposal directly led to the Agreement of August 10, 2005.  (Resp. ¶7)

During negotiations of the Agreement, HSBC represented to Polaris that the volume-based approach enabled HSBC to apply less conservative underwriting standards to drive

---

[2] Polaris incorporates herein the facts submitted in the accompanying "Polaris Sales Inc.'s Local Rule 56.1(b)(3) Response" (hereinafter referred to as the "Resp.").

additional volume. (Resp. ¶7)  Indeed, this intent is evidenced by negotiations related to Sections 4(f) and 4(g) of that Agreement.  When the parties negotiated Section 4(f), Polaris proposed language that limited HSBC's right to change underwriting standards.  (Resp. ¶9)  Rather than insisting on language that reserved to HSBC sole or unfettered discretion, HSBC proposed alternative limitations to its right to alter underwriting.  (Resp. ¶10)

When the parties could not agree, the stalemate was broken only when HSBC represented to Polaris that Polaris should not worry about placing a specific limitation on HSBC because HSBC intended to manage underwriting in a manner that would increase sales volume.  (Resp. ¶¶11-12)   Only after this representation did the parties settle on the final language which expressly limited HSBC's rights to alter underwriting criteria before 2006, but are silent after then.  (*See* Agreement, §4(f); Resp. ¶13)  If the parties intended HSBC to have unfettered discretion on such a critical provision, they would have given it "sole discretion" just as they did in five other places in the Agreement on non-underwriting provisions.  (Resp. ¶¶49-54; see also Resp. ¶55)

Similarly, Paragraph 4(g) was intended as a hedge against decreasing sales volume.  Section 4(g) provides:

> The parties agree that if the dollar volume of Card Sales generated by the Revolving Program during any twelve (12) month period is less than $350,000,000.00, then the parties will meet to discuss proposed changes to the Revolving Program such as, for example, credit underwriting, credit promotion mix, marketing strategies and support, and other proposed changes in an effort to increase Card Sales.

(Resp. ¶37)  At the time HSBC proposed the language in Paragraph 4(g), HSBC told Polaris that the purpose of the language was to protect HSBC against the sales volume shifting away from HSBC's revolving program to Polaris' installment retail financing program, in which HSBC

played no role. (Resp. ¶15)  It is clear from this provision that increasing sales volume was a primary purpose of this Agreement.

There are several other examples in the Agreement that illustrate that the purpose of the Agreement was to increase sales volume. (*See* Agreement §4(a) (Polaris should promote and encourage dealer participation); Schedule 3c ($250,000 to promote and market the program); Agreement §5(b) (customer service standards designed to ensure speedy transactions); *id.* at §5(e) (HSBC required to provide monthly *"sales and marketing"* reports); *id.* at §9(a) (HSBC required to report on sales volumes)) (Resp. ¶¶26, 34, 35, 38, 39, 40)  Taken together, these provisions demonstrate that the purpose of the Agreement is to support and increase sales volume through the Revolving Program, and that HSBC's underwriting standards were to be managed consistent with that purpose. (*See also,* Resp. ¶¶29-33, 36, 41)

**B.      The Dealer Agreements are Not Part of the Agreement**

The Agreement contains several references to the separate DRAs between HSBC and Polaris dealers. (Brief at 5, 14)  The DRAs, however, are not part of the Agreement.  To the contrary, the DRAs are expressly excluded from the Agreement under Section 20, which makes clear that Polaris is neither a party to nor bound by any contract between HSBC and dealers:

> Except as specifically provided in this Agreement, (i) Polaris shall not be a party to any agreement between HSBC and Individual Dealers, (ii) Polaris shall not be responsible for the obligations of HSBC and any Dealer one to the other, including without limitation, the payment of any amounts owed by one to the other, and (iii) Polaris shall not be in any way responsible for the acts, omissions or breaches of any arrangements or contract between HSBC and Dealers or for any other obligations of HSBC or any Dealer.[3]

