PORTIONS REDACTED HEREIN FILED
UNDER SEAL PURSUANT TO L.R. 26.2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| POLARIS SALES INC., | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 08 CV 1924** |
| v. | ) | |
| | ) | **Judge Zagel** |
| HSBC BANK NEVADA, N.A., | ) | |
| | ) | **Magistrate Judge Mason** |
| **Defendant.** | ) | |

### POLARIS SALES INC.'S LOCAL RULE 56.1(b)(3) RESPONSE
### IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

In accordance with Local Rule 56.1(b)(3), Plaintiff Polaris Sales Inc. ("Polaris") hereby responds to Defendant HSBC Bank Nevada N.A.'s ("HSBC") Statement of Uncontested Facts and submits its statement of additional facts that require the denial of HSBC's Motion for Summary Judgment.

### L.R. 56.1(b)(3)(A) Response to HSBC

1.      Polaris Sales, Inc. ("Polaris" or "Plaintiff") is a Minnesota corporation with its principal place of business in Medina, Minnesota. (Complaint, which is attached hereto as Ex. A, §4; Defendant's Answer, Additional Defenses, and Counterclaim ("Answ."), which is attached hereto as Ex. B, §4)

**ANSWER:**    Admitted.

2.      Polaris is engaged in the sale of snowmobiles, utility vehicles, all terrain vehicles, motorcycles, and other related products and services ("Goods") through a distribution network of Dealers. (The Revolving Program Agreement ("Program Agreement" or "Agreement"), which is attached hereto as Ex. C, §2.; Ex. A, §4)

**ANSWER:**    Admitted.

3.      HSBC is a nationally chartered bank association located in Las Vegas, Nevada. (Ex. A, §5; Ex. B, §5; Ex. C, Introduction ("Intro."))

**ANSWER:**    Admitted.

4.      Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 based on the diversity of citizenship among the parties. (Ex. A, §6; Ex. B, §6)  The amount in controversy exceeds $75,000.00, exclusive of interest and costs. (Ex. A, §6; Ex. B, §6)  Furthermore, in Section 24 of the Program Agreement, the parties consented and submitted to the exclusive jurisdiction of this Court and the courts of the State of Illinois for the purpose of any suit, action, proceeding, or judgment arising from the Program Agreement. (Ex. A, §6; Ex. B, §6; Ex. C, §24)

**ANSWER:**    Admitted.

5.      Venue in this District is proper under 28 U.S.C. § 1391(a). (Ex. A, §7; Ex. B, §7) Furthermore, in Section 24 of the Program Agreement, the parties irrevocably agreed that any suit, action, or proceeding arising out of or relating to the Program Agreement must be brought solely in the United States District Court for the Northern District of Illinois or the courts of the State of Illinois. (Ex. A, §7; Ex. B, §7; Ex. C, §24)

**ANSWER:**    Admitted.

6.      In Section 15 of the Program Agreement, the parties agreed that the Program Agreement shall be governed by and construed in accordance with the laws of the State of Nevada. (Ex. C, § 15)

**ANSWER:**    Admitted.

7.      There is an actual controversy under 28 U.S.C. § 2201 between HSBC and Polaris, which controversy is within the proper jurisdiction of this Court. (Def. Ex. A, ¶ 43; Def. Ex. B, First Defense, ¶ 43; Def. Ex. B, Counterclaim, ¶ 12)

**ANSWER:**    Admitted. (*See also,* Answ. to Counterclaim, ¶12, attached as Pl. Ex. A).

8.      On August 10, 2005, the parties entered into a Revolving Program Agreement to provide revolving credit to customers of independent dealers selling Polaris products which runs until October 31, 2010. (Ex. A, §1; Ex. B, §1; Ex. C, §8)  The parties' dispute relates to this Program Agreement. (Ex. A, §8, Ex. B, §8)

**ANSWER:**    Admitted, except that defendant fails to include either in Exhibit C, which

purports to constitute the Revolving Program Agreement, or as a separate exhibit the First

Amendment to the Revolving Program Agreement, made and entered into by the parties on

October 31, 2007. (Def. Ex. C, Agreement; Def. Ex. B, Complaint)

9.      The Program Agreement constitutes a valid contract between HSBC and Polaris. (Ex. A, §32, Ex. B, §32)

**ANSWER:**    Admitted.

2

10.    The parties included in their Program Agreement a provision entitled, "Scope." (Ex. C, §2)

**ANSWER:**    Admitted.

11.    In the provision of the Program Agreement entitled "Scope," the parties agree that "Polaris is engaged in the sale of snowmobiles, utility vehicles, all terrain vehicles, motorcycles, and other related products and services ("Goods") through a distribution network of Dealers. Polaris requested and HSBC agreed to provide a Private Label Credit Card program and Debt Cancellation program for consumers purchasing Goods from Dealers (the 'Revolving Program') *under the terms and conditions of agreements with Dealers (Dealer Revolving Agreements') entered into heretofore and hereafter between HSBC and Dealers*. HSBC shall own all Accounts and shall bear the credit risk for such Accounts." (Ex. B, Counterclaim, §5; Ex. C, §2) (emphasis added)

**ANSWER:**    Polaris states that this is an incomplete, and therefore, misleading statement of the provision of the Revolving Program Agreement entitled "Scope." (*See* Def. Ex. C, Agreement §2 (second paragraph))

12.    The form Dealer Revolving Agreement, to which the parties' Program Agreement explicitly refers, is attached hereto as Exhibit D and states that "[a]ll completed applications for Accounts submitted by Dealer to HSBC whether mailed, telephoned or otherwise electronically transmitted will be processed and approved or declined *in accordance with such credit criteria and procedures established from time to time by HSBC with HSBC having and retaining all rights to reject or accept such applications."* (Ex. B, Counterclaim, §5(a); Ex. D, §2b(a)) (emphasis added)

**ANSWER:**    Def. Ex. D is a copy of a form Dealer Revolving Agreement used by HSBC with Polaris Dealers in connection with its revolving credit programs before and after 2005. (Clawson Declaration, Pl. Ex. C, ¶3)    Polaris states that the Revolving Program Agreement contains references to "Revolving Credit Dealer Agreement," "Dealer Revolving Agreements" and "Dealer Agreements," but the Revolving Program Agreement expressly acknowledges that Polaris is not a party to the Dealer Agreements and excludes the terms and obligations of the HSBC agreements with Dealers from the Polaris Agreement "except as specifically provided in this Agreement." (Def. Ex. C, Agreement §20) The parties' Revolving Program Agreement does not generally incorporate the terms of the form Dealer Revolving

3

Agreements and does not "specifically" adopt the terms of the Dealer Agreement for HSBC's rights regarding credit criteria or credit applications. (Def. Ex. C, Agreement)

13.    The parties' Program Agreement makes other express references to the Dealer Agreements. (Ex. B, Counterclaim, §5; Ex. C, §1k, §2, §4a, §4b, §8c, §8d, §11, §14, §19, §21 A2)

**ANSWER:**    Polaris states that the Revolving Program Agreement contains references to "Revolving Credit Dealer Agreement," "Dealer Revolving Agreements" and "Dealer Agreements," and that, in addition to the sections noted, the Revolving Program Agreement also refers to "any agreement between HSBC and individual Dealers," in Section 20.   Section 20 expressly acknowledges that Polaris is not a party to the Dealer Agreements and excludes the terms and obligations of the HSBC agreements with Dealers from the Polaris Agreement "except as specifically provided in this Agreement."   (Def. Ex. C, Agreement §20)   The parties' Revolving Program Agreement does not generally incorporate the terms of the form Dealer Revolving Agreements and does not "specifically" adopt the terms of the Dealer Agreement for HSBC's rights regarding credit criteria or credit applications. (*See* Def. Ex. C, Agreement)

14.    The parties' Program Agreement explicitly references the credit criteria that HSBC would use to approve the consumers to which it would extend financing under the revolving credit program. Specifically, Section 4f of the Program Agreement provides, "[d]uring the period of time beginning ten (10) business days following the Effective Date through December 31, 2005, HSBC agrees to utilize credit score cutoffs used just prior to the January, 2005 score cutoff adjustments." (Ex. B, Counterclaim, §2(a); Ex. C, §4f)

**ANSWER:**    Admitted.

15.    Section 4g of the Program Agreement provides, "[t]he parties agree that if the dollar volume of Card Sales generated by the Revolving Program during any twelve (12) month period is less than $350,000,000.00, then the parties will meet to discuss proposed changes to the Revolving Program such as, for example, credit underwriting, credit promotion mix, marketing strategies and support, and other proposed changes in an effort to increase Card Sales." (Ex. B, Counterclaim, §2(b); Ex. C, §4g)

**ANSWER:**    Admitted.

16.    There are no other express provisions placing any limitation or procedural requirement on HSBC's right to alter credit criteria.  (Ex. B, Counterclaim, §2, §3; Ex. C)

**ANSWER:**    Admitted.

17.    The dollar volume of card sales generated by the Revolving Program has not fallen below $350,000,000.00. (Ex. A, §17; Ex. B, §17)

