**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

POLARIS SALES INC.,                )
                                   )
                    Plaintiff,     )          Case No. 08 CV 1924
                                   )
        v.                         )          Judge Zagel
                                   )
HSBC BANK NEVADA, N.A.,            )          Magistrate Judge Mason
                                   )
                    Defendant.     )

**REPLY BRIEF IN SUPPORT OF HSBC'S MOTION FOR SUMMARY JUDGMENT**
**AND IN SUPPORT OF MOTION TO**
**STRIKE PAROL AND OTHER EXTRINSIC  EVIDENCE**

Polaris misconstrues HSBC's motion, casting it as one based on mere "implication" and addressed to issues on which the contract is "silent."  But HSBC does not seek summary judgment on the basis of implications suggested by the language of the parties' agreement alone, although supportive implications abound.  Rather, HSBC has pointed to specific and explicit language in the Revolving Program Agreement ("Program Agreement" or "Agreement") expressly giving HSBC the right to determine the criteria by which it will extend its credit to consumers.  Polaris' attempt to create a question of fact by reference to the covenant of good faith and fair dealing also fails, because the spirit and purpose of the Program Agreement are clear from the express language of that Agreement, and also vest HSBC with "all rights" to set its credit criteria.   Nor can the parol and other extrinsic evidence offered by Polaris create a contested issue of fact.  Because the Program Agreement is unambiguous, and because the language, spirit, and intent of the Agreement are clear from the face of the Agreement itself, reference to extrinsic evidence is inappropriate.  Consequently, HSBC also respectfully requests that the Court grant its motion to strike that evidence, which is filed simultaneously herewith.

I.      **The Program Agreement Expressly and Impliedly Gives HSBC
        the Right To Determine Its Consumer Credit Criteria.**

      A.      <u>**Express Terms Provide HSBC the Right to Determine Its Credit Criteria.**</u>

Polaris asserts that there is no express language in the Agreement giving HSBC the right to determine consumer credit criteria. Polaris is wrong. In Section 2 of the Program Agreement, the parties defined the very "Scope" of their agreement – the breadth and bounds of its terms and what those terms would encompass. In that critical "Scope" provision, the parties explicitly agreed that the terms and conditions of the Dealer Revolving Agreement would control and govern HSBC's provision of credit to consumers under the program. (Program Agreement at Section 2; Defendant's Rule 56.1 Statement of Uncontested Facts, hereinafter referred to as "Facts," at ¶ 11) The Dealer Revolving Agreement, in turn, explicitly states that all credit applications "*will be processed and approved or declined in accordance with such credit criteria and procedures established from time to time by HSBC, with HSBC having and retaining all rights to reject or accept such applications.*" (Dealer Revolving Agreement at ¶ 2b; Facts at ¶ 12) (emphasis added.) Thus, the parties expressly agreed that HSBC would have "all rights" to set its own credit criteria.

It is significant that Polaris has offered no other interpretation of this language in the Dealer Revolving Agreement. Nor does Polaris offer any alternate explanation for the parties' explicit reference to that language in the critical "Scope" definition of their Program Agreement. Instead, Polaris attempts to manufacture an ambiguity (and a fact issue) by pointing to Section 20 of the Program Agreement, which provides:

> Except as specifically provided in this Agreement, (i) Polaris shall not be a party to any agreement between HSBC and individual Dealers, (ii) Polaris shall not be responsible for the obligations of HSBC and any Dealer one to the other, including without limitation, the payment of any amounts owed by one to other, and

(iii) Polaris shall not in any way be responsible for the acts, omissions or breaches of any arrangements or contracts between HSBC and Dealers or for any other obligations of HSBC or any Dealer.

Polaris' reliance on Section 20 of the Program Agreement is misplaced. HSBC is not seeking to make Polaris a party to the Dealer Revolving Agreements as Section 20 prohibits. Nor does it seek to hold Polaris responsible for any HSBC or Dealer acts or obligations arising under the Dealer Revolving Agreements. Rather, HSBC seeks to hold Polaris to the contract that Polaris made – clearly and explicitly – when it executed the Program Agreement. That contract unambiguously provides that the Dealer Revolving Agreement will dictate the terms and conditions of the revolving credit program, and the Dealer Revolving Agreement clearly states that HSBC has "all rights" to set and alter credit criteria.

