# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

POLARIS SALES, INC.

      Plaintiff,

        v.

HSBC BANK NEVADA, N.A.,

      Defendant.

No. 08 C 1924
Judge James B. Zagel

## <u>MEMORANDUM OPINION AND ORDER</u>

Polaris Sales, Inc. ("Polaris") and HSBC Bank Nevada, N.A. ("HSBC") entered into an agreement for HSBC to provide revolving credit financing to eligible customers buying products from participating Polaris dealers. The dispute is over the meaning of the Revolving Program Agreement ("Agreement"). The contention is that HSBC altered, without right, the credit terms by which HSBC decides customer eligibility. HSBC asserts it did have the right.[1]

HSBC is a national bank located in Las Vegas, Nevada. It issues so-called Private Label credit cards to eligible consumers of retail products for companies like Polaris, which sells snowmobiles (enthusiastically praised along with their ATVs by several of my neighbors) and provides utility vehicles, all terrain vehicles, motorcycles and related products and services through a network of dealers.

On August 10, 2005, Polaris and HSBC entered the Agreement here for a private label credit card and debt cancellation program for eligible consumers.

---

[1] Polaris alleges breach of contract (Count I) and seeks declaratory judgment that HSBC must stick to its prior credit criteria (Count II). HSBC answered and filed a counterclaim for declaratory judgment that it can, under its contract, change credit criteria as it did and announced its intention to do so.

In this program, HSBC owns the accounts and bears the credit risk so it protects itself with criteria for those to whom it would extend credit. There were two provisions which addressed or restricted its freedom to set criteria. Through the end of 2005, HSBC agreed to use the credit score cutoff used just prior to the "January 2005 score cutoff adjustments." HSBC also agreed to discuss modifying credit criteria "if the dollar volume of Card Sales generated by the Revolving Program during any twelve-month period is less than $350,000 . . . ."

The Dealers themselves had to be individually accepted into the program. The "Dealer Revolving Agreement" provided that all applications for accounts "will be . . . approved or declined in accordance with . . . credit criteria . . . established from time to time by HSBC with HSBC having and retaining all rights to reject or accept . . . applications." The Agreement between Polaris and HSBC stated that the revolving credit program would operate "under the terms and conditions of agreements with dealers."

The Agreement itself did not say that accounts would be "approved or declined [under] credit criteria . . . [set by HSBC] from time to time."[2]

On January 25, 2008, HSBC (facing, it said, general deterioration in credit and financing markets and poorer performance in the revolving credit program) told Polaris it was tightening credit criteria. HSBC offered to discuss things Polaris might do to mitigate, in part, the stricter proposed criteria. HSBC also offered early termination of the Agreement so Polaris could shop for a better deal on revolving credit. Polaris, saying it was acting "under duress" accepted some of HSBC's offers.

---

[2] This is the reason why HSBC expressly argues for the Agreement to be read in light of its "spirit and intent." In this way, it cites to other provisions that expressly leave the setting of other terms and conditions to HSBC (in some cases, subject to advance notice.)

The new terms were effective March 1, 2008.[3]  A month later, Polaris sued, alleging breach of contract and requesting a declaratory judgment that HSBC's conduct violated the contract and that HSBC is contractually obligated to utilize the previous set of criteria in approving credit to be extended under the Agreement.  On May 1, 2008, HSBC filed its answer, additional defenses, and counterclaim.  On July 8, 2008 HSBC filed a motion for summary judgment on its counterclaim for a declaratory judgment that (1) HSBC has the right under the Agreement to alter the criteria it uses to approve credit to consumers; (2) HSBC had the right under the Agreement to make the changes to the criteria in January and March of 2008; (3) HSBC did not breach the Agreement by announcing its intention to tighten the criteria it uses or by making changes to those criteria; and (4) HSBC is not obliged under the Agreement to continue to provide financing based on the applicant approval rates and credit criteria used prior to March 1, 2008.