(Resp. ¶56)  There is no express incorporation of any underwriting terms from the DRA into the Agreement.  In addition, Section 2 of the Agreement confirms that HSBC cannot bind Polaris to

---

[3] Section 19 of the Agreement contains similar language with respect to agreements between Polaris and dealers, reinforcing the point that contracts with dealers are separate, extrinsic matters except as specifically provided by the Agreement. (Resp. ¶57)

any obligations. (*See* Agreement § 2 ("[n]either Polaris nor HSBC shall have the power or authority to incur any obligation legally binding upon the other.") (Resp. ¶58)

## II.  HSBC's Proposed and Actual Changes to the Agreement

As they had done under the 2001 Agreement, Polaris and HSBC continued to regularly meet and confer after signing the Agreement.  Though HSBC claims that the Agreement intended to vest unfettered discretion in HSBC, HSBC continued the practice of providing Polaris with quarterly business reviews regarding the performance of the Polaris portfolio – including discussions about underwriting changes, and the parties continued to work together to make changes to the program as needed, including changes to the underwriting.  (Resp. ¶59) Over the course of its relationship, HSBC and Polaris reviewed actual experiences which confirmed that tighter underwriting standards would disrupt Polaris' relationships with its dealers, and the dealers' relationships with customers.  (Resp. ¶60)  Because of this disruption, the parties worked together to moderate changes in approval rates under both the 2001 Agreement and the Agreement.  (Resp. ¶¶59-60)  From 2005 to 2007, approval rates averaged around 47 percent.  (Resp. ¶61)

In January 2008, everything changed.  After assuring Polaris in December 2007 that the core portfolio was performing as expected, on January 25, 2008, HSBC shocked Polaris when it announced its intention to tighten credit scores so drastically that approval rates would plummet from about 52 percent to approximately 28 percent in little more than 30 days.  (Resp. ¶¶62-63) HSBC knew full well that such a sudden and drastic change would severely disrupt Polaris' relationships with its dealers and its customers and necessarily would reduce sales volume. (Resp. ¶71)  Additionally, HSBC knew that the short time period and the exclusivity clause in the Agreement would prevent Polaris from securing an alternative revolving credit source.

(Resp. ¶65)  Polaris immediately told HSBC that the proposed change was unjustified given HSBC's recent observations on the overall performance of the core Polaris portfolio.  (Resp. ¶66)  Polaris made several requests for factual information about the need for these changes to enable the sides to solve any problem that in fact existed, but HSBC did not provide the requested information.  (Resp. ¶¶67-68)

The drastic decline in approval rates HSBC proposed was to take effect March 1, 2008, unless Polaris succumbed to variety of options that gutted the profitability of the Agreement for Polaris.  (Resp. ¶63)  Polaris' "options" to avoid some of the radical underwriting changes threatened by HSBC included: (1) accepting a drastic re-indexing of promotional discounts or severe adjustments to volume incentives that severely change the structure provided in the Agreement; (2) accepting a radical increase for promotional costs over the agreed structure in Section 3(b) and Schedule 3b; or (3) foregoing Polaris' primary income source under the Section 3(a) and Schedule 3a.  (Resp. ¶64)  Each "option" required Polaris to forego substantial benefits under the Agreement, to avoid the sure disruption to its dealer and customers.  (Resp. ¶71) Acting under duress, Polaris chose "Option 3" and was thus forced to give up nearly $20 million per year in financial income for the remaining term of 2.5 years of the exclusive Agreement. (Resp. ¶¶72, 75)

### III.    Polaris' Lawsuit

On April 3, 2008, Polaris filed its complaint against HSBC, alleging breaches of both the implied covenant of good faith and fair dealing as well as the express provisions of the Agreement.  Specifically, HSBC breached the implied covenant of good faith and fair dealing by threatening to drastically slash approval rates without any reasonable justification to extort huge contractual concessions from Polaris.  (Resp. ¶¶75-76)  HSBC's action breached the express

provisions of the Agreement as well because, among other things, it amounts to a unilateral change in violation of Section 14 and violates HSBC's obligations pay Polaris its volume incentive payment under Section 3(a) and Schedule 3b. Far from agreeing to HSBC's changes, Polaris made it clear that it was being forced under duress to succumb to HSBC's demands. (Resp. ¶72) Polaris' seeks damages in excess of $50 million for HSBC's breach. (Resp. ¶¶75-76)