**ANSWER:**    Admitted.

18.    Several provisions of the Program Agreement require Polaris' agreement or approval for HSBC Action.

**ANSWER:**    Admitted.

18.    ...Specifically:

A.    Section 1t of the Program Agreement provides, "'Marketing Expenses' means and includes, but is not limited to, expenses for point of sale materials, direct mail materials, general media advertising and any other marketing materials related to promoting and marketing the Revolving Program *mutually agreed upon by HSBC and Polaris*.  Marketing Expenses shall not include discounts associated with Credit Promotions or Participation Fees. (Ex. C, §1t (emphasis added)

**ANSWER:**    Admitted that Section 1(t) of the Program Agreement contains the identified quotation.  Further stating that Section 1(t) defines the term "Marketing Expenses" as may be incurred by either party under the Program Agreement.  (Def. Ex. C, Agreement §1(t))

B.    Section 5e of the Program Agreement provides, "[o]n or before the 10th Business Day of each Month, HSBC shall provide to Polaris *agreed-upon sales and marketing reports*." (Ex. C, §5e) (emphasis added)

**ANSWER:**    Admitted that Section 5(e) of the Program Agreement contains the identified quotation.

C.    Section 4h of the Program Agreement provides, "HSBC agrees that all Dealer-facing service representatives will be based on locations within the United States *unless otherwise agreed upon by the parties*." (Ex. C, §4h) (emphasis added)

**ANSWER:**    Denied. (*See* Def. Ex. C, Agreement §4, pp. 4-5)

D.    Section 4c of the Program Agreement provides, "Polaris agrees to actively promote the Revolving Program with both Dealers and consumers including, but not limited to,

providing such Dealer training and consumer marketing regarding the Revolving Program *mutually agreed to by Polaris and HSBC*." (Ex. C, §4c) (emphasis added)

    **ANSWER:**   Admitted that Section 4(c) of the Program Agreement contains the identified quotation. Denied that Section 4(c) requires Polaris' agreement or approval for HSBC action. (Def. Ex. C, Agreement §4(c))

    E.    Section 12 of the Program Agreement provides, "[d]uring and after the term of this Agreement, HSBC and or/its Affiliates shall have the non-exclusive right to solicit Cardholders for the products set forth in Schedule 12, attached hereto. HSBC may add additional products to Schedule 12 after the Commencement Date of the Agreement, but any additions to the products set forth in Schedule 12 *shall receive Polaris' prior review*. Such solicitations shall comply with Applicable Law, including privacy laws." (Ex. C, §12) (emphasis added)

    **ANSWER:**   Admitted that Section 12 of the Program Agreement, entitled "Additional Products and Services," contains the identified quotation. Further stating that Section 12 on its face does not concern Polaris' agreement with or approval of HSBC setting of credit criteria for consumers purchasing Goods from Polaris Dealers. (Def. Ex. C, Agreement §12)

    F.    Section 21 of the Program Agreement provides, "HSBC shall offer a debt cancellation product ('Debt Cancellation') to Cardholders, which may be made available through the *following mutually agreed upon channels*: (1) Card applications available at point of sale, and (2) other business channels including direct mail, inbound telemarketing, outbound telemarketing and card carriers in the states agreed upon by the parties in accordance with [certain terms]." (Ex. C, §21) (emphasis added)

    **ANSWER:**   Admitted that Section 21 of the Program Agreement contains the identified quotation.

    G.    Section 21.B.1 of the Program Agreement provides, "HSBC shall develop and print the contractual terms and conditions ("Terms and Conditions") for Debt Cancellation and shall also supply Debt Cancellation disclosures to Polaris Dealers to be inserted in the Card Application. HSBC may from time to time, at its discretion, revise the Terms and Conditions and the Debt Cancellation disclosures provided to Polaris. HSBC will notify Polaris of any changes. *If such changes, in Polaris' reasonable judgment, materially change the Debt Cancellation program, Polaris may require HSBC to cease offering Debt Cancellation on new customers.*" (Ex. C, §21.B.1) (emphasis added)

**ANSWER:**    Admitted that Section 21(B)(1) of the Program Agreement contains the identified quotation, including its express and limited provision for HSBC's discretion with regard to the debt cancellation program which defendant's statement does not emphasize. (Def. Ex. C, Agreement §21(B)(1))

       H.

**[Redacted and Filed Under Seal Pursuant to L.R. 26.2.]**

(Ex. C, §21.B.2) (emphasis added)

**ANSWER:**    Admitted that Section 21(B)(2) of the Program Agreement contains the identified quotation, including its express and limited provision for HSBC's discretion with regard to its debt cancellation program fees (which defendant's statement does not emphasize).

(Def. Ex. C, Agreement §21(B)(2))

       I.    Section 18 of the Program Agreement provides in pertinent part, "Polaris hereby authorizes HSBC, solely for the purposes and obligations described in the Agreement, to use Polaris' name, logo, registered trademarks and service marks (if any) and any other propriety designations ("Proprietary Materials") on the credit cards, applications, periodic statements, billing statements, collection letters, documents, promotional or advertising materials and otherwise in connection with the Revolving Program, *subject to Polaris' periodic reasonable review of such use and to such reasonable specifications of Polaris.*" (Ex. C, §18) (emphasis added)

**ANSWER:**    Admitted that Section 18 of the Program Agreement, entitled "Limited License," contains the identified quotation.  Further stating that Section 18 on its face does not concern Polaris' periodic review of HSBC's use of Polaris Proprietary Materials.  (Def. Ex. C, Agreement §18)

       J.

**[Redacted and Filed Under Seal Pursuant to L.R. 26.2.]**

(Ex. C, Schedule 3c) (emphasis added)

**ANSWER:**    Admitted that Schedule 3c attached to the Program Agreement contains the identified quotation.  Further stating that Schedule 3c concerns the "Marketing Expenses" that may be incurred by either party under the agreement.  (Def. Ex. C, Schedule 3c)

19.    The parties did not include in the Program Agreement a requirement that HSBC obtain Polaris' agreement or approval before making changes to the credit criteria.  (Ex. B, Counterclaim, §2, §7; Ex. C)

**ANSWER:**    The Revolving Program Agreement, like all Nevada contracts, contains an implied covenant of good faith and fair dealing.  This covenant limits the discretion that HSBC may exercise, including with respect to arbitrary and drastic changes to credit criteria drastic changes that conflict with the spirit and intent of the Revolving Program Agreement, including its stated purpose "to promote [the parties'] respective business goals." (*Hilton Hotels Corp. v. Butch Lewis Productions, Inc.*, 109 Nev. 1043, 1046 (1993); Def. Ex. C, §12) The Agreement does not have an express provision with the requirement that HSBC obtain agreement or approval before making credit criteria changes, but it also does not contain a provision granting HSBC sole discretion to arbitrarily or unreasonably deny credit or change credit criteria without regard to the consequences to Polaris or the revolving credit program.  (*See generally,* Pl. Ex. C, Agreement)

20.    Under the 2005 Program Agreement, HSBC alone took on all of the credit risks associated with the revolving credit program. Specifically, Section 2 of the Agreement states, in pertinent part, "HSBC or its Affiliates shall own all Accounts and shall bear the credit risk for such Accounts." (Ex. B, Counterclaim, §1; Ex. C, §2)

**ANSWER:**    Admitted.

21.    The Program Agreement gives HSBC the right to determine the terms by which it deals with consumers.

**ANSWER:**    Admitted, subject to HSBC's obligations to Polaris set forth in the Agreement and its duty of good faith and fair dealing implied under Nevada law. (*See, e.g.,* Pl. Ex. C, Agreement, §§1(m), 2, 5(a), 5(b), 8(c), 10, 12, 21(B)(1), 21(B)(2), 21(B)(3) (bullets);

*Hilton Hotels Corp. v. Butch Lewis Productions, Inc.*, 109 Nev. 1043, 1046 (1993)); Def. Ex. A., Complaint, ¶35)

21. (cont'd) …Specifically:

A.    Section 1i of the Program Agreement, which sets forth definitions for purposes of construing the Agreement, provides, "'Cardholder Agreement' means as to any Account, the related application and agreement between the Cardholder and HSBC, governing the terms and conditions of such Account, as such agreement may be amended from time to time by HSBC." (Ex. C, §1i)

**ANSWER:**    Polaris admits that §1(i) of the Program Agreement contains the quoted definition. It denies the allegation to the extent that it asserts that HSBC may exercise its rights at its sole discretion and without being subject to both HSBC's express obligations to Polaris and its implied duty of good faith and fair dealing. (*See* response to ¶21)

B.    Section 1n of the Program Agreement provides, "'Credit Promotion' means the promotional plans set forth in the Cardholder Agreements." (Ex. C, §1n)

**ANSWER:**    Polaris admits that §1(n) of the Program Agreement contains the quoted definition. It denies the allegation to the extent that it asserts that HSBC may exercise its rights at its sole discretion and without being subject to both HSBC's express obligations to Polaris and its implied duty of good faith and fair dealing. (*See* response to ¶21)