Worse for Polaris, the Section 20 prohibition upon which Polaris relies contains the express limitation, "[e]xcept as specifically provided in this Agreement . . . ." The Program Agreement "specifically provides" that credit would be provided to consumers "*under the terms and conditions of agreements with Dealers ('Dealer Revolving Agreements' ) . . . .*" (emphasis added)  Accordingly, the Court need not search further than the express language of both Sections 2 and 20 to construe the parties' agreement. The parties expressly agreed that HSBC would provide credit to consumers for the Revolving Program under the terms and conditions of the Dealer Revolving Agreement, which states that HSBC may approve and decline credit "in accordance with such credit criteria and procedures established from time to time by HSBC." Such language would be clear enough on its own, but the Dealer Agreement also states that HSBC "ha[s] and retain[s] all rights to reject or accept such applications." The parties' contract is clear: HSBC has all rights to decide the credit criteria it will use under the program.

**B.    HSBC's Right to Determine Its Credit Criteria Is Also Implied.**

In addition to these express provisions, there is further language in the Program Agreement that confirms, by implication, that HSBC has the sole right to determine consumer credit criteria. For example, the parties stated that HSBC was required to use certain credit criteria (specifically those used just prior to the January 2005 adjustments) until December 31, 2005. (Program Agreement at §4f; Facts at ¶ 14) The parties clearly knew how to state a limitation on HSBC's ability to alter its credit criteria, and they listed in the Agreement their sole restriction – use the specified criteria through December 2005. Other than that limitation, the parties included no restriction on HSBC's ability to alter its credit criteria. Under the rule of '*expressio unius est exclusio alterius*' — the expression of one thing excludes others — this language confirms that HSBC reserved all rights after 2005 to determine and alter its credit criteria. *Nevada Food King, Inc. v. Reno Press Brick Co.*, 81 Nev. 135, 138, 400 P.2d 140, 142 (Nev. 1965) (additional restrictions regarding lessor's right to operate a supermarket would not be read into lease that already contained explicit restrictions). *See also In re Musicland Holding Corp.*, 374 B.R. 113, 121 (S.D.N.Y. 2007) (because parties' agreement contained express limitation as to certain loans, the absence of limits concerning other loans is significant in construing the contract); *Foad Consulting Group, Inc. v. Azzalino*, 270 F.3d 821, 829 (9th Cir. 2001) (express contractual provision requiring real estate developer to indemnify creator of copyright specimen in the event that a modification to the specimen led to liability, would not be construed to require creator's consent for modification).

This rule is also called into play by Section 4(g) of the Program Agreement, which requires HSBC to "meet to discuss" with Polaris changes to the credit program, including changes to credit criteria, only when sales volume falls below $350,000,000. The parties

considered – and explicitly memorialized – the circumstances under which Polaris should have an opportunity to provide input regarding changes to credit criteria. The specific statement of those circumstances – when sales fall below $350,000,000 – precludes reading any others into the contract. Because the parties do not dispute that sales have remained above $350,000,000, the Program Agreement does not require that HSBC meet to discuss with Polaris any changes to its credit criteria. Polaris seeks to contravene the express terms of the Program Agreement when it argues that HSBC is required, not only to "meet to discuss" changes to the credit criteria, but also to obtain HSBC's *agreement* to the changes that it wishes to make.

Other provisions of the Program Agreement confirm and support the express language regarding HSBC's right to alter its credit criteria. For example, Section 2 of the Agreement states that HSBC would bear the credit risk for all accounts. (Facts at ¶11) It makes sense, therefore, that HSBC would have sole discretion to determine its consumer credit criteria. Furthermore, several other sections of the Agreement give HSBC the right to determine the terms by which it deals with consumers (Facts at ¶21), further supporting HSBC's right to set its own credit criteria.[1] These provisions, together with the explicit provisions discussed above, establish the clear and unambiguous meaning of the parties' agreement—HSBC has the sole right to determine consumer credit criteria. *See Eversole v. Sunrise Villas VIII Homeowners Ass'n*, 112 Nev. 1255, 1260, 925 P.2d 505, 509 (Nev. 1996) ("contractual provisions should be harmonized whenever possible . . . and construed to reach a reasonable construction.")