The standard for summary judgment is well-known and does not bear repeating since the 1986 trilogy of Supreme Court opinions.  *See e.g. Matsushita Elec. Indus. Co. V. Zenith Radio Corp.,* 475 U.S. 574 (1986) and its two successors in that October Term.  Contract interpretation cases are particularly, though not universally, suitable for summary judgment.  *Tingstol Co. V. Rainbow Sales, Inc.,* 218 F.3d 770 (7th Cir. 2000).

Nevada law governs the contract.  Nevada contract law, like the law of contracts elsewhere, adopts the rule that unambiguous contracts are enforced as written and parole evidence is not to be considered in deciding the meaning of terms.  *Kaldi v. Farmers Ins. Exch.,*

---

[3]  Generally speaking, the revolving program fee would no longer be paid, credit promotion discount fees would be reset, promotional APRs would be charged and the revision of credit cut-off scores would be mitigated.

21 P.3d 16, 21 (Nev. 2001).   The intent of parties is determined by the language of the contract alone.

HSBC argues for its right to change credit criteria after the initial months of the Agreement.  It reasons in this way:

HSBC assumed all credit risk and, while some unsophisticated lender might commit to accept such risk over several years without altering criteria by which it assumed new risk, an experienced lender like a bank would not do so.  If HSBC did not reserve the right to alter credit criteria, it would leave itself at the mercy of Polaris if it wished to change criteria in the face of significant deterioration in the economy.  Were this its only argument, HSBC, as it seems to recognize, would lose its motion.  If experienced lenders did not make unwise deals we would have no need for the FDIC and similar agencies.

In its further arguments, HSBC relies on the structure and language of the contract. While there is no explicit provision giving HSBC the right to change acceptable credit scores, there is one provision that does restrict a right to charge for a sharply limited period of time. This language is consistent with the proposition that Polaris and HSBC would ordinarily have the power to change criteria and what had to be made explicit was any limitation on the power.  That understanding is also consistent with the provision requiring discussion of changes if volume fell below (as it has not yet done) a certain limit.

There are other provisions requiring approval of Polaris for changes in a) the definition of "marketing expenses," b) the requirement that certain representatives be located in the United States, c) the duties of Polaris to promote the revolving program, d) the manner in which HSBC uses Polaris' name, logo and marks, e) the amount each contributes to a marketing budget, f) the

4

channels through which HSBC can offer debt cancellation to cardholders, and g) material changes in the debt cancellation program.

In short, the parties demonstrated the ability to provide for the required approval by Polaris of HSBC charges and never similarly provided for approval with respect to credit scores.

Lastly, there is an explicit retention of the right of HSBC to change credit criteria in the Dealer Revolving Agreement. The Agreement itself refers repeatedly to the Dealer Revolving Agreement. It is clear that the program contemplated by the Agreement can be executed only by dealers who are accepted into the program. The provisions of the Dealer Revolving Agreement are implicitly incorporated by reference into the Agreement.

Polaris does not, in my view, make a case that the Agreement is ambiguous. They rely, of course, on the absence of an explicit right to change credit scores and an explicit incorporation by reference of that right contained in the Dealer Revolving Agreement.[4]

What Polaris offers is the extrinsic evidence inadmissible in cases of unambiguous contracts. And, even as it stands, it does not help Polaris.

We are told that Polaris and HSBC had an earlier agreement in which they shared the credit risk. HSBC, in 2005, wanted to loosen credit criteria to increase sales volume and its income. Polaris, a risk sharer, preferred the more conservative approach. HSBC offered to pay

---

[4]  The Agreement states that Polaris is not generally subject to those agreements, but the clear meaning of this is that Polaris is not responsible for the failure of dealers or HSBC to honor their agreements with HSBC. But Section 20 does bind Polaris to provisions of the Dealer Revolving Agreement where the Agreement itself specifically provided. The Agreement does specifically provide that the credit would be provided to consumers under the terms of the Dealer Agreements.

Polaris a monthly amount based on sales volume and excuse Polaris from sharing risk.  This offer led to the Agreement at issue here.