## ARGUMENT

### I.    Standard of Review for Summary Judgment

Summary judgment is a drastic remedy which should be granted only when it is clear that the requirements of Rule 56 have been met. *Gonzalez v. Board of Trustees of Community College District No. 508*, 1986 U.S. Dist. LEXIS 20443 at *1 (N.D. Ill. Sept. 12, 1986). Rule 56 requires HSBC to show, based upon all the record evidence, that there is no genuine issue of material fact. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Guzman v. Sheahan*, 495 F.3d 852, 856 (7th Cir. 2007). In determining whether a genuine issue of material fact exists in this case, the Court must construe all facts in the light most favorable to Polaris and draw all reasonable inferences in favor of Polaris. *Abdullahi v. City of Madison*, 423 F.3d 763, 769 (7th Cir. 2005). HSBC has not met its burden.

### II.    Numerous Genuine Issues of Material Fact Preclude Summary Judgment

HSBC's request for a summary declaration that it can drastically alter underwriting standards without any regard to the impact on Polaris or the intended purpose of the Agreement should be denied. As illustrated below, genuine issues of material fact exist, including, without limitation, the following:  (1) whether the Agreement expressly or implicitly grants HSBC unfettered discretion to alter underwriting; (2) whether HSBC's actions were contrary to the purpose of the Agreement; and (3) whether HSBC acted in good faith by threatening

unprecedented underwriting changes to extract contractual concessions from Polaris. The existence of these genuine issues of fact precludes summary judgment.

### A. The Agreement Does Not Clearly and Unambiguously Give HSBC with Unfettered Discretion to Adjust Credit Criteria

HSBC argues that the Agreement clearly and unambiguously grants it unfettered discretion to alter underwriting standards. (Brief at 10-15) However, the most critical piece of evidence is missing – HSBC cannot point the Court to any express language in the Agreement that gives HSBC unfettered, unlimited, or sole discretion – express language one would expect to see for a grant of unfettered discretion. The absence of such language is telling because when the parties intended HSBC to have "sole discretion" or "discretion," they made that explicitly clear in four other sections of the Agreement unrelated to underwriting. (Resp. ¶¶49-54) This language is notably absent where HSBC's underwriting is discussed, and its absence dooms HSBC's argument.

Because there is no express declaration in the Agreement, HSBC argues that the Agreement clearly and unambiguously grants HSBC, by implication, the unfettered right to suddenly, drastically, and without justification alter credit underwriting standards without any regard to the consequences to Polaris' business goals or the intended purpose of the Agreement to increase retail sales. While this "clear and unambiguous by implication" approach speaks volumes about HSBC's theory on summary judgment, it also fails on the evidence because the provisions cited by HSBC favor Polaris' view of this case, not HSBC's.

First, HSBC cites to numerous Agreement provisions where the parties expressly agreed to discuss certain matters. (Brief at pp. 12-13) These provisions merely highlight the main weakness in HSBC's case – if the parties intended HSBC to have unfettered or broad discretion on underwriting changes they would have said that in the Agreement, as they did in eight other

provisions in the Agreement for non-underwriting issues.  (Resp. ¶¶49-55)  Moreover, as discussed below, Polaris is not claiming that HSBC has no discretion, only that HSBC must exercise that discretion in good faith as required by the implied covenant of good faith and fair dealing.  (*See infra* at II.C)  To prevail on its summary judgment motion, HSBC must demonstrate that there is no factual dispute whether the parties agreed to relieve HSBC of its obligation to act in good faith.  However, there is no evidence that demonstrates this claim.