C.    Section 1o of the Program Agreement provides, "'Credit Promotion Period' means the promotional period for the promotional plans set forth in the Cardholder Agreements.'" (Ex. C, §1o)

**ANSWER:**    Polaris admits that §1(o) of the Program Agreement contains the quoted definition. It denies the allegation to the extent that it asserts that HSBC may exercise its rights at its sole discretion and without being subject to both HSBC's express obligations to Polaris and its implied duty of good faith and fair dealing. (*See* response to ¶21)

D.    Section 6 of the Program Agreement provides, "[c]ardholder Terms between HSBC and the consumer(s) who purchase Goods from the Dealers are set forth on Schedule 6. HSBC reserves the right to amend the terms of the Cardholder Agreement (other than the terms and conditions of the Credit Promotions previously agreed to in writing by the

parties) in its sole discretion and with reasonable advance notice to Polaris. Notwithstanding the foregoing, HSBC may amend the terms and conditions of Credit Promotions, if required by Applicable law." (Ex. C, §6)

**ANSWER:**    Polaris admits that this paragraph quotes from Section 6 of the Agreement,

but otherwise denies the allegation to the extent that it asserts that HSBC may exercise its rights

at its sole discretion and without being subject to both HSBC's express obligations to Polaris and

its implied duty of good faith and fair dealing.  (*See* response to ¶21)

22.    HSBC and Polaris had a telephone conference on January 25, 2008, during which HSBC informed Polaris that it would be altering the credit criteria for the program. (Ex. A, §21; Ex. B, §21)

**ANSWER:**    Admitted.

23.    HSBC offered, in addition to and as an alternative to the tightening of the credit criteria, several other options, including altering the payments to be made under the Program Agreement. (Ex. B, §28, Counterclaim, §8)

**ANSWER:**    Admitted that during the January 25 conference, HSBC presented three

options purportedly as an alternative to its threat to slash its loan approval rate from

approximately 52 percent to 28 percent of applicants, an unprecedented reduction of more than

47 percent. (Def. Ex. A, Complaint, ¶¶21-22; Pl. Ex. C, Clawson Dec., ¶16 and Ex.1 thereto)

24.    HSBC also gave Polaris the option of terminating the Program Agreement before the termination date so that Polaris could replace HSBC with another financial institution and a revolving credit program more to Polaris' liking. (Ex. B, Counterclaim, §2; The February 29, 2008 Execution Letter from Brian D. Hughes to Scott Swenson, which is attached hereto as Ex. E)

**ANSWER:**    Admitted that during the January 25 conference, HSBC told Polaris that

HSBC would consider an early termination of the Agreement to allow Polaris to obtain a

substitute credit provider. Remaining allegations are denied, including without limitation the

implicit allegation that HSBC's offer presented Polaris with a reasonable alternative under the

circumstances. (Def. Ex. E, February 29, 2008 letter (Hughes); Def. Ex. G February 22, 2008

letter; Pl. Ex. B, Swenson Dec., ¶¶8, 12-14; Pl. Ex. C, Clawson Dec., ¶17)

25.    Polaris objected to the changes in credit criteria that HSBC announced on January 25, 2008, and it challenged HSBC's right to make such alterations. (Ex. A, §28; Ex. B, §28; The February 18, 2008 Letter from Thomas M. Lynch to HSBC is attached hereto as Ex. F)

**ANSWER:**    Admitted that Polaris objected to the unprecedented and drastic action threatened by HSBC at the January 25 conference, including HSBC's right to make such changes, as set out in its correspondence of February 18 and 22. Remaining allegations are denied. (Def. Ex. E, February 29, 2008 letter; Def. Ex. G, February 22, 2008 letter; Pl. Ex. B, Swenson Dec., ¶¶9, 12)

26.    On February 22, 2008, Polaris chose one of the proffered options which provided that changes (including altered approval criteria) would be made to the program in March 2008, but did so claiming that it was acting "under duress." (Ex. B, Counterclaim, §9; The February 22, 2008 Acceptance Letter, which is attached hereto as Ex. G)

**ANSWER:**    Admitted that on February 22, 2008, Mr. Swenson wrote to HSBC and stated in pertinent part:

> Polaris simply can not afford to take the business risk that its customers will be unable to secure retail financing to buy its products on this short notice. As you know, this could put Polaris at an extreme competitive disadvantage in our industry which is apparently exactly what HSBC intends. Facing these threats, we have no choice but to mitigate the damages that will result from HSBC's precipitous breach of our Agreement. Accordingly, we propose that Polaris forgo our volume incentive and reduce underwriting in accordance with Option 3 in the Program Discussion.

> **[Redacted and Filed Under Seal Pursuant to L.R. 26.2.]**

> We are forced to accept this course of action under severe duress and, in doing so, do not waive any of our rights and remedies under the Agreement and the law, including but not limited to the recovery of our damages.

Remaining allegations are denied. (Def. G, February 22, 2008 letter; Def. Ex. F, February 18, 2008 letter, Def. Ex. A, Complaint at ¶28; Pl. Ex. B, Swenson Dec., ¶12)

26. (cont'd)    …The option chosen by Polaris set forth the following terms:

**ANSWER:**    Admitted that on February 22, 2008, Mr. Swenson sent Polaris' response to HSBC.  Denied that HSBC proceeded under Option 3 as presented on January 25.  Remaining allegations are denied.  (Def. Ex. G, February 22, 2008 letter; Def. Ex. E, February 29, 2008 letter' Pl. Ex. B, Swenson Dec., ¶¶12-14)

26. (cont'd)    …

- The Revolving Program Compensation Fee will end effective March 1, 2008.  The compensation fee will be paid for the February 2008 period.

- **[Redacted and Filed Under Seal Pursuant to L.R. 26.2.]**

- **[Redacted and Filed Under Seal Pursuant to L.R. 26.2.]**

- All non-contractual promotions end effective February 29, 2008. Extension of non-contractual promotions will be reviewed on a case-by-case basis.

- **[Redacted and Filed Under Seal Pursuant to L.R. 26.2.]**

**ANSWER:**    Admitted that these terms are found in the letter HSBC wrote to Polaris on February 29, 2008.  Remaining allegations are denied.  (Def. Ex. G, February 22, 2008 letter; Def. Ex. E, February 29, 2008 letter); Pl. Ex. B, Swenson Dec., ¶14; Def. Ex. A, Complaint, ¶29)

27.    Polaris continues to allege that HSBC does not have the right to alter the criteria that it uses to approve credit to consumers under the Program Agreement.  (Ex. A, §§25-27, §34; Ex. B, Counterclaim, §10)

**ANSWER:**     Denied.  HSBC misstates the allegations of Polaris' Complaint.  Polaris does not contend that HSBC has no right to alter the credit criteria.  Rather, Polaris states that the proposed changes to the credit criteria were so severe and inconsistent with the spirit and intent of the Program Agreement that HSBC's insistence on these changes (or one of its proposed alternatives) and its use of the changes to alter key terms of the Agreement were breaches of the implied covenant of good faith and fair dealing.  (Def. Ex. A, Complaint ¶¶25-27, 34; Pl. Ex. A, Answ. to Countercl., ¶¶10-11)

28.     Polaris alleges that HSBC did not have the right to make the program changes it announced in January 2008, and made in March 2008, including changes to the criteria it uses to approve credit to consumers under the Agreement.  (Ex. A, §§25-27, 34; Ex. B, Counterclaims, §§10-11)

**ANSWER:**     Denied.  HSBC misstates the allegations of Polaris' Complaint.  (Def. Ex. A, Complaint, ¶¶12, 14, 15, 21-27, 35)

29.     On April 3, 2008, Polaris filed the instant action against HSBC, alleging breach of contract, breach of the covenant of good faith and fair dealing, and declaratory judgment. (Ex. A; Ex. B, §3)

**ANSWER:**     Admitted.

30.     On May 1, 2008, HSBC filed its Answer to Complaint, Additional Defenses, and Counterclaim setting forth the parties' dispute and requesting a declaratory judgment resolving that dispute based upon the language of their Agreement.  (Ex. B)

**ANSWER:**     Admitted.

31.     HSBC's counterclaim seeks declaratory relief and requests that the Court declare:

A.     HSBC has the right to alter the criteria it uses to approve credit to consumers under the Program Agreement.

B.     HSBC had the right under the Agreement to make the changes it announced in January 2008, and the changes it made in March 2008, to the criteria it uses to approve credit to consumers under the Agreement.

C.     HSBC did not breach the Agreement by announcing its intention to tighten the criteria it uses to approve credit to consumers under the Agreement or by making changes to those criteria.