---

[1] Polaris argues that these provisions illustrate that the parties could have stated that HSBC had an unfettered right to alter its credit criteria. However, HSBC's right to alter criteria was limited for several months after execution of the contract (during the time period ending on December 31, 2005, as stated above), and a statement to that effect therefore could not have been included.

Faced with the clear and unambiguous language of the Program Agreement, Polaris attempts to create an "ambiguity" – and conjure a question of fact – by submitting parol evidence regarding the negotiations leading up to the signing of the contract, extrinsic documents, and a Local Rule 56.1(b) statement asserting "additional facts" regarding the history between the parties and HSBC's alleged conduct. Consideration of this parol and other extrinsic evidence is both unnecessary and inappropriate. "Where a written contract is clear and unambiguous on its face, extraneous evidence cannot be introduced to explain its meaning." *Kaldi v. Farmers Ins. Exchange*, 117 Nev. 273,  281, 21 P.3d 16, 21 (Nev. 2001), citing *Geo. B. Smith Chemical v. Simon*, 92 Nev. 580, 582, 555 P.2d 216, 216 (Nev. 1976). *See also Radobenko v. Automated Equipment Corp.*, 520 F.2d 540, 543 (9th Cir. 1975) (disregarding parol evidence submitted in opposition to motion for summary judgment where contract provision at issue was unambiguous). A document that is clear on its face must be construed from the written language and enforced as written. *Crockett & Myers, Ltd.. v. Napier, Fitzgerald & Kirby, LLP*, 440 F. Supp. 2d 1184, 1193 (D. Nev., 2006).

As shown above, the Program Agreement clearly provides that HSBC has "all rights" to determine its credit criteria. Thus, under the case law cited above and in HSBC's initial brief, no parol or other extrinsic evidence is necessary or appropriate to construe the meaning or intent of the Program Agreement, and the extrinsic evidence offered by Polaris in support of its Opposition is inadmissible and should not be considered.[2] *See also Daly v. Del E. Webb Corp.*, 96 Nev. 359, 361, 609 P.2d 319, 320 (Nev. 1980) (proffered deposition testimony inadmissible and summary judgment affirmed because "[t]he parol evidence rule forbids the reception of

---

[2] Fed.R.Civ.P. 56(e) requires, in pertinent part, that an affidavit submitted in support of or in opposition to a motion for summary judgment be "made on personal knowledge, *set out facts that would be admissible in evidence*, and show that the affiant is competent to testify on the matters stated…" (emphasis added)

evidence which would vary or contradict the contract"). In light of the clear language of the parties' agreement, HSBC had "all rights" to accept or reject credit applications "in accordance with such credit criteria and procedures established from time to time by HSBC," and HSBC is entitled to summary judgment on Polaris' claim for breach of contract.

## II.    Polaris' Allegations Regarding Lack of Good Faith or Fair Dealing Do Not Avoid Summary Judgment.

In its attempt to avoid summary judgment, Polaris retreats to the covenant of good faith and fair dealing.[3] As Polaris admits, that covenant is breached (under Nevada law) when one party to a contract acts in a way that frustrates the purpose of the agreement, and Polaris alleges that HSBC "frustrated the purpose" of the Program Agreement when it altered its credit criteria. (Response, pp. 11-13) To support this argument, Polaris offers parol evidence to establish that the Agreement's "purpose" was to increase Polaris' sales volume and asserts that HSBC's alteration of its credit criteria frustrated that purpose.