In negotiations, there were conflicts over HSBC's right to change underwriting standards, and there was a stalemate.  The Agreement was arrived at only when HSBC told Polaris it should not worry because HSBC intended to administer the program in a manner to increase sales volume.[5]

A key part of the Polaris argument is that the sole purpose of the Agreement was to increase sales volume and anything that might be inconsistent with that purpose is out of bounds. The theory carries too far.  There are contracts to restrict sales volume, but this is not the usual course.  I have no difficulty concluding that the intent of both parties to the Agreement was to increase sales.  I do not think a rational finder of fact could conclude that there was a "meeting of the minds" on the proposition that HSBC, to increase sales volume, would be extending credit on the same terms through the years regardless of any changes in credit or financing markets.  The problem with the extraneous evidence in contract interpretation cases is that what Polaris calls the "negotiation and background of the agreement" extends to the entire "background" which

---

[5]  There is some level of incoherency in Polaris' argument.  Its objection to a change in the deal was that it feared using looser standards to increase volume because it shared the credit risk.  It is rational for Polaris to lose its fear of looser standards under the new arrangement.  But, it is difficult to conceive that they believe that HSBC intended to restrict, generally, its right to revise credit criteria for several years to follow.  Indeed, the only thing HSBC agreed to do if sales volume fell (because of changes, say, in credit underwriting) was "to meet to discuss" changes.  HSBC agreed to no other restriction.  Polaris says that this clause was also addressed to the HSBC concern that Polaris could try to shift customers to Polaris' installment retail financing program in which HSBC played no part.  I assume, arguendo, this is true, but I do not see why this fact necessarily supports Polaris' argument.  If Polaris could, as it seems to say, shift income from HSBC to a non-HSBC program, then Polaris had leverage to use against HSBC's over-tightening of credit.

includes here both standard practices in the industry and the economics of credit in a national

economy.  I note this, not because there is evidence presented by HSBC on this point, but

because it tends to show why courts adhere generally to rules which enforce contracts as written

and to demonstrate how unpromising is the position Polaris adopts.

I note, too, that an affidavit filed by HSBC contradicts important elements of Polaris'

account of negotiations.

The Agreement is not ambiguous and, under its explicit and implied terms, HSBC can

change credit criteria which authority is not inconsistent with the purpose of the Agreement.  I,

therefore, strike Polaris' parol and extrinsic evidence.

This leaves only the claim of Polaris that HSBC breached the implied covenant of good

faith and fair dealing, which in Nevada and elsewhere is read into all contracts.  *Hilton Hotels*

*Corp. V. Butch Lewis Productions, Inc.*, 862 P.2d 1207, 1209 (Nev. 1993).  The claim, though, is

conclusory.  It amounts to nothing more than an assertion that Polaris disagrees with what HSBC

did because it meant Polaris would make less money and therefore HSBC acted in bad faith.

Courts have recognized that a simple assertion of bad faith or unfair dealing should not preclude

summary judgment on unambiguous contracts.  Such a result would impair the efficacy of

contracts.  To justify this conclusion, Polaris notes that HSBC did not provide "factual

information for the supposed need for changes" and that HSBC gave Polaris too short a time to

allow Polaris to "readily [secure] an alternative revolving credit source."

The covenant of good faith and fair dealing cannot be used to defeat (or delay, for that

matter) the exercise of a right expressly granted to one party.  *Kaldi, supra,* 21 P.3d at 277, says

so as do other leading cases.  *See Moreau v. Air France,* 356 F.3d 942, 954 (9th Cir. 2004).  So

summary judgment can be had. *LaForge v. State, Univ., and Cmty. Coll.Sys. of Nev.*, 997 P.2d 130, 135 (Nev. 2000).

The fact that HSBC warned Polaris about its perceived need for change is not suggestive of bad faith;[6] it suggests the opposite, since notice of change and discussion was not required (unless volume fell below a certain level, which it had not).

HSBC's motion for summary judgment is granted.

ENTER:

James B. Zagel
United States District Judge

DATE:  August 13, 2008

---

[6]  The statement that the time period of four or five weeks was too short to allow Polaris to readily secure an alternate source is of no legal significance, because the Agreement did not require that HSBC provide a transition period.  Even if it did, there is no evidence that there existed in early 2008 any desirable alternative to HSBC's program.

8