Second, HSBC ignores key express language in the Agreement that is fatal to its "clear and unambiguous by implication" argument.  HSBC spends significant time arguing that the DRAs[4] make its case.  (Brief at 5-6, 14-15)  But Section 20 of the Agreement clearly provides that the DRAs are not part of the Agreement.  (Resp. ¶56)  Additionally, Section 2 of the Agreement makes it clear that HSBC cannot bind Polaris to any terms between HSBC and the dealers: "[n]either Polaris nor HSBC shall have the power or authority to incur any obligation legally binding upon the other."  (Resp. ¶58).  In light of these express limitations, the extrinsic DRAs are irrelevant to this dispute.

Moreover, HSBC's suggestion that any discretion granted to HSBC by the DRAs was incorporated into the Agreement makes no sense.  (Brief at 14)  The DRAs are form contracts between HSBC and Dealers that HSBC has used both under the 2001 Agreement and the current Agreement.  (Resp. ¶¶16-17)  Indeed, the key DRA language on which HSBC relies (*i.e.,* "...credit criteria and procedures...established from time to time by HSBC") is contained unchanged in the form DRAs used by HSBC and its predecessor under the 2001 Agreement and that agreement's completely different underwriting arrangement.  (Brief at 5) (Resp. ¶¶16-18)  Consequently, it does not make sense for HSBC to claim that this unchanged language must now be read as a clear statement of the parties' intentions regarding their obligations to one another

---

[4] The form Dealer Revolving Credit Agreements. (*See* Resp. ¶16)

under the Agreement.  It is far more reasonable to conclude that if the parties actually intended to grant HSBC sole discretion, they would not do that by implication, but by clear, express language – as they did elsewhere in the Agreement on other subject matters.  (*See* Resp.  ¶¶49-54)  At best, the DRAs only raise an issue of fact.

Lastly, there is a rational explanation for why HSBC could have the unfettered discretion it claims to have in the DRAs, but does not under the Agreement.  The DRAs are form agreements between HSBC and hundreds of dealers that merely grant dealers access to HSBC's revolving program on terms "established from time to time by HSBC."  In that context, it makes sense the HSBC needs freedom to make unilateral changes without negotiating with each dealer.  Here, Polaris and HSBC have a course of dealing going back seven years, under both the 2001 Agreement and the Agreement, in which they have regularly met to discuss and jointly develop the terms of that Program.  This process worked for the parties until January 2008 when HSBC radically departed from this approach.  This issue of fact that exists is whether HSBC's departure was or was not made in good faith.

**B.    There is a Genuine Issue of Material Fact Regarding Whether HSBC's Actions Were Contrary to the Purpose of the Agreement**

HSBC also argues that because the Agreement assigned the credit risk to HSBC, it necessarily follows that the parties intended to grant it unfettered discretion to make any underwriting changes.  (Brief at 5, 10)  HSBC again misses the point.  Polaris does not claim that HSBC has no discretion on underwriting.  But HSBC nevertheless seeks an unlimited declaration that the parties intended to allow HSBC to adjust underwriting standards whenever and however it likes regardless of any consequences to Polaris or the revolving finance program.  HSBC seeks a summary declaration, however, that directly contradicts and frustrates the stated purpose of Agreement to increase sales volume.

Section 2 states the purpose of the Agreement: "Polaris and HSBC joined in this Agreement to promote their respective business goals." (Resp. ¶23) This language clearly states that the parties intended to further the goals of both parties, not just HSBC. The purpose of the Agreement – including shifting the credit risk to HSBC – was to drive sales volume, not solely to manage credit risk. Indeed, the Agreement is replete with provisions where the parties are obligated to take actions that drive sales growth or are rewarded for increased sales volume. (*See supra* at 3-4; Resp. ¶¶27-28, 35-36, 42-45)