D.     HSBC is not obligated under the Agreement to continue to provide retail financing based on the applicant approval rates and credit criteria used prior to March 1, 2008. (Ex. A, Counterclaim, Prayer for Relief)

**ANSWER:**     Admitted that the Counterclaim for declaratory relief that HSBC filed contains demands A-D. (*See* Pl. Ex. A, Answ. to Countercl., ¶¶6-7)

32.     A ripe and justiciable controversy exists between the parties that can and should be settled by declaratory judgment issued by this Court. (Ex. A, §43, Ex. B, §43, Counterclaim, §12)

**ANSWER:**     Paragraph 32 consists of legal argument and is not a statement of material fact. In further response, Polaris incorporates its answer to HSBC's counterclaim. (Pl. Ex. A, Answ. To Countercl., ¶12 and answer to defendant's *ad damnum* statement)

## L.R. 56.1(b)(3)(B) Statement of Additional Facts that Require Denial of Motion

### A.     Background to the Parties' Retail Revolving Credit Program

1.     Polaris is engaged in the sale of snowmobiles, utility vehicles, all-terrain vehicles, motorcycles, and other related products and services through a long-established network of qualified dealers. (Def. Ex. A, Complaint ¶4; Def. Ex. C, Agreement §2)

2.     To support its customers, dealers, and business, Polaris has provided programs for financing the retail purchases of Polaris products and services from authorized Polaris dealers. (Def. Ex. A, Complaint ¶¶1, 8)

3.     Before August 10, 2005, HSBC and its predecessor provided revolving credit financing for retail customers of Polaris products and services under an agreement with Polaris that was originally made in 2001. Under the 2001 Agreement, the parties shared the risk of extending credit to consumers. (Pl. Ex. C, Clawson Dec. ¶3; Def. Ex. A, Complaint ¶8)

**1.    HSBC's 2005 Proposal to Increase Sales Volume Led to Current Agreement**

4.    In 2005, at the urging of HSBC, the 2001 Agreement was restructured to a volume-based approach that was intended to increase retail sales volume.  (Pl. Ex. C, Clawson Dec. ¶¶4-6; Def. Ex. A, Complaint ¶8)

5.    HSBC approached Polaris to suggest that the program be revised to change credit criteria to increase sales volume, proposing a volume-based structure under which Polaris received a monthly payment based upon the sales volume without being required take on the credit risk.  (Pl. Ex. C, Clawson Dec. ¶5)

6.    HSBC told Polaris that its proposed volume-based approach would enable HSBC to apply less conservative underwriting standards to drive additional volume.   (Pl. Ex. C, Clawson Dec. ¶5; Def. Ex. A, Complaint, ¶8)

7.    On August 10, 2005, at the urging of HSBC and based upon HSBC's assurances and representations, Polaris agreed to move to the volume-based structure and entered into the new Agreement to increase retail sales volume as proposed by HSBC.  (Pl. Ex. C, Clawson Dec. ¶6)

**a.    Section 4(f) Is a Compromise Based on Sales Volume Assurances**

8.    During the negotiations for the 2005 Agreement, each of the parties proposed language to be added to Section 4(f) that expressly addressed HSBC's ability to change underwriting standards after 2005.  Neither of these proposals ended up in the Agreement.  (Pl. Ex. C, Clawson Dec. ¶¶8-9)

9.    Polaris proposed additional language for Section 4(f) limiting HSBC's ability to change underwriting standards after 2005.  (Pl. Ex. C, Clawson Dec. ¶8)

10.    HSBC proposed an additional alternative for Section 4(f) that expressly reserved for it a limited right to adjust underwriting and credit scores.  (Pl. Ex. C, Clawson Dec. ¶8)

11.    HSBC and Polaris could not agree on either proposal for 4(f).  (Pl. Ex. C, Clawson Dec. ¶9)

12.    HSBC then assured Polaris that it intended to manage underwriting to increase sales volume.  (Pl. Ex. C, Clawson Dec. ¶9)

13.    Based on this assurance Polaris agreed to leave Section 4(f) as it appears in the Agreement.  (Pl. Ex. C, Clawson Dec. ¶9)

**b.    Section 4(g) Was Added to Protect Sales Volume**

14.    During these negotiations, HSBC proposed the language that forms Section 4(g) of the Agreement.  (Pl. Ex. C, Clawson Dec. ¶10)

15.    HSBC explained that it wanted this term to protect HSBC against Polaris shifting sales volume away from the HSBC revolving credit program to an installment financing program in which HSBC did not participate.  (Pl. Ex. C, Clawson Dec. ¶10)

**2.    The Form Revolving Credit Dealer Agreements Are Not Part of the 2005 Agreement**

16.    While the 2001 Agreement was in effect, HSBC used form Dealer Revolving Agreements ("DRAs") (also referred to as Revolving Credit Dealer Agreements) to govern their relationships with Polaris Dealers.  (Pl. Ex. C, Clawson Dec. ¶3)

17.    The Dealer Revolving Agreements are form agreements between HSBC and hundreds of dealers that merely grant dealers access to HSBC's revolving program.  (Pl. Ex. C, Clawson Dec. ¶3)

18.    Except for the name of the bank, the language in the DRAs regarding processing and approval or declination of applications in accordance with credit criteria and the right to accept or reject applications has remained unchanged since 2001.  (Pl. Ex. C, Clawson Dec. ¶3)

**3.    The Parties Amended the Agreement in October 2007**

19.    On October 31, 2007, HSBC and Polaris entered into a First Amendment to the Revolving Program Agreement (the "2007 Amendment") that amends the Agreement, including its Schedule 3a, by revising Revolving Program Compensation Fee with regard to the Net Sales Volume in the Previous 12 Months.  (Pl. Ex. C, Clawson Dec. ¶14; Def. Ex. A, Complaint, Ex. B attached thereto)

20.    The 2007 Amendment is the only writing signed by a duly authorized officer or representative of HSBC and Polaris that changes the Agreement.  (Pl. Ex. B, Swenson Dec., ¶4)

**B.    The Express Terms of the Agreement Do Not Provide HSBC Unfettered Discretion Without Regard for the Consequences to the Polaris Program and Plaintiff's Business Goals.**

21.    The parties agreed that the Agreement shall be binding as of August 10, 2005 and "shall remain in effect until October 31, 2010 ("Initial Term") and shall thereafter be automatically renewed for successive one (1) year terms (the "Renewal Term(s)") unless and until terminated as provided herein."  (Def. Ex. C, Agreement §8(a))

22.    The parties agreed that the Agreement shall be governed by and construed in accordance with the Laws of the State of Nevada.  (Def. Ex. C, Agreement §15)

**1.    The Scope of the Agreement:  To Promote Parties' Respective Business Goals**

23.    In Section 2 of the Agreement, captioned "Scope", the parties agree that "Polaris and HSBC have joined in this Agreement **to promote their respective business goals**."  (Def. Ex. C, Agreement §2) (emphasis supplied)

24.    The Agreement contains no other statement that explicitly sets out the reason for the parties joining in the Agreement. (*See generally,* Def. Ex. C, Agreement)

25.    This statement in Section 2 expressly states the purpose and intent of the parties in making the Agreement. (Def. Ex. C, Agreement §2)

**2.    Sales Promotion Purpose Evident Throughout Agreement**

26.    A purpose of the Agreement is to maintain and increase sales volume. (Pl. Ex. C, Clawson Dec. ¶¶4-6)

27.    Several provisions of the Agreement specifically relate to the purpose to maintain and increase sales volume, including specific sections for "Revolving Program Economics" and "Revolving Program Support." (Def. Ex. C, Agreement, §§1, 3, 4, 5, 9, and 18, Schedules 3a and 3b, and the 2007 Amendment)

28.    The parties agreed in Section 3(b) that "Polaris shall pay to HSBC the **Credit Promotion Discount Fees** according to Schedule 3b." (Def. Ex. C, Agreement, §3(b)) (emphasis supplied)

29.    Schedule 3b states, in pertinent part, that "The new Credit Promotion Discount Fees shall be effective as to all Card sale volume accepted and funded by HSBC for the three (3) month period beginning on the applicable Adjustment Date." ((Def. Ex. C, Agreement, Schedule 3b; *see also, id.* at "Definitions," §§1(n) ("Credit **Promotions**"), 1(o) ("**Credit Promotion Period**"), 1(l) ("**Marketing** Expenses"), 1(y) ("**Promotional** Financing") (emphasis supplied)

30.    The parties agreed in Section 3(c) that "HSBC and Polaris agree to equally contribute to a **marketing budget** as set forth on Exhibit 3c." (Def. Ex. C, Agreement, §3(c)) (emphasis supplied)

31.    Section 9(c) specifically provides for making HSBC personnel and pertinent records available that show "Marketing Expenses", among other things. (Def. Ex. C, Agreement, §9(c))

32.    Schedule 3c states, in pertinent part, that

**[Redacted and Filed Under Seal Pursuant to L.R. 26.2.]**

(Def. Ex. C, Agreement, Schedule 3c)

33.    This paragraph intentionally left blank

34.    This paragraph intentionally left blank

35.    The parties agreed in Section 4(a) in pertinent part that "Polaris further agrees that it will use commercially reasonable efforts to encourage appropriate Dealers to participate in the Revolving Program." (Def. Ex. C, Agreement, §4(a))

36.    The parties agreed in Section 4(c) that

**Polaris agrees to actively promote the Revolving Program with both Dealers and consumers** including, but not limited to, providing such Dealer training and **consumer marketing** regarding the Revolving Program mutually agreed to by Polaris and HSBC.