Polaris is wrong again. First, the Program Agreement is clear and unambiguous in describing its purpose, and second, the parties' expression of their purpose explicitly contemplates that HSBC will have "all rights" to alter its credit criteria. In determining the Agreement's purpose, it is appropriate to consider how the parties themselves defined its scope and, as discussed above, the parties established in the "Scope" section of their Agreement that their purpose was to create a revolving credit program under which HSBC will provide credit to consumers under the terms and conditions of the Dealer Revolving Agreements -- which allow HSBC "all rights" to set its own credit criteria. The purpose of the parties' Agreement therefore

---

[3] Polaris' complaint does not contain a separately delineated claim for breach of the covenant of good faith and fair dealing. Count I claims breach of contract and Count II requests a declaratory judgment that HSBC may not alter its credit criteria.

is clear. The case law prohibiting parol evidence in the absence of ambiguity also is clear. Polaris' proffered extrinsic evidence attempting to establish another "purpose" is unnecessary and inappropriate.[4]

Polaris' reliance on *Hilton Hotel Corps. v. Butch Lewis Productions,* 107 Nev. 226, 231 (Nev. 1991) *Hilton Hotels* is misplaced, and an analysis of that case actually supports HSBC's position, rather than Polaris'. *Hilton Hotels* pertained to a contract between the defendant boxing promoters and Hilton Hotels regarding a series of fights to be staged in Las Vegas between the various boxing champions. When the contract was signed, Michael Spinks was the International Boxing Federation heavyweight champion, and the contract stated that Spinks would be one of the fighters in the first event in the series. 808 P.2d at 228, fn 1. After that first event, however, the contract was silent as to Spinks' participation. Before the end of the series, Spinks relinquished his heavyweight champion title and therefore became ineligible to fight in the final event of the series. Hilton Hotels sued, arguing that the promoters were required to provide Spinks as a contestant for the entire series, until he lost or the series concluded. Defendants argued that Spinks was not required to keep fighting since his name was mentioned only for the first event. Hilton Hotels appealed the jury verdict against it arguing that it was error for the court to have excluded evidence of a statement made by one of the promoter defendants that he

---

[4] Polaris argues that Section 4(g) of the Program Agreement supports its assertion that the purpose of the Agreement is the growth of Polaris' sales volume and that the Agreement prohibits HSBC from altering its credit criteria. However, this Section (which requires HSBC to "meet to discuss" with Polaris proposed changes to the credit program, including credit criteria, if sales drop below $350,000,000) merely requires a meeting to discuss such changes, and does not prohibit or limit those changes in any way or require HSBC to get Polaris' agreement before making such changes. Even that limited obligation – a meeting to discuss changes – applies only if sales drop below $350,000,000, and the parties do not dispute that sales have remained above $350,000,000. Similarly, the Program Agreement's statement (in Section 2) that the parties "have joined in this Agreement to promote their respective business goals" begs the question of what goal constitutes the purpose of the Agreement and merely supports the language that follows in that section denying the existence of a joint venture.

had purposefully caused Spinks to relinquish his title in order to make him ineligible to fight in the series and to feature him in a more profitable fight. The court decided that this admission should have been admitted on rebuttal. 808 P. 2d at 236-37.

There are two key points in *Hilton Hotels:* (1) the court in that case found that "The written contract is far from being a model of clarity," 808 P.2d at.230, and (2) the Hilton Hotels contract specifically mentioned Spinks as a participant in the boxing series, therefore giving the plaintiff *an express contractual basis* for asserting a contractual purpose that was frustrated. Because neither point is true in the instant case, *Hilton Hotels* does not apply here. Unlike in the Spinks fight contract, there is no ambiguity here regarding the Program Agreement's purpose, or regarding HSBC's right to alter its credit criteria. Unlike the plaintiff in *Hilton Hotels* (which based its argument on contractual language stating that Spinks would fight in the series), Polaris can point to no language in the Program Agreement establishing a purpose for the agreement that has been frustrated by HSBC's conduct. Indeed, the Program Agreement in this case plainly states that its purpose is to provide a revolving credit program under which HSBC would offer credit to consumers under the terms and conditions of the Dealer Revolving Agreement – which specifically states that HSBC will process and approve or decline credit "in accordance with such credit criteria and procedures established from time to time by HSBC, with HSBC having and retaining all rights to reject or accept such applications." (Dealer Revolving Agreement, §2b; Facts at ¶12). Unlike the boxing promotion agreement at issue in *Hilton Hotels*, the Program Agreement in this case explicitly provides that HSBC has "all rights" to engage in the challenged conduct.