Additionally, driving volume was the main reason why the Agreement came to be. As the 2001 Agreement was coming to an end, one of the friction points had been that HSBC wanted to adopt looser credit standards than Polaris. (Resp. ¶5) HSBC's solution was to propose the volume-based structure, whereby HSBC took on the credit risk and Polaris was incentivized via the Volume Incentive Payment to increase sales volume. (Resp. ¶¶6-7) The gist was straightforward – HSBC will promote sales by managing the credit standards, Polaris will promote the Program through its dealer network and receive a Volume Incentive Payment. The parties did not agree to relieve HSBC of its obligation to act in good faith. (Resp. ¶48) [5]

While HSBC would prefer that the Court disregard evidence that sheds light on why HSBC and Polaris entered the Agreement, determining the parties' intent requires looking at both the Agreement and extrinsic evidence. *Hilton Hotels Corp. v. Butch Lewis Productions*, 107 Nev. 226, 231 (1991)(*"Hilton I"*). To the extent that HSBC maintains that the spirit and intent of the Agreement are anything other than to promote sales through the Revolving Program, then its purpose becomes a question of material fact, making summary judgment inappropriate at this early stage of the litigation.

---

[5] Importantly, Polaris has asked HSBC to provide the data it relied upon when it threatened the drastic underwriting changes, but HSBC has steadfastly refused to provide that information to Polaris. (Resp. ¶¶67-68)

C.    **HSBC's Breach of the Implied Covenant of Good Faith and Fair Dealing is a Question of Fact**

Although its entire discussion of the implied covenant of good faith and fair dealing is relegated to a footnote in its brief (Brief at 1, n.1), HSBC's assertion of discretion necessarily invokes these principles. Indeed, the heart of this dispute is not whether HSBC could alter underwriting, but whether it exercised its discretion in good faith. HSBC may attempt to avoid this inquiry, it remains the fundamental question here, an unavoidable fact question that cannot be resolved on summary judgment.[6]

Under Nevada law, every contract imposes upon the contracting parties the duty of good faith and fair dealing. *Hilton Hotels Corp. v. Butch Lewis Productions, Inc.,* 109 Nev. 1043, 1046 (1993) (*"Hilton II"*). *See generally, Markowitz v. Ryland Mortgage Co.*, 1995 U.S. Dist. LEXIS 11323 at *5-6 (N.D. Ill. Aug. 9, 1995) ("[C]ontractual discretion does not free a party to act without regard to the consequences for the other contracting party."). This duty limits HSBC's discretion by prohibiting it from acting contrary to the spirit and intent of the Agreement, and expressly forbids the exercise of contractual discretion to deny the intended benefit of the contract, <u>even when it does not violate any express terms</u>. *Hilton I,* 107 Nev. at 232-33. The implied covenant also prevents HSBC from depriving Polaris of its right to receive the intended benefits of the Agreement. *Western States Minerals Corp. v. Jones,* 1991 Nev. LEXIS 17 at *17 (March 7, 1991). Thus, even if HSBC could show that it literally complied with the express terms of the Agreement, it breached its implied covenant if it deliberately contravened the intention and spirit of the contract. *Hilton II,* 109 Nev. at 1048. *See also, Morris v. Bank of America Nevada,* 110 Nev. 1274, 1278 (1994) ("Whether a breach of the letter

---

[6] Polaris has also alleged that by coercing Polaris to forego it volume incentive income, HSBC violated various express terms, among other things, Sections 3(a), 3(b) and 14, and Schedules 3a and 3b of the Agreement, and the implied duty of good faith and fair dealing in the Agreement. (Resp. ¶76) And the related question of whether Polaris acted under duress also clearly presents material questions of fact. (Resp. ¶72)

of the contract exists or not, the implied covenant of good faith is an obligation independent of the consensual contractual covenants."); *Western States Minerals, supra*, at *17 (the implied covenant is "ordinarily recognized as a kind of accessory remedy ... where the terms of a contract are literally carried out, but the spirit of the agreement and the intentions of the party are not").

Nevada law disfavors summary adjudication of implied covenant claims that focus solely on contractual language:

> Although some courts still follow traditional bargain theory and refuse to delve beyond the express terms of a written contract, the better approach is for the parties to examine the circumstances surrounding the parties' agreement in order to determine the true mutual intentions of the parties. Courts today tend to be willing to look beyond the written document to find the "true understanding of the parties."