(Def. Ex. C, Agreement, §4(c)) (emphasis supplied)

37.    The parties agreed in Section 4(g) that

The parties agree that **if the dollar volume of Card Sales generated by the Revolving Program during any twelve (12) month period is less than $350,000,000.00, then the parties will meet to discuss proposed changes to the Revolving Program** such as, for example, credit underwriting, credit promotion mix, marketing strategies and support, and other proposed **changes in an effort to increase Card Sales**.

(Def. Ex. C, Agreement, §4g) (emphasis supplied)

38.    The parties agreed to customer service standards designed to ensure speedy transactions in Section 5(b) and that each month "HSBC shall provide to Polaris agreed-upon sales and **marketing reports.**" (Def. Ex. C, Agreement, §5(b)) (emphasis supplied)

39.    The parties agreed in Section 5(e) that "On or before the 10th Business Day of each Month, HSBC shall provide to Polaris agreed-upon sales and marketing reports." (Def. Ex. C, Agreement, §5(e))

40.    In Section 9(a), the parties agreed that Polaris shall have the right to review HSBC records showing the Computation of Sales Volume. (Def. Ex. C, Agreement, §9(a))

41.    In Section 18, captioned "Limited License", Polaris expressly "**authorizes HSBC, in pertinent part, solely for the purposes** and obligations described in this Agreement, to use Polaris' name, logo registered trademarks and servicemarks (if any) and any other proprietary designations ("Proprietary Materials") on the credit cards, **...promotional or advertising materials** and otherwise in connection with the Revolving Program, ...." (Def. Ex. C, Agreement, §18) (emphasis supplied)

42.    Further, the parties expressly defined "Net Sales Volume" as that term applies to the Agreement. (Def. Ex. C, Agreement, §1(v))

43.    The parties agreed that the fee Polaris receives from HSBC for the Program is based on sales volume "according to Schedule 3a." (Def. Ex. C, Agreement, §3(a))

44.    Schedule 3a of the Agreement initially provided that HSBC shall be obligated to pay Polaris as follows:

**[Redacted and Filed Under Seal Pursuant to L.R. 26.2.]**

(Def. Ex. C, Agreement, Schedule 3a)

45.    On October 31, 2007,   HSBC and Polaris agreed to amend the Agreement, including Schedule 3a,

**[Redacted and Filed Under Seal Pursuant to L.R. 26.2.]**

(Def. Ex. A, 2007 Amendment (attached thereto as Ex. B); Pl. Ex. C, Clawson Dec., ¶14)

**3.    The Agreement Does Not Grant HSBC Unfettered Discretion Nor Disclaim Its Duty of Good Faith.**

**a.    No Express Provision**

46.    The Agreement does not contain any term that provides that HSBC has unfettered discretion to change underwriting standards or credit criteria.   (*See generally,* Def. Ex. C, Agreement)

47.    The Agreement does not contain a term that states that HSBC may change underwriting standards or credit criteria without regard for the consequences to Polaris or its respective business goals. (*See generally,* Def. Ex. C, Agreement)

48.    The Agreement does not contain a term that states that HSBC is relieved from any duty implied by law, including its implied duty of good faith and fair dealing. (*See generally,* Def. Ex. C, Agreement)

### b. Parties Expressly Provided HSBC's Discretion for Other Acts Unrelated to Underwriting

49.    The Agreement contains a number of provisions that make explicit reference to HSBC's discretion to act in connection with specific matters. (Def. Ex. C, Agreement, §§4(a), 6, 11, 21(B)(1), 21(B)(2))

50.    The parties expressly acknowledged in Section 4(a) that in connection with Revolving Program Support HSBC has sole discretion whether to decline to enter into a particular DRA:

> ...Polaris shall request each Dealer which desires to participate in the Revolving Program to enter into Dealer Agreements which, once executed, shall be forwarded to HSBC. **HSBC may, at any time and in its sole discretion for any reason, decline to accept a Dealer** referred by Polaris...

(Def. Ex. C, Agreement, §4(a)) (emphasis supplied)

51.    Section 11 further states that

> **HSBC, upon notice to Polaris, may elect to terminate its relationship with a particular Dealer if** such Dealer breaches the Dealer Agreement, is associated with excessive chargebacks, high fraudulent activity or other course of business conduct that is injurious to either HSBC's business interests or the business relationships between HSBC and Polaris.

(Def. Ex. C, Agreement, §11) (emphasis supplied)

52.    The parties also expressly acknowledged in Section 6 that, with respect to the form Cardholder Agreements, HSBC has sole discretion to amend its terms:

> Cardholder Terms between HSBC and the consumer(s) who purchase Goods from the Dealers are set forth on Schedule 6. **HSBC reserves the right to amend the terms of the Cardholder Agreement (other than the terms and conditions of the Credit Promotions previously agreed to in writing by the parties) in its sole discretion and with reasonable advance notice** to Polaris. Notwithstanding the foregoing, HSBC may amend the terms and conditions of Credit Promotions, if required by Applicable law.

(Def. Ex. C, Agreement, §6) (emphasis supplied)

53.    In a subsection entitled "Debt Cancellation Forms," the parties also expressly acknowledged that

> HSBC shall develop and print the contractual terms and conditions ("Terms and Conditions") for Debt Cancellation and shall also supply Debt Cancellation disclosures to Polaris Dealers to be inserted in the Card Application. **HSBC may from time to time, at its discretion, revise the Terms and Conditions and the Debt Cancellation disclosures provided to Polaris.** HSBC will notify Polaris of any changes. If such changes, in Polaris' reasonable judgment, materially change the Debt Cancellation program, Polaris may require HSBC to cease offering Debt Cancellation on new customers.

(Def. Ex. C, Agreement, §21(B)(1)) (emphasis supplied)

54.    The parties also expressly acknowledged in connection with the Debt Cancellation program, at Section 21(B)(2), that

**[Redacted and Filed Under Seal Pursuant to L.R. 26.2.]**

(Def. Ex. C, Agreement, §21(B)(2)) (emphasis supplied)

55.    The parties expressly indicated in the Agreement other matters for which HSBC received particularized but not arbitrary authority:

- **[Redacted and Filed Under Seal Pursuant to L.R. 26.2.]**

(Def. Ex. C, Agreement, §8(d)) (emphasis supplied)); and

- Section 21(B)(5) (in connection with the Debt Cancellation program "**HSBC may enter into a servicing arrangement with any** of its Affiliates….Any such servicing agreement **does not absolve HSBC of its duties and obligations**." (Def. Ex. C, Agreement, §21(B)(5) (emphasis supplied))

**4.    Agreement Expressly Does Not Incorporate the Dealer Agreements' Terms**

56.    In Section 20 of the Agreement, the parties agreed that

Except as specifically provided in this Agreement, (i) **Polaris shall not be a party to any agreement between HSBC and Individual Dealers**, (ii) **Polaris shall not be responsible for the obligations of HSBC and any Dealer one to the other**, including without limitation, the payment of any amounts owed by one to the other, and (iii) Polaris shall not be in any way responsible for the acts, omissions or breaches of any arrangements **or contract between HSBC and Dealers or for any other obligations of HSBC or any Dealer.**

(Def. Ex. C, Agreement, §20) (emphasis supplied)

57.    In Section 19 of the Agreement, the parties agreed that

Except as specifically provided in this Agreement or in the Dealer Agreements, (i) HSBC shall not be a party to any agreement between Polaris and Individual Dealers, (ii) HSBC shall not be responsible for the obligations of Polaris and any Dealers one to the other, including without limitation, the payment of any fees agreed to between Polaris and Dealers, and (iii) HSBC shall not in any way be responsible for the acts, omissions, or breaches of any arrangements or contracts between Polaris and Dealer(s).

(Def. Ex. C, Agreement, §19)

58.    Further, in the provision setting forth the "Scope" of the Agreement, Section 2, the parties agreed that "Neither Polaris nor HSBC shall have the power or authority to incur any obligation legally binding upon the other." (Def. Ex. C, Agreement, §2)

**C.    Threatened Drastic Unilateral Changes To Credit Criteria In January 2008 Forced Polaris to Proceed Under Duress with Program Changes Demanded by HSBC**

59.    Under the Agreement, HSBC continued the practice of providing Polaris with quarterly business reviews that discussed the performance of the Polaris retail financing portfolio, including discussions about underwriting changes.    The parties worked together to consider and make changes to the program as needed, including modest changes to underwriting and credit criteria that avoided disrupting relations with Dealers and Customers.    (Pl. Ex. C, Clawson Dec., ¶11; Pl. Ex. B, Swenson Dec., ¶¶3-4).