If a plaintiff could defeat summary judgment against it simply by asserting the absence of good faith and fair dealing, every contract dispute would go to trial. That is not the law -- in

Nevada or anywhere else. It is inappropriate for a plaintiff to avoid the explicit terms of its agreement by invoking the covenant of good faith and fair dealing. *See Kaldi v. Farmers Ins. Exchange*, 21 P.3d at 277 (plaintiff's claim for breach of covenant of good faith and fair dealing properly dismissed as a matter of law, since explicit terms of contract granted defendant the right to engage in the challenged conduct). *See also Times Mirror Magazines, Inc. v. Field & Stream Licenses Co.,* 294 F.3d 383, 394-95 (2d Cir. 2002) ("Having already found that the express terms of the agreements clearly set forth the parties' respective rights . . . [plaintiff] cannot avoid the express terms of the contract by relying on the implied covenant of food faith and fair dealing"); *Q Management v. Snake River Equipment Co.*, No. CV-05-322-E-MHW, 2008 WL 219173, *7 (D. Idaho Jan. 24, 2008) (refusing to impose obligation under covenant of good faith and fair dealing as contrary to contract's terms); *DeHorney v. Bank of America Nat. Trust and Sav. Ass'n*, 879 F.2d 459, 466 (9th Cir. 1989) (covenant of good faith and fair dealing cannot be invoked to prevent a party from taking action expressly allowed by the contract); *Moreau v. Air France*, 356 F.3d 942, 954 (9th Cir. 2004) (covenant of good faith and fair dealing "cannot impose any substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement") citing to *Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 317, 350-52, 8 P.3d 1089 (Cal. 2000).

Contrary to Polaris' assertion, this case is appropriate for summary determination. The question of whether a contract is ambiguous is a question of law for the Court's determination. *Marquis Models, Inc. v. Green Valley Ranch Gaming, LLC*, No. 2:05-CV-01400-KJD-PAL, 2007 WL 2904172, *4 (D. Nev. Sept. 30, 2007); *Bourke v. Dun & Bradstreet Corp.*, 159 F.3d 1032, 1036 (7th Cir. 1998). Because the Program Agreement is clear and unequivocal, whether

HSBC had the right to alter its credit criteria is also a question of law for the Court to determine. *Marquis Models,* 2007 WL 2904172, at *4.

As the case law cited above indicates, Polaris goes to too far in suggesting that summary adjudication of implied covenant claims is not available under Nevada law. To the contrary, Nevada courts have entered summary judgment on implied covenant claims where, as here, the contract at issue contained clear and unambiguous language from which the purpose could be gleaned. *See* e.g., *LaForge v. State University and Community College System of Nevada,* 116 Nev. 415, 422, 997 P.2d 130, 135 (Nev. 2000) (affirming summary judgment as breach of contract and covenant of good faith and fair dealing claims). The Program Agreement explicitly and unequivocally lays out the purpose of that Agreement, which was the creation of a revolving credit program under the terms and conditions of the Dealer Revolving Agreements – which provide that HSBC shall have all rights to alter its credit criteria. HSBC's alteration of its credit criteria therefore is expressly allowed by the parties and is within the "purpose" of the Agreement as expressly provided by the parties. Accordingly, HSBC is entitled to judgment as a matter of law.

**III.    Polaris' Parol and Other Extrinsic Evidence Should Be Stricken.**

HSBC has based its motion for summary judgment on the premise that the terms, spirit, and purpose of the Program Agreement are clear and unambiguous and can be gleaned from the four corners of the contract. The parol and other extrinsic evidence offered by Polaris alleges facts regarding the parties' previous dealings and the negotiations leading up to the execution of the Agreement. Under the case law discussed above, such extrinsic evidence is unnecessary and inappropriate. Moreover, because Federal Rule of Civil Procedure 56(e)(1) requires that proffered affidavits and other evidence submitted in opposition to a motion for summary