*Hilton I*, 107 Nev. at 231. Nevada courts explicitly prefer this fact-intensive inquiry to contractual interpretation that is limited to the "four corners of the contract." (*Id.*) Whether a party has breached the implied covenant of good faith is a question of fact. *Consolidated Generator Nevada, Inc. v. Cummins Engine Co.*, 114 Nev. 1304, 1312 (1998); *Mitchell v. Bailey and Selover, Inc.*, 96 Nev. 147, 150 (1980); *A.C. Shaw Construction, Inc. v. Washoe County, South Truckee Meadows General Improvement District*, 105 Nev. 913, 915 (1989).

Simply put, HSBC cannot avoid its duty of good faith simply by claiming the Agreement is silent on, or otherwise lacks of an express term that specifically limits HSBC's discretion. Indeed, even had HSBC complied with the express terms of the Agreement (and it did not), a genuine issue of material fact exists as to whether HSBC's threat to cut customer approvals almost in half to coerce Polaris to concede its primary income source under the Agreement contravened its spirit and purpose and denied Polaris its intended and negotiated benefits. (Resp. ¶75) Indeed, Polaris presents evidence supporting a reasonable view of the negotiations of the

parties, the language of the Agreement and the purpose of the Agreement which contradicts HSBC's statements regarding the Agreement and the parties' relationship.  (*See* supra at §I.A) The reasonable inferences to which the Polaris submissions are entitled and the genuine issues of fact they reveal preclude summary judgment.

Finally, the question of whether HSBC acted in good faith is quintessentially a disputed issue of fact.  For example, HSBC claims that "changes in the credit and financing markets" and a "capricious or lagging economy" are the reasons it threatened such drastic and precipitous changes, and ultimately forced Polaris to forego its Volume Incentive Payment.  (Brief at 6, 10) But HSBC offers no evidence for this claim.  Indeed, when HSBC presented its January 2008 ultimatum,  Polaris immediately disputed whether HSBC's demands could be justified based on the performance of its core retail portfolio, and requested HSBC to provide factual information relating to its decision.  HSBC has refused to provide the requested information (Resp. ¶67-68), further revealing that genuine issues of material fact regarding HSBC's good faith or lack thereof exist.  Accordingly, defendant's motion must be denied.

## CONCLUSION

Polaris need only show the existence of a single genuine issue of material fact to avoid summary judgment.  Polaris respectfully submits that it has gone well beyond this minimal showing.  Consequently, HSBC's motion for summary judgment must be denied.  This is especially true here, where a quintessential fact issue (*i.e.*, whether HSBC acted in good faith when it threatened to make unprecedented underwriting changes to extort huge contractual concession from Polaris) has not been subjected to any discovery.  HSBC has successfully stonewalled Polaris' pre-litigation and continuing requests for this information, but HSBC should not be allowed to avoid providing this information in discovery.

Dates:  June 24, 2008

Respectfully submitted,

POLARIS SALES INC,
Plaintiff

By:    /s/ Thomas M. Lynch
       One of Plaintiff's Attorneys

Thomas M. Lynch  (6197698)
James Hegarty  (6280186)
Wildman, Harrold, Allen & Dixon LLP
225 West Wacker Drive, Suite 2800
Chicago, Illinois 60606
Telephone: (312) 201-2000
Facsimile: (312) 201-2555

*Attorneys for Plaintiff Polaris Sales Inc.*

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on June 24, 2008, he served copies of

the foregoing Polaris Sales Inc.'s Response to Motion For Summary Judgment via e-mail and

U.S. mail, and on July 8, 2008 by ECF, upon the following counsel of record:

> Linda K. Stevens, Esq.
> Schiff Hardin LLP
> 6600 Sears Tower
> 233 South Wacker Drive
> Chicago, Illinois 60606
> lstevens@schiffhardin.com


                              /s/ James J. Hegarty