60.    Over the course of their relationship, Polaris and HSBC frequently discussed actual experiences with financing and the fact that sudden, arbitrary changes to underwriting standards would injure Polaris' relationships with its dealers and its customers.    (Pl. Ex. C, Clawson Dec., ¶12)

61.    Approval rates from 2005 to 2007 averaged approximately 47%.    (Pl. Ex. B, Swenson Dec., ¶5)

62.    In December 2007, HSBC had assured Polaris that the revolving credit core portfolio was performing as expected and that it did not see the need for any unusual action. (Def. Ex. A, Complaint, ¶¶19-20; Pl. Ex. C, Clawson Dec., ¶15)

63.    On January 25, 2008, HSBC suddenly informed Polaris that it would drastically lower credit scores to cut approval rates from about 52 percent to approximately 28 percent effective March 1, 2008, unless Polaris agreed to other changes to the Revolving Credit program. (Def. Ex. A, Complaint, ¶¶21-22; Pl. Ex. C, Clawson Dec., ¶16; Pl. Ex. B, Swenson Dec., ¶6)

64.    To avoid the drastic reductions to credit scores, HSBC insisted that Polaris accept one of three other options HSBC presented, which included the following: (1) accepting a drastic re-indexing of promotional discounts or severe adjustments to volume incentives that severely

change the structure provided in the Agreement; (2) accepting a drastic increase in promotional costs to be paid by Polaris over that provided in the Agreement; or (3) foregoing the fees that were Polaris' primary income source under the Agreement. (Def. Ex. A, Complaint, ¶21; Pl. Ex. C, Clawson Dec., ¶16 and Ex. 2 attached thereto; Pl. Ex. B, Swenson Dec., ¶7)

65.    The exclusivity clause in the Agreement and the short time frame within which Polaris had to respond to HSBC's threats prevented Polaris from readily securing an alternative revolving credit source. (Pl. Ex. C, Clawson Dec., ¶17)

66.    Polaris immediately told HSBC that the proposed change was unjustified given HSBC's recent observations about the overall performance of the core Polaris portfolio. (Pl. Ex. B, Swenson Dec., ¶9)

67.    Several times Polaris has requested that HSBC provide factual information for the supposed need for changes demanded to enable both sides to sit down and work out a reasonable solution to any problem that in fact may exist. (Def. Ex. A, Complaint, ¶24; Pl. Ex. B, Swenson Dec., ¶9)

68.    HSBC has not provided the requested information. (Def. Ex. A, Complaint, ¶24; Pl. Ex. B, Swenson Dec., ¶9)

69.    Polaris offered a counterproposal that HSBC dismissed. (Def. Ex. A, Complaint ¶24; Pl. Ex. B, Swenson Dec., ¶10)

70.    The drastic credit and underwriting cuts threatened by HSBC would have severely disrupted the program and substantially injured Polaris' relations with its dealers and its customers. (Def. Ex. A, Complaint, ¶¶22, 23, 27; Pl. Ex. B, Swenson Dec., ¶12)

71.    HSBC understood that the sudden and drastic changes it proposed would disrupt Polaris' relationship with dealers and customers. (Pl. Ex. C, Clawson Dec., ¶ 12)

72.    Having no alternative, Polaris informed HSBC that it was forced under duress to go forward with HSBC's third "Option." (Def. Ex. A, Complaint, ¶28; Pl. Ex. B, Swenson Dec., ¶12)

73.    HSBC then informed Polaris that it was making further changes to the terms of the option designated by Polaris and would implement those changes to the Agreement and the Revolving Program on March 1, 2008. (Def. Ex. A, Complaint, ¶29; Pl. Ex. B, Swenson Dec., ¶13)

74.    HSBC unilaterally implemented these changes as further revised without a writing signed by an authorized representative of each company. (Def. Ex. A, Complaint, ¶26; Pl. Ex. B, Swenson Dec., ¶¶4, 12)

75.    The changes imposed by HSBC have and continue to deprive Polaris of the benefits of the Agreement as, among other things, they deprive Polaris of fees due it under the Agreement, and impose charges on it beyond those set in the Agreement, impair sales volume and customer relations. As a result of these unlawful changes, Polaris estimates that it will lose nearly $20 million per year, with total losses exceeding $50 million. (Pl. Ex. B, Swenson Dec., ¶15; Def. Ex. A, Complaint, ¶¶ 22, 23, 27, 30)

76.    On April 3, 2008, Polaris filed its complaint against HSBC, alleging breaches of both the implied covenant of good faith and fair dealing and of the express language of the contract, including, but not limited to, Sections 3(a), 3(b), and 14 and Schedules 3a and 3b. Polaris seeks both money damages and declaratory relief. (Def. Ex. A, Complaint)

Date:  June 24, 2008

Respectfully submitted,

POLARIS SALES INC,
Plaintiff

By:    /s/ Thomas M. Lynch
        One of Plaintiff's Attorneys

Thomas M. Lynch  (6197698)
James Hegarty  (6280186)
Wildman, Harrold, Allen & Dixon LLP
225 West Wacker Drive, Suite 2800
Chicago, Illinois 60606
Telephone: (312) 201-2000
Facsimile: (312) 201-2555

*Attorneys for Plaintiff Polaris Sales Inc.*

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on June 24, 2008, he served copies of the foregoing and Polaris Sales Inc.'s Local Rule 56.1(b)(3) Response in Opposition to Defendant's Motion For Summary Judgment: via e-mail and U.S. mail, and on July 8, 2008 by ECF, upon the following counsel of record:

> Linda K. Stevens, Esq.
> Schiff Hardin LLP
> 6600 Sears Tower
> 233 South Wacker Drive
> Chicago, Illinois 60606
> lstevens@schiffhardin.com

/s/ James J. Hegarty

# PLAINTIFF'S EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

POLARIS SALES INC.,               )
                                  )
                  Plaintiff,      )
                                  )
        v.                        )    No.  08 CV 1924
                                  )
HSBC BANK NEVADA, N.A.,           )    Judge Zagel
                                  )    Magistrate Judge Mason
                  Defendant.      )

## PLAINTIFF'S ANSWER TO COUNTERLCAIM

Plaintiff Polaris Sales Inc. ("Polaris") answers Defendant HSBC Bank Nevada, N.A.'s

("HSBC") Counterclaim as follows:

## COUNTERCLAIM

1.      Polaris and HSBC clearly and unambiguously stated in their Revolving Program
Agreement, dated August 10, 2005 (the "Agreement," a copy of which is attached hereto as
Exhibit A) that HSBC would bear the credit risk for the revolving program.  Specifically, the
Agreement states, "HSBC or its Affiliates shall own all Accounts and shall bear the credit risk
for such Accounts." (Agreement, attached hereto as Exhibit A, §2)

**ANSWER:**    Admitted that Polaris and HSBC entered into an a Revolving Program

Agreement dated August 10, 2005 (the "Agreement"), that a copy of the Agreement is attached

to the Counterclaim as Exhibit A, and that Section 2 of the Agreement includes the quotation

alleged, but Polaris denies that paragraph 1 sets out a complete and accurate description of the

Program.  Polaris denies the remaining allegations contained in paragraph 1.

2.      Not surprisingly, because the parties agreed that HSBC would bear all of the risk
associated with the revolving credit program, HSBC has the right to set the credit approval
criteria.  The provisions of the Agreement are clear and unambiguous as to the nature and extent
of the very limited restrictions on HSBC's right to alter those criteria.  Specifically, the parties
agreed that:

**ANSWER:**    Denied.

a.   HSBC would use particular credit score cut-offs through the end of 2005, as explicitly stated in the Agreement, which provides, "During the period of time beginning ten (10) business days following the Effective Date through December 31, 2005, HSBC agrees to utilize credit score cutoffs used just prior to the January, 2005 score cutoff adjustments. (Agreement, attached hereto as Exhibit A, §4f.)

**ANSWER:**   Admitted.

b.   If volume fell below a certain point, the parties would meet to discuss how to increase sales volume, e.g., by modifying credit criteria: "The parties agree that if the dollar volume of Card Sales generated by the Revolving Program during any twelve (12) month period is less than $350,000,000.00, then the parties will meet to discuss proposed changes to the Revolving Program such as, for example, credit underwriting, credit promotion mix, marketing strategies and support, and other proposed changes in an effort to increase Card Sales." (Agreement, attached hereto as Exhibit A, §4g.)

**ANSWER:**   Admitted.

3.   If the parties had intended to include in their Agreement other, additional restrictions on HSBC's right to alter credit score cut-offs and other underwriting criteria from and after the end of 2005, they could have. Their inclusion of the few limitations described above indicates that they would have explicitly spelled out any additional imitations, had they intended that there should be any. They chose not to, and HSBC's right to set those criteria from and after the end of 2005 is unrestricted, except for the obligation to meet and discuss if volume should fall below $350 million.

**ANSWER:**   Paragraph 3 consists of Defendant's argument and speculation for which no response is required. To the extent a further response is necessary, paragraph 3 is denied.