judgment must be relevant and admissible, the extrinsic evidence offered by Polaris should not be considered.  *See  Radobenko v. Automated Equipment Corp.*, 520 F.2d at 543 (rejecting contention that conflicting parol evidence over meaning of contractual provision creates a triable issue of fact barring summary judgment; "any conflict in the parol evidence concerning the meaning of that clause is immaterial because it is inadmissible at trial and may be disregarded in considering the motion for summary judgment").  *See also J..E. Jones Const. Co. v. Chubb & Sons, Inc.*, 486 F.3d 337, 339-40 (8th Cir. 2007) (affidavit properly excluded on summary judgment where facts set forth therein were irrelevant to the issue presented in the summary judgment motion).  Consequently, HSBC is filing herewith a Motion to Strike Polaris' Parol Evidence.

However, in order to avoid any finding that it has somehow admitted any of the assertions of fact contained in Polaris' proffered parol evidence or its Local Rule 56.1(b) statement HSBC submits herewith the affidavit of Victor L. Jackson, who was involved in the negotiations between HSBC and Polaris.  HSBC offers this affidavit, not to support its motion for summary judgment (which is based on the premise that no parol evidence need be, or should be, considered in determining the motion) but only in the event that the Court denies HSBC's Motion to Strike Polaris' Parol Evidence and thereafter deems it appropriate to consider extrinsic evidence in deciding HSBC's motion for summary judgment.[5]

---

[5]  HSBC's affidavit describes how the parties changed their relationship from a joint venture, in which both parties were involved in decisions regarding the issuance of credit under the StarCard revolving credit program, including credit criteria, to an arrangement whereby the joint venture was terminated, Polaris was given responsibility for marketing and selling its products, and HSBC was given sole control over the issuance of credit. (Affidavit of Victor L. Jackson, attached hereto as Ex. A, ¶2.)  Once Polaris no longer shared in the credit risk, the parties explicitly agreed to give, and the spirit and intention of the Program Agreement was to give, HSBC all rights to alter the criteria it would use in issuing that credit. Ex. A, ¶3.  As such, HSBC did not contravene the spirit or intent of the Agreement when it exercised its discretion to

## CONCLUSION

The unambiguous language of the Program Agreement makes clear that the meaning, spirit, intent and purpose of that Agreement is that HSBC has the right to alter the criteria it uses to approve credit to consumers under the Revolving Program. Polaris has failed to establish any genuine issue of disputed fact that would preclude the entry of summary judgment. Instead, Polaris has offered extrinsic evidence which, in light of the clear and unambiguous language in the parties' Agreement clearly establishing its meaning, intent and purpose, should be stricken. Accordingly, HSBC respectfully requests that this Court grant its Motion for Summary Judgment and its Motion to Strike Polaris' Parol and Other Extrinsic Evidence.

Dated:  July 8, 2008

                                                                    /s/ Linda K. Stevens
                                                                Ronald S. Safer
                                                                Linda K. Stevens
                                                                SCHIFF HARDIN LLP
                                                                6600 Sears Tower
                                                                Chicago, Illinois  60606
                                                                312-258-5500

                                                                Drahcir M. Smith
                                                                SCHIFF HARDIN LLP
                                                                1201 West Peachtree Street
                                                                Atlanta, Georgia  30309
                                                                404-437-7000

                                                                Attorneys for Defendant
                                                                HSBC BANK NEVADA, N.A.

CH2\2586450.2

---

do so. Mr. Jackson also describes how and why certain draft language was left out of the parties' Agreement during the negotiation process. Ex. A, ¶5.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| POLARIS SALES INC., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 08 CV 1924 |
| | ) | |
| v. | ) | Judge Zagel |
| | ) | |
| HSBC BANK NEVADA, N.A., | ) | Magistrate Judge Mason |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF VICTOR L. JACKSON

VICTOR L. JACKSON, pursuant to 28 U.S.C. § 1746, declares as follows:

1.      I am Vice President of Client Development for HSBC Private Label Corporation, a servicing entity for HSBC Bank Nevada, N.A. ("HSBC").   In the summer of 2005, I was an account representative assigned by HSBC to the Polaris relationship, and I was involved in negotiating the August 2005 Revolving Program Agreement between HSBC and Polaris Sales Inc. ("Polaris").