4.   Volume has not fallen below $350 million.

**ANSWER:**   Admitted that the last Program information provided by HSBC reports that twelve month card sales dollar volumes generated by the Revolving Credit Program have not as of yet fallen below $350 million dollars. Polaris states further that HSBC, contrary to the terms of the Agreement, has not provided the last quarterly report to Polaris and has refused repeated

requests by Polaris to supply it with specific information regarding the Program and related activity.

5. The parties also made clear HSBC's ability to alter credit criteria in Section 2 of their Agreement, which defines the Agreement's "Scope." Specifically:

**ANSWER:** Denied.

a. HSBC entered into a separate agreement with the Polaris Dealers who were accepted for participation in the program (the "Dealer Revolving Agreement," a copy of which is attached hereto as Exhibit B). That Dealer Revolving Agreement explicitly states that "All completed applications for Accounts submitted by Dealer to HSBC whether mailed, telephone or otherwise electronically transmitted *will be processed and approved or declined in accordance with such credit criteria and procedures established from time to time by HSBC with HSBC having and retaining all rights to reject or accept such applications."* (Dealer Revolving Agreement, attached hereto as Exhibit B, §2b)

**ANSWER:** Admitted that HSBC has entered into separate agreements with Polaris dealers called the Dealer Revolving Agreement, that Exhibit B to the Counterclaim appears to be a form of the Dealer Revolving Agreement that HSBC claims to use, and that Section 2.b. of the form Dealer Revolving Agreement includes the quoted sentence alleged except for the comma omitted in paragraph 5.a. Polaris denies that paragraph 5.a. sets forth a complete and accurate description of the Program. Polaris denies the remaining allegations contained in paragraph 5.a., stating further that HSBC expressly agrees and acknowledges in its Agreement with Polaris, among other things, that Polaris is not a party to any agreement between HSBC and the individual dealers and that Polaris shall not be responsible for the obligations of HSBC and the dealers to one another.

b. The Dealer Revolving Agreement – which includes the provision quoted above specifically stating that HSBC alone shall establish the program's credit criteria -- was explicitly referenced by Polaris and HSBC in their Agreement. Specifically, in defining the "Scope" of the Agreement

between them, HSBC and Polaris agreed and acknowledged that, "…Polaris requested and HSBC agreed to provide a Private label Credit Card program and Debt Cancellation program for consumers purchasing Goods from Dealers (the "Revolving Credit Program") *under the terms and conditions of agreements with Dealers ("Dealer Revolving Agreements") entered into heretofore and hereafter between HSBC and Dealers."* (Exhibit A, Section 2.)

**ANSWER:** Admitted that Section 2.b. of the form Dealer Revolving Agreement includes the quoted sentence alleged in paragraph 5.b. of the Counterclaim except for the comma omitted in paragraph 5.b., and that Section 2 of the Agreement includes the quoted sentence that is alleged in paragraph 5.b. except for the highlighting added to the quotation, but Polaris denies that paragraph 5.b. sets forth a complete and accurate description of the Program. Polaris also denies that the terms of any Dealer Revolving Agreement were incorporated into the Agreement between Polaris and HSBC, stating further that HSBC expressly agrees and acknowledges in its Agreement with Polaris, among other things, that Polaris is not a party to any agreement between HSBC and the individual dealers and that Polaris shall not be responsible for the obligations of HSBC and the dealers to one another. The remaining allegations are denied.

6. The parties' intent must be gleaned, where possible, from the four corners of the Agreement.

**ANSWER:** Paragraph 6 consists of a legal conclusion for which no response is necessary.

7. The Agreement is clear and unambiguous on its face: HSBC was to use certain credit score cut-off criteria until the end of 2005, and HSBC will meet with Polaris to discuss modifying such criteria to increase sales volume, should sales volume fall below $350 million. Otherwise, there is no restriction on HSBC's ability to alter credit approval criteria. Indeed, the Agreement is premised upon and makes explicit and specific reference to the Dealer Revolving Agreement, which explicitly states and confirms that the underwriting criteria are to be determined by HSBC.

**ANSWER:** Admitted that the Agreement provides that HSBC must use certain credit score cut-off criteria to the end of 2005 and that HSBC and Polaris would need to discuss action to increase sales volume should the sales volume for the preceding twelve months fall below $350 million. The remaining allegations contained in paragraph 7 are denied.

8. In light of changes in the credit and financing markets, and faced with deteriorating performance of the various promotions offered under the revolving credit program, HSBC notified Polaris in January 2008, that it would be altering the credit criteria for that program. In an effort to mitigate the impact on Polaris, HSBC offered, in addition to and as alternatives to the tightening of the credit criteria, several other options, including altering the participation payments.

**ANSWER:** Denied.

9. Polaris accepted one of the proffered options which provided that changes (including altered approval criteria) would be made to the program in March of 2008.

**ANSWER:** Admitted that HSBC demanded that Polaris accept one of the options that it had proffered to Polaris on or about January 25, 2008, and that under severe commercial duress and protest without waiver of its rights, claims and objections, and in mitigation of its damages, all being expressly raised in its response, Polaris was forced to forgo its Volume Incentive and proceed with proposed modest revisions to underwriting applications to the Revolving Program in order to avoid severe and drastic interruption of customer retail credit purchases. Polaris states further that HSBC further unilaterally revised some of the terms of its "proffered option." The remaining allegations contained in paragraph 9 are denied.

10. The clear and unambiguous language of the agreement establishes both the spirit and intent of the agreement as well as HSBC's compliance with that spirit and intent.

**ANSWER:** Denied.

10. [sic] Polaris alleges that HSBC does not have the right to alter the criteria that it uses to approve credit to consumers under the Agreement.

**ANSWER:**    The second paragraph 10 mischaracterizes the allegations set forth in the Polaris Complaint and, therefore, is denied.

11.    Polaris alleges that HSBC did not have the right to make the program changes it announced in January 2008, and made in March of 2008, including changes to the criteria it uses to approve credit to consumers under the Agreement.

**ANSWER:**    Paragraph 11 mischaracterizes the allegations set forth in the Polaris Complaint and, therefore, is denied.

12.    There is an actual controversy under 28 U.S.C., § 2201 between the Bank and Polaris as set forth herein, which controversy is within the proper jurisdiction of this Court.

**ANSWER:**    Admitted.

## HSBC'S PRAYER FOR RELIEF

WHEREFORE, HSBC respectfully prays that this Court enter judgment in its favor and grant it the following relief:

A.    HSBC asks the Court to declare the rights and obligations of the parties relative to this controversy and declare that:

    a.    HSBC has the right under the Agreement to alter the criteria it uses to approve credit to consumers under the Agreement.

    b.    HSBC had the right under the Agreement to make the changes it announced in January 2008, and the changes it made in March 2008, to the criteria it uses to approve credit to consumers under the Agreement.

    c.    HSBC did not breach the Agreement by announcing its intention to tighten the criteria it uses to approve credit to consumers under the Agreement or by making changes to those criteria.

    d.    HSBC is not obligated under the Agreement to continue to provide retail financing based on the applicant approval rates and credit criteria used prior to March 1, 2008.

    e.    The clear and unambiguous language of the agreement establishes both the spirit and intent of the agreement as well as HSBC's compliance with that spirit and intent.

B.    HSBC also seeks its costs and fees incurred herein, and such other relief as the Court deems just and proper.

**ANSWER:**    Polaris denies that HSBC is entitled to and that Polaris is liable for any of the relief HSBC seeks.

## POLARIS'S AFFIRMATIVE DEFENSE

HSBC's claims are precluded by the defense of duress, based on facts described above and in Polaris's Complaint.

WHEREFORE, Plaintiff Polaris Sales Inc. respectfully asks this Court to enter judgment in its favor and to award it its costs and fees and to grant it such other relief as the Court determines to be just and necessary.

May 21, 2008

POLARIS SALES INC.,
Plaintiff

By:    /s/ Thomas M. Lynch
        One of its Attorneys

Thomas M. Lynch (Atty. no. 6197698)
James J. Hegarty  (Atty. no. 6280186)
Wildman, Harrold, Allen & Dixon LLP
225 West Wacker Drive, Suite 3000
Chicago, IL 60606
(312) 201-2000 / Fax: (312) 201-2555

*Of Counsel:*
Mary P. McConnell
Michael Mitchell
Polaris Industries Inc.
2100 Highway 55
Medina, MN  55340

(763) 542-0500 / Facsimile:  (763) 542-0595

Attorneys for Plaintiff Polaris Sales Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on May 21, 2008, a copy of the foregoing **Plaintiff's Answer to Counterclaim** was filed with the Clerk of U.S. District.  Notice of this filing will be sent to the following parties by operation of the court's electronic filing system.  Parties may access this filing through the Court's system.