2.      I have reviewed the Declaration of Kelly Clawson dated June 23, 2008. Ms. Clawson is correct that the parties renegotiated their arrangement in 2005.  At that time, the parties changed their relationship from a joint venture, in which both parties were involved in decisions regarding the issuance of credit under the StarCard revolving credit program, including credit criteria, to an arrangement whereby the joint venture was terminated, Polaris was to be in charge of and responsible for marketing and selling its products, and HSBC would be in charge of and responsible for the issuance of credit under the revolving program.   Under this new arrangement, Polaris would be compensated, not by sharing with HSBC the income derived from the issuance of credit, but by payments from HSBC based upon sales volume.

3.    Consequently, the fundamental goals and purpose of the parties' 2005 Program Agreement was to continue providing a private label credit card program for consumers purchasing products from Polaris' dealers, and to restructure that revolving program from a joint venture to a new arrangement under which Polaris would have control over the marketing and sales of products and HSBC would have control over the issuance of credit. It makes no sense to say that the agreement's purpose was to increase Polaris' sales. Because HSBC would bear all risk of credit loss under the parties' new arrangement, it certainly was not HSBC's goal to increase sales volume without regard for the appropriateness of the criteria used to evaluate credit applications. Once Polaris no longer shared in the credit risk, it received payment for all revolving credit sales up front, in full, and without regard to whether the consumer ever actually paid off the credit card bill. Polaris no longer had any reason to care about credit criteria; it would get paid regardless of the creditworthiness of the buyers to whom its dealers sold product. In contrast, when sales resulted in uncollectible debt, HSBC would suffer the loss. For this reason, HSBC was primarily concerned with extending credit to people who would make their payments, and the parties explicitly agreed to give, and the spirit and intention of the parties' agreement was to give, HSBC all rights to alter the criteria it would use in issuing that credit.

4.    Because HSBC has never viewed the purpose of the parties' agreement to be increasing product sales, HSBC never agreed to manage, and it never assured Polaris during negotiations that HSBC would manage, the credit criteria in a way that would increase sales volume.

5.    Ms. Clawson's affidavit is incomplete in its description of the negotiation of the parties' agreement. For example, although Ms. Clawson states that "The parties could not agree on the additional language" for section 4(f) of the Program Agreement, she does not reveal

the reason why the parties could not agree to include such language. At no time during the negotiations did anyone from Polaris indicate in any way that they believed HSBC's right to alter credit criteria to be limited in any way after December 31, 2005. There was no disagreement during the negotiations as to whether HSBC would have all rights to set and alter the credit criteria after December 31, 2005. Indeed, it was explicitly discussed and acknowledged during the negotiations that HSBC would have all such rights. Additional language was proposed for Section 4(f) of the Program Agreement so stating, but Polaris asked that this language not be included. The reason given by Polaris (through Kelly Clawson, its representative in the negotiations) for not wanting to include the additional language was that it would be redundant, and was therefore unnecessary, because the Program Agreement, the Dealer Agreement, and the parties' new arrangement was giving HSBC all control over credit criteria. Jay Mukherjee and I (who were on the call for HSBC) said we would agree to leave out the additional language and rely on the language already appearing in the Program Agreement and in the Dealer Agreement, as long as everyone agreed that that the existing language was sufficiently clear that HSBC did, in fact, have all rights to set and alter credit criteria, and Clawson expressly confirmed that this was so. We also discussed placing limits on HSBC's ability to alter credit criteria after the end of 2005 but Polaris ended up stating that this was unnecessary and that including such language was likely to prompt questions from Polaris' investors that it would have to answer, so that language, as well, was left out of the agreement.

6.      After the 2005 Program Agreement was signed, HSBC did not seek Polaris' approval for changes to credit criteria. Rather, it made several unilateral changes to those criteria, and Polaris acknowledged during several other conversations with me since

August of 2005 HSBC's right to alter the criteria, for example, asking whether HSBC would be

making alterations.

**I DECLARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT. EXECUTED THIS ⁊ᵗʰ DAY OF July 2008.**

Victor L. Jackson

CH2\2581212.1

-4-