Ronald S. Safer
Linda K. Stevens
Schiff Hardin LLP
6600 Sears Tower
Chicago, IL  60606


/s/ Thomas M. Lynch

# PLAINTIFF'S EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| POLARIS SALES INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.   08 CV 1924 |
| | ) | |
| HSBC BANK NEVADA, N.A., | ) | |
| | ) | |
| Defendant. | ) | |

### DECLARATION OF SCOTT SWENSON

I, Scott Swenson, having personal knowledge of the facts set forth below and otherwise being competent to testify, declare that if called to appear in the above captioned case, I can and will testify as follows:

1.      I am a Vice President of Polaris Industries Inc., parent company of Polaris Sales Inc. ("Polaris").

2.      During the times mentioned in my Declaration, my responsibilities included overseeing the revolving credit programs of Polaris Sales Inc., including its Revolving Credit program with HSBC Bank- Nevada, N.A.  Polaris employee Kelly Clawson reports to me with regard to these programs.

3.      Beginning in 2001, HSBC or its predecessor provided Polaris with quarterly business reviews regarding the performance of the Polaris retail financing portfolio.  Prior to 2008, the Polaris and HSBC representatives would discuss underwriting and credit criteria, portfolio performance and proposals to make adjustments as appropriate for the program.

4.      An authorized representative of Polaris signed the 2005 Revolving Program Agreement on behalf of the company. The First Amendment to the Revolving Program

Agreement in 2007 is the only writing signed by HSBC and Polaris that changes Revolving Program Agreement.

5.    While operating under the Revolving Program Agreement and the prior agreement between Polaris and HSBC, HSBC and Polaris representatives regularly discussed examples and events that showed how tighter underwriting standards had disrupted Polaris' relationships with its dealers and the dealers' relationships with customers.  The parties have also worked together to make small to moderate changes in approval rates and underwriting and credit criteria to avoid or minimize disruptions and further the program's objective of supporting sales volumes 2007.

6.    From 2005 to 2007, approval rates averaged around 47 percent.

7.    On January 25, 2008, HSBC surprised Polaris with a demand that Polaris select one of three options that HSBC presented to change significant terms of the Revolving Credit Program, or HSBC would slash the underwriting and credit criteria used for the program beginning March 1, 2008.  The threatened changes would reduce approval rates would from about 52 percent to approximately 28 percent.  I believe that these changes, if then imposed, would have severely disrupted Polaris dealer and customer relations.

8.    HSBC presented Polaris with three alternative options to avoid the full implementation of the threatened radical changes in underwriting and credit criteria which included:  (1) accepting a drastic re-indexing of promotional discounts or severe adjustments to volume incentives that severely change the structure provided in the Agreement; (2) accepting a drastic increase in promotional costs to be paid by Polaris over that provided in the Agreement; or (3) foregoing the fees that were Polaris' primary income source under the Agreement.  Each of these options would cause Polaris to lose substantial benefits provided by the Agreement.

9.     Polaris responded by informing HSBC that HSBC's own recent information about the overall performance of the core credit program portfolio did not support the proposed changes and that the changes demanded by HSBC did not appear to be necessary or justified.

10.     At my direction, Polaris made several requests to HSBC for detailed factual information about the supposed need for these changes to enable both sides to sit down and work out a reasonable solution to any problem that in fact may exist. HSBC did not provide the requested information.

11.     Polaris offered a counterproposal to HSBC that was dismissed out of hand.

12.     Having no choice to avoid certain and serious injury to the program and our dealer and customers relations, and having no ready and commercially feasible alternative available in the time frame proposed by HSBC, Polaris informed HSBC that it was being forced under duress to go forward with HSBC's "Option 3" as clarified by HSBC in early February. Attached as Exhibit 1 is a copy of my letter, dated February 22, 2008, which accurately described these events and Polaris' response.

13.     Polaris took the action described in the my February 22, 2008 letter because HSBC's threatened changes to underwriting changes posed a risk of significant harm to Polaris' business, and to its dealer and customer relations.  Polaris acted under duress and without any commercially feasible alternative under the circumstances.

14.     I subsequently received a letter from Mr. Hughes of HSBC dated February 29, 2008, a copy of which is attached as Ex. 2. While the letter makes reference to the third Option contained in HSBC's January presentation, it indicated that HSBC would further alter its terms. On or about March 1, 2008, HSBC implemented its "Option 3" with the additional changes noted in the February 29, 2008 letter.

3

15. HSBC has forced Polaris to give up its volume incentive income for the remaining term of the Revolving Program Agreement.  Polaris' volume incentive income would be expected to exceed $20 million per year.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Scott Swenson

Dated June 24, 2008
Medina, MN

4

# PLAINTIFF'S EXHIBIT B-1

# SEALED DOCUMENT

# NOT AVAILABLE
# FOR PUBLIC VIEWING

# PLAINTIFF'S EXHIBIT B-2

# SEALED DOCUMENT

# NOT AVAILABLE
# FOR PUBLIC VIEWING

# PLAINTIFF'S EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| POLARIS SALES INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.   08 CV 1924 |
| | ) | |
| HSBC BANK NEVADA, N.A., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DECLARATION OF KELLY CLAWSON**

I, Kelly Clawson, having personal knowledge of the facts set forth below and otherwise being competent to testify, declare that if called to appear in the above-captioned case, I can and will testify as follows:

1.      I am an employee of Polaris Industries Inc., parent company of Polaris Sales Inc. ("Polaris").

2.      During the times mentioned in my Declaration, I represented Polaris in connection with its Revolving Credit program.

3.      Beginning in 2001, HSBC and its predecessor financed Polaris retail customer purchases under a Revolving Credit program.  The copies of the form Revolving Credit Dealer Agreements used by HSBC and its predecessor that were provided to Polaris showed that since 2001, the statement in these form Agreement regarding the processing and approval or declination of applications in accordance with credit criteria and procedures and the right to reject or accept applications have remained unchanged except for the name of the bank.

4.     In 2005, HSBC communicated to Polaris that it wanted to discuss loosening credit criteria to approve more applicants and increase sales volume.

5.     Polaris informed HSBC that it preferred a more conservative approach. HSBC responded by proposing a volume-based structure under which Polaris would receive a monthly payment based upon the sales volume without being required take on the credit risk. HSBC told Polaris that the volume-based approach would enable HSBC to apply less conservative underwriting standards to drive additional volume.

6.     Based on HSBC's representations, Polaris entered into discussions for a new agreement for its revolving credit program with HSBC that was based on the new volume-based approach HSBC proposed.

7.     I was involved in the negotiations for the 2005 Revolving Program Agreement.

8.     During our negotiations, Polaris proposed language for Section 4(f) of the Agreement that limited HSBC's right to change underwriting standards. Rather than insisting on language that reserved to HSBC complete discretion, HSBC proposed alternative language that expressly reserved a limited right to adjust underwriting and credit scores.

9.     The parties could not agree on the additional language for that section. The stalemate was finally broken when HSBC assured Polaris that is should not worry about placing a specific limitation on HSBC because HSBC intended to manage underwriting in a manner that would increase sales volume. Based on this, Polaris agreed to leave Section 4(f) as it appears in the Agreement.

10.     HSBC's proposed the language contained in Section 4(g) of the Agreement. HSBC indicated at the time that the purpose of this provision was to protect HSBC against Polaris shifting sales volume away from our Revolving Credit program to another Polaris installment retail financing program in which HSBC did not participate.

11.    Under the 2005 Revolving Program Agreement, the parties worked together to consider and make changes to the program as needed, including changes to underwriting and credit criteria.

12.    In the course of working with Polaris, HSBC frequently was informed about the actual impact of changes in underwriting and credit standards to the program, including experiences that confirmed how changes in underwriting standards would disrupt Polaris relationships with dealers and dealers' relationships with customers.

13.    Before 2008, HSBC and Polaris worked together to make modest adjustments to such standards to avoid disruptions.  Approval rates from 2005 through 2007 averaged around 47 percent.

14.    Attached as Ex. 1 to my Declaration is a true copy of the First Amendment to the 2005 Revolving Program Agreement, dated October 31, 2007.

15.    In December 2007, HSBC assured Polaris that the revolving credit core portfolio was performing as expected and that it did not see the need for any unusual action.

16.    However, in a conference with HSBC that I attended on January 25, 2008, HSBC informed Polaris that it would slash credit scores such that approval rates would drop, in little more than 30 days, from about 52 percent to approximately 28 percent unless Polaris agreed to changes to the revolving credit program that HSBC presented in the form of three "Options." Attached as Ex. 2 to my declaration is a true copy of the summary page of the Options from HSBC's January presentation to us.

17.    Based upon my experience with HSBC, I understand that HSBC was aware that Polaris could not find a suitable alternative source to finance the Revolving Credit program in light of the limited time period given by HSBC and the Revolving Program Agreement's provision that prevented Polaris from readily securing an alternative source.

3

I declare under penalty of perjury that the foregoing is true and correct.

*Kelly Clawson*

Kelly Clawson

Dated June 23, 2008
Medina, MN

# PLAINTIFF'S EXHIBIT C-1

# SEALED DOCUMENT

# NOT AVAILABLE
# FOR PUBLIC VIEWING

# PLAINTIFF'S EXHIBIT C-2

# SEALED DOCUMENT

# NOT AVAILABLE
# FOR PUBLIC VIEWING